

# Master Service Agreement

This Agreement, entered into on the 31 December 2014 (the "Effective Date") is by and between Tris Pharma, Inc. whose administrative office is at 2033 Route 130, Suite D, Monmouth Junction, New Jersey 08852 (hereinafter referred to as "Tris") and **Pharma Medica Research Inc.** [whose primary office is at **6100 Belgrave Road, Mississauga, Ontario, L5R 0B7** (hereinafter referred to as "CRO").

## 1. **Definitions**

1.1.  "Affiliate" means, with respect to a party to this Agreement, any corporation, association, or other entity that, directly or indirectly, owns, is owned by, or under common ownership with such party either currently or during the term of this Agreement. For purposes of this definition, the terms "owns," "owned," or "ownership" mean the direct or indirect possession of more than fifty percent (50%) of the voting securities, income interest, or a comparable equity in such business entity. The term "Affiliates" shall mean the plural of Affiliate.

1.2.  "Agreement" means this Master Service Agreement, between Tris and CRO.

1.3.  "C.F.R." means the United States Code of Federal Regulations.

1.4.  "Clinical Trial" means a pre-clinical or clinical research study with regard to a pharmaceutical product, conducted by Tris in accordance with the Protocol.

1.5.  "Confidential Information" means any and all information (including without limitation, the Information and the terms of this Agreement and each PSA and the fact that Tris has engaged CRO), which is now or at any time hereafter in the possession of CRO and which has been or hereafter is disclosed (whether orally or in any material form) by or on behalf of Tris to CRO or of which CRO becomes aware in connection with this Agreement or any PSA, including, without limitation, Intellectual Property Rights of Tris, information relating to the Services, the Materials, the Protocol, data, databases, know-how, formulae, processes, designs, photographs, drawings, specifications, prices, results, software programs and samples, any analysis, compilations, studies or other documents or records prepared based on Confidential Information, and any other material bearing or incorporating any information relating to Tris' business, business affairs, products, employees, consultants, contractors and marketing information; provided, however, that "Confidential Information" shall not include any information (a) which the CRO proves by documentary evidence was already in its possession prior to it being furnished by or on behalf of Tris; (b) which is or becomes generally available to the public through no fault or omission on the CRO's part; or (c) to the extent it is required to be disclosed by law and/or regulatory authority (provided that CRO complies with the provisions of Section 9.3).

1.6.  "FDA" means the U.S. Food and Drug Administration.



1.7.    "Force Majeure" shall have the meaning provided in Section 13.1.

1.8.    "Good Clinical Practice"' means the international recognized ethical and scientific quality requirements as laid down in the International Conference on Harmonisation (ICH) Note for Guidance on Good Clinical Practice (GCP) (CPMP/ICH/135/95), which must be observed for designing, conducting, recording and reporting clinical trials that involve the participation of human subjects.

1.9.    "Good Laboratory Practices" means current Good Laboratory Practices (a) as promulgated under 21 C.F.R. Part 58, as the same may be amended or re-enacted from time to time, and (b) as required by law in countries other than the United States where non-clinical laboratory studies are conducted.

1.10.   "Information" means any and all data, information and Materials, relating or referring to Tris' projects, products or business including but not limited to, the Materials, the Protocols, any methodology, trade secrets, know-how, Intellectual Property Rights, drug product candidates, compounds, chemical structures, results or reports in written, electronic or other form disclosed to CRO in connection with this Agreement or to which CRO will be provided direct or indirect access under or pursuant to this Agreement, or which is generated by or on behalf of CRO in connection with this Agreement (including, without limitation, the PSA(s)).

1.11.   "Intellectual Property Rights" means any and all intellectual property rights (whether applied for, issued, registered or unregistered), including patents, patent-applications, know-how, trade marks, design rights , utility models, applications for and rights to apply for any of the same, rights to prevent passing off, copyright, database rights, topography rights and any other rights in any invention, discovery or process in any jurisdiction in the world.

1.12.   "Materials" means Tris' drug product candidates  as referred to in the Protocol and provided to CRO to enable it to perform the Services.

1.13.   "Pass Through Expenses" shall have the meaning provided in Section 2.1.

1.14.   "Protocols" means the clinical trial protocols and other protocols if required, describing the objective(s), design, methodology, statistical considerations and organization of the Clinical Trials, and other studies to be conducted under this Agreement and the PSA(s).

1.15.   "PSA" means Project-Specific Addendum, a document which contains detailed project specific requirements for the Services contracted to CRO.

1.16.   "Services" means pre-clinical and clinical trial and related services, as further specified in the PSAs negotiated and executed by the parties and incorporated into this Agreement.

1.17.   "Work Product" means the results of the Services performed by CRO (or its Affiliates or third parties approved in writing by Tris) under a PSA, as more particularly described in such PSA, including, without limitation, reports, analysis, data, findings, summaries and documentation.



2. **Services**

2.1. This Agreement forms the basis for a working relationship between Tris and CRO. This Agreement covers the provision of Services by CRO and, subject to Section 2.5, CRO's Affiliates and, accordingly, this Agreement represents a vehicle by which Tris can efficiently contract with CRO and its Affiliates for a broad range of Services. The specific details of any Services under this Agreement shall be separately negotiated and specified in writing in the form of a PSA duly executed by each of Tris and CRO. Each PSA will include, as appropriate, the specific tasks and Work Product comprising the Services to be provided, the responsibilities of the parties, time line, milestones, budget, amount and nature of Pass Through Expenses and payment schedule. Each PSA shall be subject to all of the terms and conditions of this Agreement, in addition to the specific details set forth in the PSA. Without limiting the foregoing, each PSA will specify CRO's Pass Through Expenses, if any, to be reimbursed by Tris in connection with the Services to be provided pursuant to such PSA. For purposes hereof, "Pass Through Expenses" shall mean (i) CRO's out-of-pocket costs of travel, lodging and mileage, and (ii) CRO's out-of-pocket costs payable to any third party retained or otherwise engaged by CRO (subject to the requirements of Section 2.6 hereof) to provide assistances in providing the Services under a PSA. Upon Tris' request, CRO will provide reasonable documentation evidencing such Pass Through Expenses and, in the case of any travel, lodging or mileage expense exceeding $500 in any instance, shall obtain Tris' prior written consent before incurring such expense.

2.2. Pursuant to the terms and conditions of this Agreement, CRO will provide Tris with the Services described in the PSA(s) in accordance with the specifications, documentation and Protocols described in or appended as an exhibit or addendum to the PSA, Good Clinical Practices, Good Laboratory Practices, procedures approved by Tris, and other written instructions provided by Tris. CRO will provide written status reports and other information to Tris with respect to the Services under each PSA with such frequency and containing such content as agreed by the parties and specified in each PSA, or as reasonably requested by Tris. Tris may review or request copies of data derived from the Services at any time. CRO will maintain complete and up-to-date records as required herein and by applicable laws and regulations. Where CRO is required pursuant to this Agreement to provide reports to Tris in hard-copy format, CRO, upon request of Tris, shall provide to Tris at no additional cost any such report in an electronic format to be mutually agreed by the parties. Without limiting TRIS' other rights or remedies under this Agreement or otherwise, CRO agrees that in the event the FDA or other regulatory agency determines, after its review of the information and data generated from the Services in connection with any PSA, that there were deficiences of a technical or regulatory nature, that CRO shall, promptly upon TRIS' request, and at no additional cost and expense to TRIS, assist TRIS in rectifying such deficiencies (including, performing such activities ("Remedial Activities") reasonably requested by TRIS to address such deficiencies). It being understood and agreed by the CRO that such deficiencies (with respect to which such assistance by the CRO may be so requested) may include, without limitation the following: (i) the data that was included in the filing with the FDA or other regulatory agency needs to be re-presented in another manner (in which case, at TRIS' request, Remedial Activites shall include re-presenting such data); (ii) a parameter that

was monitored in the Services rendered with respect to such PSA but was not included in the data and other information filed with the FDA or other regulatory agency (in which case, at TRIS' request, Remedial Activities shall include appropriately revising the information and data, to be included in a filing with the FDA or other regulatory agency, as applicable, to track such parameter); or (iii) additional statistical analysis requested by FDA or other regulatory agency based on reviewed data and other information filed with the FDA or other regulatory agency is needed (in which case, at TRIS' request, Remedial Activites shall include performing such statistical analysis and providing the data and information from such analysis in an appropriate manner to be included in a filing with the FDA or other regulatory agency, as applicable);

2.3.   All PSAs and other exhibits hereto or thereto shall be deemed to be incorporated herein by reference.

2.4.   To the extent any terms or provisions of a PSA conflict with the terms and provisions of this Agreement, the terms and provisions of this Agreement shall control, except to the extent that the applicable PSA expressly and specifically states that the terms of the PSA shall supersede this Agreement on a specific matter.

2.5.   Tris and CRO agree that:

(a)   CRO may use the services of its Affiliates to fulfill CRO's obligations under this Agreement and any PSA. Prior to the use of any Affiliate in the performance of the Services, CRO shall provide Tris with prior written notice identifying such Affiliate. The use of any CRO Affiliate shall not lessen or otherwise impair CRO's obligations under this Agreement, it being the intention of the parties that CRO shall remain primarily responsible for its obligations under this Agreement. The use by CRO of any Affiliate will not increase the fees or expenses otherwise payable by Tris under any PSA. Any Affiliate so used shall be subject to all of the terms and conditions applicable to CRO under this Agreement and any PSA, and be entitled to all rights and protections afforded CRO under this Agreement and any PSA.

(b)   Any Affiliate of CRO may execute a PSA directly.

2.6.   Upon Tris' prior written consent, CRO may use subcontractors to perform part of the Services under any PSA, provided that the subcontractor agrees in writing (a "Subcontractor Agreement") to be bound by the terms regarding maintaining the confidentiality of proprietary information, that are no less stringent than those contained in this Agreement and regarding ownership of Intellectual Property Rights that are consistent with those contained in this Agreement. The form and content of any Subcontractor Agreement shall be subject to Tris' prior written approval. CRO shall be responsible for the diligent selection, instruction and supervision of subcontractors. CRO shall be wholly responsible for paying the subcontractor(s) at its own expense and for the Work Product of such subcontractors.

Tris acknowledges and agrees that CRO may subcontract the clinical research component of the services under this agreement to an affiliate, Pharma Medica Research, Inc., a



Missouri corporation, 400 Fountain Lakes Boulevard, St. Charles, Missouri 63301 ("PMRI-U.S."), and CRO shall notify Tris if such subcontract is entered into.  PMRI-U.S. shall be subject to and bound by all terms and conditions set forth in this agreement.

2.7. Tris will provide CRO with the Materials, documents and information necessary for the conduct of the Services.  Tris shall provide CRO with all information available to it regarding known or potential hazards associated with the use of any Materials supplied to CRO by Tris, and Tris shall comply with all current legislation and regulations concerning the shipment (by any means) of substances.  CRO agrees that:  (a) it will use the Materials solely and exclusively in performing Services in accordance and compliance with the specific applicable Protocol, this Agreement and any other written instructions from Tris; (b) it will in no way chemically, physically or otherwise alter the Materials; (c) it accepts the Materials with the understanding that their hazardous and toxicological properties may not be completely investigated and therefore may not be fully understood, and will handle the Materials accordingly and will inform Tris in writing of any adverse effect experienced by persons handling the Materials and/or person to whom Materials are administered; (d) it will at all times handle and store Materials in strict compliance with all product labeling and all applicable national, federal, state, provincial, municipal and local laws, statutes, rules, regulations, decrees, orders and ordinances; and (e) it will maintain complete and accurate inventory records of the Materials, including, without limitation, full accounting and documentation of all Materials utilization, in such format required by Tris, and shall promptly supply Tris with copies thereof upon request by Tris.

2.8. CRO shall not be liable to Tris nor be deemed to have breached this Agreement for errors, delays or other consequences arising from Tris' material failure to timely provide documents, Materials or information or to otherwise cooperate with CRO in order for CRO to timely and properly perform its obligations, and any such failure by Tris shall automatically extend any timelines affected by a time period reasonably commensurate to take into account such failure, unless Tris agrees in writing to pay any additional costs that would be required to meet the original timeline.

2.9. CRO agrees to perform the Services under the general direction of Tris' designated representative.

2.10. Any regulatory obligation assigned by Tris to CRO must be described in writing in the relevant PSA. Any obligations not specifically transferred will be deemed not to have been transferred and will remain the regulatory responsibility of Tris. Any transfer of regulatory obligations will be filed by Tris with the FDA or other applicable regulatory authority as required by law or regulation.

2.11. The CRO personnel assigned to provide the Services described in a particular PSA shall be described in such PSA and shall be acceptable to and approved by Tris prior to the commencement of such Services.  CRO agrees to use commercial diligence to ensure the continuity of CRO personnel assigned to provide Services under any PSA.  CRO reserves the right to change any assigned personnel provided that (i) ten (10) days' prior written



notice of such proposed change is given to Tris, and (ii) personnel proposed by CRO for replacement shall have substantially equivalent qualifications as the personnel being replaced. In the event Tris shall object to any replacement personnel, CRO shall use diligent efforts to provide substitute personnel acceptable to Tris. Tris shall also have the right to request removal of certain CRO personnel from a project under a PSA based on reasonable, non-discriminatory, performance-related causes. Tris shall promptly notify CRO of any concerns regarding specific CRO personnel and the parties shall work together to address the issues surrounding specific CRO personnel and actions to be taken.

2.12.   Upon completion of the Services to be provided by CRO under a PSA, or at such other time intervals as shall be specified in a PSA, CRO shall deliver to Tris the Work Product for review. Tris shall have forty-five (45) days from receipt of the Work Product to confirm that such Work Product satisfies, in form and substance, the requirements of the PSA. In the absence of written notice to the contrary provided by Tris to CRO within such forty-five (45) day period, Tris will be deemed to have accepted such Work Product. Alternatively, if Tris provides written notice objecting to all or any portion of such Work Product, CRO will exercise commercially diligent efforts to promptly revise such Work Product so that it complies with requirements of the PSA. If CRO disputes Tris' determination that any or all such Work Product fails to comply with the requirements of the applicable PSA, such dispute shall be resolved pursuant to the dispute resolution provisions of Section 14 hereof. Notwithstanding anything to the contrary contained in Section 3, Tris' payment obligations under a PSA shall be suspended to the extent of the service fees and Pass Through Expenses attributable to the disputed Work Product until resolved in accordance with Section 14. The portion of CRO's invoice unrelated to the disputed Work Product will be paid in accordance with the procedures set forth in Section 3 below.

## 3.   **Payment**

3.1.   Tris will pay CRO for performance of Services as agreed in each PSA.

3.2.   Unless agreed otherwise in the PSA, CRO will submit an electronic invoice to Tris within 15 days after the end of each month in which Services were performed for Tris. Such invoices will separately itemize, on a PSA-by-PSA basis, the name of the CRO employee providing any Service, his/her title, a detailed description of the Services provided by each CRO employee and the total number of hours and/or days spent in the performance of Services under a PSA, together with separate itemization of any related Pass Through Expenses incurred by CRO during the month.

3.3.   Unless otherwise provided in the PSA, payment is due from Tris within [thirty (30)] calendar days from Tris' receipt of an invoice. Without limiting Section 2.12 above, if Tris has any valid reason for disputing any part of the invoice supplied by CRO it will notify CRO within thirty (30) calendar days of receipt by Tris. Any dispute relating to a CRO invoice will be resolved in accordance with Section 14 hereof. The portion of CRO's invoice, which is not in dispute, will be paid in accordance with the procedures set forth herein. In the event that the undisputed portion of any such invoice is outstanding for more than thirty (30) calendar days from Tris' receipt of an invoice, CRO



reserves the right to suspend further Services related to the applicable PSA, upon giving Tris at least twenty (20) "Business Days" written notice, until such time as Tris has paid the undisputed portion of the outstanding invoice. A "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York, USA are authorized or required by law to close. For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Agreement, any portion of an invoice with respect to which an objection has been raised within the forty-five (45) day period referred to in Section 2.12 (even though such objection may have been raised more than thirty (30) calendar days after Tris' receipt of such invoice) shall be deemed a disputed portion of an invoice and there shall be no right to suspend further Services as a result of such non-payment. In the event that, at the time of shipment of the final report, any undisputed amount remains unpaid for more than thirty (30) calendar days after Tris' receipt of the applicable invoice, CRO reserves the right to withhold shipment of the final report until such amount is paid.

3.4.    Changes in scope may be incorporated into the PSA upon the written consent of both parties provided that both parties agree on any additional Service fees and Pass Through Expenses, if any, associated with the performance of the changed Services. Any changes in the scope of a PSA affecting the regulatory obligations to be transferred to and performed by CRO will also be documented in writing and agreed by both parties. If required, Tris will also file a corresponding amendment to any documents filed with the FDA or other applicable regulatory authority as described in section 2.10 above, or as required by law or regulation relating to any changes in CRO's regulatory obligations. Notwithstanding the foregoing, Tris may require the suspension of Services relating to a project with respect to a PSA if Tris, in the exercise of its reasonable scientific judgment, determines that the safety and/or efficacy data, or regulatory requirements relating to such project or PSA impair the development or marketing of the products underlying such project or PSA. Both parties agree to act reasonably, in good faith, and promptly when Tris shall have delivered a written request to CRO requiring that such project be suspended, and shall discuss in good faith the duration of such suspension and the impact on budgets, resourcing related to such project and the completion of the project. Tris' right of suspension as provided in this Section 3.4 shall not impair or otherwise diminish Tris' right of termination as provided in Article 5 hereof.

3.5.    Unless otherwise specified in a PSA, the currency to be used for invoice and payment will be US Dollars (the "Contracted Currency"). For PSAs that involve the performance of Services or incurrence of expenses by CRO in any countries that use currencies other than the Contracted Currency then a currency exchange provision may be included in the PSA.

3.6.    Taxes (and any penalties thereon) imposed upon any payment by Tris to CRO shall be the responsibility of CRO.

3.7.    The total amount payable by Tris to CRO with respect to each project under a PSA shall not exceed the amounts set forth in the applicable PSA without the prior written consent of Tris.



3.8.   CRO shall make and keep written records of all Services performed and expenses incurred under this Agreement sufficient for the purpose of determining that the Services were performed in accordance with this Agreement and any PSA.  Such records shall include supporting documentation of any costs or expenses incurred by CRO and charged to Tris and CRO shall preserve all such records until at least five (5) years after the work is completed under the particular PSA.  During the term of this Agreement and for two years thereafter, Tris or its agent shall have the right at its own expense and upon reasonable advance notice to CRO to inspect, copy and/or have copied such financial records during CRO's regular business hours.  If during the inspection of such records, Tris determines that it overpaid amounts for Services provided under any PSA, CRO shall refund such overpayment plus any agency and collection fees incurred by Tris.

## 4.   **Period of the Agreement**

4.1.   This Agreement shall take effect on the Effective Date and shall continue until terminated in accordance with Section 5.

## 5.   **Termination**

5.1.   This Agreement or any PSA may be terminated as follows: .

(a)   By Tris at any time during the term of the Agreement or any PSA, for any reason or no reason, on not less than thirty (30) days prior written notice to CRO;

(b)   By either party by giving thirty (30) days' written notice to the other party if that party commits a material breach of this Agreement or an individual PSA and, if the breach is capable of remedy, it has not been remedied within thirty (30) days of written notice having been served on the breaching party notifying it of the breach and requiring its remedy;

(c)   By Tris immediately upon written notice to CRO if Tris, in the exercise of its reasonable scientific judgment, determines that the safety and/or efficacy data, or regulatory requirements relating to a PSA impair the development, receipt of regulatory approval for or marketing of the product candidate underlying the PSA;

(d)   By Tris by giving written notice to the other party of the effective date of such termination in the event that Tris determines, in its sole discretion, that the continued performance of the Services contemplated by this Agreement or a PSA would constitute a potential or actual violation of regulatory or scientific standard of integrity (unrelated to a breach of such party's obligations under this Agreement or a PSA);

(e)   By either party upon written notice to the other in the event the other party shall file in any court or agency pursuant to any stature or regulation, a petition in bankruptcy or insolvency or reorganization or for the appointment or receipt of a receiver or trustee of such party or of its assets, or if the other party shall be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition is not dismissed within sixty (60) days after the filing thereof, or if the other party shall propose or be a party to



any dissolution or liquidation, or if the other party shall make an assignment for the benefit of creditors; or

(f)     Upon written notice to the other party that is failing to comply with its obligations as a result of Force Majeure, as provided in Section 13.2.

Any written termination notice shall identify the specific PSA or PSAs that are being terminated or whether the termination relates to this Agreement, and concomitantly, all PSAs.   Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, CRO, in exercising its rights pursuant to Section 5.1(b) shall only be entitled to terminate the PSA to which the breach relates and not this entire Agreement.

5.2.     If this Agreement or any PSA is terminated:

(a)     Upon receipt of a termination notice, CRO will immediately cease performing any Services under the PSA(s) so terminated, except to the extent reasonably required to safely close out the projects with respect to such PSA(s), as mutually agreed in writing by Tris and CRO.   CRO agrees to cooperate with Tris to provide an orderly wind-down of the Services provided for Tris under such PSA(s) and/or this Agreement, as applicable, and at Tris' written request, to promptly assign to Tris or its designee any subcontracts or other arrangements which CRO may have entered into in connection with the Services related to the terminated PSA(s) or this Agreement, as applicable, and, if requested by Tris, to cooperate with Tris in good faith to facilitate the transition of such subcontracts or arrangements. CRO shall use all reasonable efforts to minimize service fees and expenses and conclude or transfer the projects under the terminated PSA(s).

(b)     Tris shall pay CRO for all Services performed in accordance with this Agreement and any applicable PSA up to the date of termination  and reimburse CRO for the Pass Through Expenses reasonably incurred in performing those Services, including all non-cancellable out-of-pocket costs reasonably incurred as of the date of the notice of termination and any additional cancellation fees that are explicitly agreed by parties and are reduced to writing by both parties in the PSA.

(c)     If payments are unit or milestone based, and the Agreement or a PSA is terminated after costs have been incurred toward achieving portions of one or more incomplete units or milestones, Tris will pay CRO's standard fees for actual work performed toward those incomplete units or milestones up to the date of termination.  Any milestone payments made by Tris prior to the date of termination will be credited against the amount due to CRO for the actual work performed under a PSA.

(d)     Tris shall pay for all actual costs, including time spent by CRO personnel (which shall be billed at CRO's hourly and/or daily rates as provided in the applicable PSA, or if not so provided, at CRO's standard hourly and/or daily rates in effect as of the date of the termination notice), incurred to complete activities associated with the termination and close-out of affected Services, as required by applicable regulatory requirements.



(e)     In the event of cancellation or termination of this Agreement or any PSA, the excess of any amount of money for the relevant PSA(s) that had previously been paid by Tris to CRO shall forthwith be refunded to Tris less the amount of other payments, if any, for other Services under other PSA(s) that may be due to CRO.

5.3.    Both parties agree that termination of a PSA shall not constitute termination of this Agreement. However, if this Agreement is terminated, all PSAs in existence at the date of termination shall also terminate unless the parties agree in writing otherwise.

5.4.    In the event of termination of this Agreement or a PSA for any reason (including, without limitation, the completion of all Services under a PSA), at Tris' written request, CRO shall promptly return to Tris all Confidential Information and Materials provided to CRO or generated by CRO in connection with the provision of the Services and shall also cooperate with and assist Tris in the transition/transfer of any databases with Tris' information to Tris or Tris' designee. Not later than thirty (30) days following, and in accordance with, Tris' written request, CRO shall deliver to Tris all statistical data, all statistical reports, all data entries and all the documentation, reports, findings and/or other materials produced as a result of the Services performed by CRO under the terminated PSA(s) (and shall remove all digital representations thereof in any form from all electronic storage media in CRO's possession or under its control), as well as any remaining Materials related to such PSA(s) (except to the extent such Materials are destroyed in accordance with Tris' written instructions). On termination of this Agreement for any reason, and after the delivery of all such Confidential Information, Materials, statistical reports, data entries and all such other documentation, reports and findings produced as a result of the Services performed by CRO under the terminated PSA(s), in accordance with Tris' written request as aforesaid, CRO shall only retain, at its own cost and expense and subject to the confidentiality provisions of this Agreement, any Information to the extent and for the duration required by any applicable law and regulatory requirements. Before destroying any Information or other materials generated in connection with Services, CRO agrees to provide written notice to Tris in accordance with the terms and provisions of Article 15, and shall continue to store such Information and materials in accordance with said Article 15 except to the extent Tris provides written instructions to the contrary.

## 6.     **Warranties**

6.1.    CRO warrants and agrees that:

(a)     the Services will be performed in accordance with (i) Good Clinical Practices, (ii) Good Laboratory Practices, (iii) the standard of care usually and reasonably expected in the performance of such Services and (iv) applicable laws, rules and regulations, including, without, limitation, the Federal Food, Drug and Cosmetic Act;

(b)     the Services and Work Product under each PSA will be correct in all material respects;

(c)     CRO has, and will have at all times while this Agreement is in effect, the capability, personnel, facilities, resources, financial ability, experience and expertise to,



fulfill its obligations hereunder and perform the Services described in each PSA, in a professional manner, with such diligence and care as is customary in the provision of contract research services of the type provided in each such PSA, without infringing third-party intellectual property rights, and in accordance with the Protocols, Good Clinical Practices, Good Laboratory Practices and all applicable laws, regulations and guidelines;

(d)     CRO is duly organized, validly existing and in good standing in the state of its jurisdiction of organization;

(e)     CRO has the appropriate power and authority to carry out the terms of this Agreement;

(f)     CRO shall use commercially reasonable efforts in meeting the timelines and milestones relating to the Services as set forth in a PSA; and

(g)     CRO has not been debarred under the Generic Drug Enforcement Act or other similar law and it will not knowingly employ any person or entity that has been so debarred to perform any of the Services under this Agreement or any PSA.   In the event that CRO becomes aware of, or receives notice that, any individual, corporation, partnership or association providing services to CRO which relate to the Services being provided under this Agreement or any PSA has ben debarred, CRO agrees to notify Tris immediately and address the issue as directed by Tris.

6.2.    Tris warrants that: (a) it is the legal and beneficial owner and has full title and interest in the Protocols and to the Materials, or is otherwise licensed to use the Protocols and Materials, and that CRO's performance of its obligations under this Agreement, provided they are undertaken in accordance with this Agreement and the applicable Protocols, and CRO's use or possession of the Materials for the purposes of this Agreement, will not infringe the rights (including the Intellectual Property Rights) of any third party; and (b) Tris is duly organized, validly existing and in good standing in the state of its jurisdiction or organization.

## 7.     **Liabilities and Indemnities**

7.1.    Neither party shall have any liability (including without limitation, contract, negligence and tort liability) for any loss of profits, opportunities or goodwill or any type of indirect or consequential damages in connection with this Agreement or any PSA, except to the extent of such damages payable to a third party as part of a third party claim for which a party has an indemnification obligation under this Article 7.

7.2.    Tris shall indemnify, defend and hold harmless CRO and its Affiliates, and its and their directors, officers, employees and agents from and against any and all losses, damages, liabilities, reasonable attorney fees, court costs, and expenses (collectively "Losses"), joint or several, resulting or arising from any third-party claims, actions, proceedings, investigations or litigation resulting or arising from: (i)   Tris' negligence, willful misconduct or breach of the terms of this Agreement; and (ii) bodily injury or death



caused by the administration of the Materials provided by Tris solely in accordance with the provisions of this Agreement and the applicable PSA, Protocols and written instructions of Tris concerning administration or use of such Materials; provided, however, that Tris shall have no such indemnification obligation to the extent CRO is required to indemnify Tris pursuant to Section 7.3.

7.3.    CRO shall indemnify, defend and hold harmless Tris and its Affiliates, and its and their directors, officers, employees and agents from and against any and all losses, damages, liabilities, reasonable attorney fees, court costs, and expenses (collectively "Losses"), joint or several, resulting or arising from (i) the breach or inaccuracy of any representations or warranties made by or, covenants of, CRO in this Agreement or any PSA, (ii) the negligence, gross negligence or wilful misconduct of CRO or its Affiliates or any their agents, directors, officers or employees, (iii) claims by CRO's or any of its Affiliates' or agent's employees or invitees on their premises, or premises under their control, who are exposed to hazardous conditions as a result of a failure to provide for or comply with the industry standard for the handling of materials and safety hazards disclosed by Tris in writing, (iv) the failure of CRO or any of its Affiliates or their agents, directors, officers or employees to comply with any applicable national, federal, state, provincial, local or municipal laws, statutes, rules, regulations, decrees, orders or ordinances, or the requirements of the terms of this Agreement, or (v) any alleged patent, trademark or Intellectual Property infringement as a result of any technology or methodology provided by or utilized by CRO or its Affiliates, or any of their agents, directors, officers or employees in the performance of the Services.

7.4.    Upon receipt of notice of any claim or lawsuit (a "Claim"), which may give rise to a right of indemnity from the other party hereto, the party seeking indemnification (the "Indemnified Party" shall promptly give written notice thereof to the other party (the "Indemnifying Party") of such a Claim for indemnity.  Promptly after a Claim is made for which the Indemnified Party seeks indemnity, the Indemnified Party shall permit the Indemnifying Party, at its own option and expense, to assume and have sole control of the defense of such Claim; provided, however, that an Indemnified Party shall have the right to participate therein, subject to control of the Indemnifying Party, by retaining its own separate legal counsel at its own expense.  The Indemnifying Party shall keep the Indemnified Party informed as to the progress of its defense of any such Claim and shall not compromise or otherwise settle any such Claim without the Indemnified Party's prior written consent, which consent shall not be unreasonably withheld or delayed.  The Indemnified Party shall reasonably cooperate in the investigation, defense and settlement of such Claim.   Notwithstanding anything else to the contrary contained herein, the failure of the Indemnified Party to promptly notify the Indemnifying Party of any Claim for which it seeks indemnification under this Agreement, will not relieve the Indemnifying Party of its indemnification obligations unless the Indemnifying Party is materially prejudiced by such failure to provide notice.

**8.**    **Inventions and Proprietary Information**

8.1.    CRO agrees:



(a)     to, and to cause its Affiliates and any of CRO's or its Affiliates' officers, directors, employees, agents, representatives and subcontractors, to disclose and assign to Tris, as its exclusive property, all data and Intellectual Property Rights which CRO or any of its Affiliates or their officers, directors, employees, agents, representatives or subcontractors, creates, develops or conceives, solely or in conjunction with others (1) that are based on or involve any Confidential Information or other Information of Tris, (2) that relate to, constitute, result from, or include the work in which CRO or its Affiliates (or any their officers, directors, employees, agents, representatives or subcontractors) will be engaged for Tris (including, without limitation, pursuant to this Agreement or any PSA), or (3) that are otherwise made through the use of any time, facilities or Materials of Tris;

(b)     that all Work Product developed by CRO or any of its Affiliates (or any of their officers, directors, employees, agents, representatives and subcontractors) in the performance of Services (including any documentation produced and/or Intellectual Property Rights created or developed) under this Agreement or any PSA shall be deemed works made for hire, and shall belong fully and exclusively to Tris. If by operation of law such Work Product are not works made for hire, CRO agrees to, and does hereby, assign to Tris all right, title, and interest in such Work Product, including all patents and copyrights therein, and including all rights therein of CRO's Affiliates and CRO's and its Affiliates directors, employees, agents, representatives and subcontractors;

(c)     that at all times it will have agreements with its Affiliates, and its and its Affiliates' officers, directors, employees, agents, representatives and subcontractors, to effectuate the terms of this Section 8.1 and shall enforce such agreements to provide Tris with the benefit of this Section 8.1. At Tris' request, CRO will provide Tris with copies of such agreements;

(d)     to execute all documents and provide Tris proper assistance as requested by Tris to enable patent, copyright or other legal protections to be obtained by Tris for any such inventions or innovations as described in paragraph 8.1(a) and (b), and to make and maintain reasonably detailed accurate records of any such inventions or innovations; and

(e)     not to utilize in the performance of Services for Tris any proprietary or confidential information, including, without limitation, Intellectual Property Rights of others or any inventions of CRO, which are not included within the scope of this Agreement.

8.2.    Notwithstanding the foregoing, Tris acknowledges that CRO possesses certain inventions, processes, know-how, trade secrets, improvements, other intellectual properties and other assets including, but not limited to, analytical methods, procedures and techniques, procedure manuals, personnel data, financial information, computer technical expertise and software, which have been independently developed by CRO and which relate to its business or operations (collectively "CRO's Property"). Tris and CRO agree that any of CRO's Property or improvements thereto which are used, improved, modified or developed by CRO under or during the terms of this Agreement but not derived from Tris Confidential Information or Materials are the sole and exclusive



property of CRO.  If CRO uses any of CRO's Property in performance of Services under this Agreement or any PSA and Tris or Tris' representative cannot utilize the results of the Services without such property, then CRO hereby grants Tris a nonexclusive and transferable license to use such property for the purpose of evaluating, applying or utilizing the results of such Services.

**9.      Confidential Information**

9.1.    CRO agrees:

(a)      except as required as part of the performance of this Agreement, not to disclose any Confidential Information to any person (other than on a need to know basis to such directors, employees or other persons engaged in activities required for the performance of the obligations set out in this Agreement who have entered legally binding written obligations at least as protective as those set out in this Section 9), and shall maintain in strict confidence all Confidential Information for a period of ten (10) years from the date of termination or expiration of this Agreement.  CRO shall be liable to Tris for any unauthorized use or disclosure of Confidential Information by CRO's Affiliates or CRO's or any such Affiliate's officers, directors, employees, agents or subcontractors;

(b)      all Confidential Information is at all times, and shall remain, the exclusive property of Tris, and it will not use any Confidential Information for any purpose other than in accordance with this Agreement; and

(c)      to take all reasonable steps necessary to prevent the unauthorized disclosure and/or use of any Confidential Information.

9.2.    Neither anything contained herein nor the delivery of any Confidential Information to CRO shall be deemed to grant to CRO any rights or licenses to or under any patents or patent applications or to any know-how, technology, inventions or other Intellectual Property Rights of Tris.

9.3.    In the event CRO is required by law or regulation or by judicial or administrative process to disclose any part of the Confidential Information, CRO shall (i) promptly notify Tris in writing of each such requirement and identify the documents required thereby so that Tris may seek an appropriate protective order or other remedy and/or waive compliance by CRO with the provisions of this Agreement; and (ii) consult with Tris on the advisability of legally available steps to resist or narrow the scope of such requirement.  If, in the absence of such protective order or such a waiver by Tris of the provisions of this Agreement, CRO is nonetheless required by law to disclose any part of the Confidential Information, CRO may disclose such Confidential Information, without liability under this Agreement, except that CRO shall (i) furnish only that portion of the Confidential Information which is legally required, and (ii) use its best efforts to obtain an order or other reliable assurances that confidential treatment shall be accorded to the portion of such Confidential Information required to be disclosed.

9.4.    Notwithstanding anything to the contrary contained in this Article 9, with respect to patients' medical records, the parties agree to hold in confidence the identity of patients



on which data has been submitted to CRO in accordance with all applicable federal, state or local laws, rules and regulations.

**10.     Regulatory Compliance**

10.1.   CRO and Tris each agree that they will respectively perform this Agreement, and they will respectively retain any Materials in material compliance with all applicable laws, rules and regulations, including but not limited to the Federal Food, Drug and Cosmetic Act and the regulations promulgated pursuant thereto.  CRO will make available to Tris, or to the responsible regulatory authority, relevant records, programs and data as may be reasonably requested by Tris for purposes related to Tris' regulatory filings.

10.2.   Each party acknowledges that the other party may respond independently to any regulatory correspondence or inquiry in which such other party or its affiliates is named. Each party, however, will:

(a)     Notify the other party promptly of any FDA or other governmental or regulatory inspection or inquiry concerning any study or project of Tris in which CRO is providing Services, including but not limited to, inspections of investigational sites or laboratories;

(b)     Forward to the other party copies of any correspondence from any regulatory or governmental agency relating to such a study or project, including, but not limited to, FDA Form 483 notices, and FDA refusal to file, rejection or warning letters, even if they do not specifically mention the other party; and

(c)     Obtain the written consent of the other party, which will not unreasonable be withheld or delayed, before referring to the other party or any of its Affiliates in any regulatory correspondence.

10.3.   Where reasonably practicable, Tris will be given the opportunity to have a representative present during a FDA or other regulatory inspection of CRO's or its Affiliates premises. If such audit or inspection relates to the Services under any PSA, CRO shall promptly provide Tris with any written communications by CRO or the FDA (or other regulator) regarding such audit or inspections.  CRO will consult with Tris regarding any action necessary to address any concerns or deficiencies resulting from such audit or inspection.

10.4.   CRO agrees that, during an inspection by the FDA or other regulatory authority concerning any study or project of Tris in which CRO is providing Services, it will not disclose information and materials that are not required to be disclosed to such agency, without the prior consent of Tris. Such information and materials include, but are not limited to, the following:

(a)     Financial data and pricing data (including, but not limited to, the budget and payment sections of the PSA);

(b)     Product sales data, if any,(other than shipment data); and



(c)     Personnel data (other than data as to qualifications of technical and professional persons performing functions subject to regulatory requirements).

10.5.   During the term of this Agreement and for one (1) year thereafter, CRO will permit Tris' representatives to examine or audit the Services performed hereunder and/or under any PSA, the facilities, systems and equipment at or with which the Services is conducted, and personnel, procedures, programming, biological fluids and tissues, and records related to such work, upon reasonable advance notice during regular business hours to determine, among other things, that the Services are being (or have been) conducted in accordance with the requirements specified for such Services in this Agreement and the applicable PSA and that the facilities are adequate and maintained in accordance with applicable law.   Upon request by Tris, CRO will assist Tris in arranging for a Tris examination or audit of any subcontractor retained by CRO to provide Services in accordance with Section 2.6.

## 11.     Independent Contractor Status

11.1.   It is understood and agreed that CRO is an independent contractor and will not have any rights to any of Tris benefits, nor for any purposes be deemed or intended to be an employee of Tris. CRO agrees to make any payments or withholding required by the Internal Revenue Code of 1986, as amended, the regulations promulgated thereunder, social security and any related statutes or regulations.

11.2.   It is further understood that CRO is not an agent of Tris and Tris is not an agent of CRO and neither party is authorized to bind the other party with respect to any third party.

## 12.     Conflicts of Interest

12.1.   CRO represents that there is no conflict of interest between performance of this Agreement and the performance of any services by CRO for any other party and CRO agrees that it will not enter into any agreement to provide any services which will prevent it from providing the Services contemplated by this Agreement or any PSA executed by the parties. In the event that CRO believes that there is any such conflict, or any such conflict arises during the term of this Agreement, CRO will immediately notify Tris, which may, at its sole discretion, immediately terminate this Agreement without liability to CRO (and which termination shall not limit any rights or remedies to which Tris would otherwise be entitled by law, equity or otherwise).

## 13.     Force Majeure

13.1.   Neither party shall be liable for a delay in performance or failure to perform this Agreement or any PSA to the extent such failure to perform is caused by any of the following reasons beyond such party's control: strikes or labor disturbance (except by CRO's or its Affiliates' employees), failure of any government required approval (except for delays in such approval resulting from delays of CRO or Tris in requesting or following up on such requests for required governmental approvals in accordance with the time tables set forth in the applicable PSA), acts of God, energy shortages or outages, fire, explosion, war or foreign invasion ("Force Majeure");  provided, however, that the



party who is unable to perform resumes performance as soon as possible following the end of the occurrence causing the delay or failure. In such circumstances, the party affected by the event of Force Majeure shall promptly notify the other party of the Force Majeure and shall take all reasonable steps to mitigate its effects. Without limiting the generality of the foregoing, if a Force Majeure affects CRO's performance, CRO will allocate personnel and resources equitably and not give preference to any particular customer or to CRO itself.

13.2.   Subject to compliance with the provisions of Section 13.1 above, an incident of Force Majeure shall not constitute a breach of this Agreement and the time for performance shall be extended accordingly; however, if it persists for more than 30 days the party not in default may immediately, on notice to the other party, terminate this Agreement pursuant to Section 5 hereof.

## 14.   Dispute Resolution

14.1.   All disputes, controversies or differences arising under this Agreement or any PSA ("Dispute(s)") will first be referred for resolution, prior to either party initiating any proceeding, to Tris' Chief Executive Officer and CRO's President who will attempt in good faith to resolve the Dispute within ten (10) business days from the date that written notice initiating this Dispute resolution process is sent to the other party (the "Initial Notice"). If, however, the Dispute between the parties has not been resolved within the aforesaid period of ten (10) business days from the date of the Initial Notice ("the Initial Period"), the matter will then be the subject of arbitration in accordance with Section 14.2.

14.2.   Arbitration.

(a)     Any and all Disputes remaining unresolved after consideration of a Dispute in accordance with Section 14.1 above, shall be exclusively and finally resolved by binding arbitration.

(b)     Any arbitration concerning a dispute shall be conducted in Newark, New Jersey. Each and any arbitration shall be administered by the American Arbitration Association ("AAA"), and shall be conducted in accordance with the Commercial Arbitration Rules of the AAA (the "Rules"), as such Rules may be amended from time to time.

(c)     Within ten (10) days after receipt of an arbitration notice from a party, the parties shall attempt in good faith to agree on a single neutral arbitrator with pharmaceutical industry experience to conduct the arbitration. If the parties do not agree on a single neutral arbitrator within ten (10) days after receipt of an arbitration notice, each party shall select one (1) arbitrator and the two (2) party-selected arbitrators shall select a third arbitrator with pharmaceutical industry experience to constitute a panel of three (3) arbitrators to conduct the arbitration in accordance with the Rules. In the event that only one of the parties selects an arbitrator, then such arbitrator shall be entitled to act as the sole arbitrator to resolve the Dispute. Each and all arbitrator(s) of the arbitration panel conducting the arbitration must and shall agree to render an opinion within twenty (20) days after the final hearing before the panel.



(d)     The decision or award of the majority of the arbitrator(s) shall be final, binding and incontestable and may be used as a basis for judgment thereon in any court in any jurisdiction.  The parties hereby expressly agree to waive the right to appeal from the decision of the arbitrator(s).  Accordingly, there shall be no appeal to any appellate court or other authority (government or private) from the decision of the arbitrator(s), and the parties shall not dispute nor question the validity of such decision or award before any regulatory or other authority in any jurisdiction where enforcement action is taken by the party in whose favor the decision or award is rendered, except in the case of fraud.  The arbitrator(s) shall, upon the request of either party, issue a written opinion of the findings of fact and conclusions of law and shall deliver a copy to each of the parties.  Each party shall bear its own costs and attorneys' fees, and the parties shall equally bear the fees, costs, and expenses of the arbitrator(s) and the arbitration proceedings; provided, however, that the  arbitrator(s) may exercise discretion to award costs, including attorneys' fees, to the prevailing party.  Without limiting any other remedies that may be available under applicable law, the arbitrator(s) shall have no authority to award provisional remedies of any nature whatsoever, injunctive relief, or punitive, special, consequential or any other similar form of damages.

14.3    Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, each of the parties shall be entitled to seek injunctive or other provisional relief if in its reasonable judgment such action is necessary to avoid irreparable harm, to preserve the status quo, or to enforce the other provisions of this Article 14.  Without limiting the generality of the foregoing, and notwithstanding anything else to the contrary contained in this agreement: (i) CRO acknowledges and agrees that in the event that Articles 8 or 9 are not performed in accordance with their specific terms or otherwise are breached by it, that money damages would be inadequate, so that Tris shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to enforce specifically said provisions (without the necessity of posting a bond, which is hereby waived by CRO) in addition to any other remedy to which Tris may be entitled at law or in equity (including, without limitation, its rights pursuant to the other provisions of this Article 14); and (ii) the venue for all such actions described in this Section 14.3 shall be the state and Federal Courts of New Jersey.

## 15.    **Storage.**

15.1.   CRO shall maintain all correspondence, materials, documents, records, and other data obtained or generated by CRO or its Affiliates or their employees, officers, directors, agents or subcontractors, in the course of providing the Services hereunder (including, without limitation, all electronic media, computerized records and files (collectively, the "Records") and biological fluids and tissues), in accordance with this Agreement and applicable Protocols, PSAs, written instructions of Tris and applicable laws and regulations, in a safe and secure manner protected from fire, theft, disclosure and destruction.  Unless otherwise required by applicable law or regulations or the terms of this Agreement, any of the Records  and other materials described in this Section 15.1,



that CRO shall have in its possession, or otherwise under its control, shall be so maintained by it for a period of not less than ten (10) years from the date of receipt thereof and shall be organized in such manner that it will be ready for immediate reference. Tris shall have the right at any time to examine or obtain from CRO copies of any or all of such property. After ten (10) years CRO may dispose of such property in accordance with written instructions provided by Tris. If Tris fails to provide such instructions, CRO shall so notify Tris and if instructions are still not forthcoming within sixty (60) days of such notification, CRO may destroy such property.

15.2. Notwithstanding the foregoing provisions of Section 15.1, unless and to the extent a longer duration is specified in a PSA or required by applicable regulatory authority or law or regulation, CRO shall store the samples generated during the conduct of Services under a PSA, including backup samples (collectively, such samples pertaining to a PSA, the "Samples"), at no additional charge to Tris for six months (6) months after the completion of all Services under such PSA and the delivery to Tris of all reports specified in the PSA to be generated in connection therewith. CRO shall notify Tris no less than sixty (60) days prior to the end of such six (6) month period with respect to each PSA. Within such sixty (60) day period Tris will, or at any time prior to receipt of CRO's notice provided for in the preceding sentence Tris may, provide written direction to CRO to:  (a) return the Samples to Tris; (b) ship the Samples to a third party identified by Tris; (c) discard the Samples; or (d) continue storing the Samples at CRO for a fee of $0.10 per tube per month. CRO agrees to act in accordance with such written instructions from Tris.

## 16. **Notices**

16.1. Any notices required or permitted to be given hereunder by either party shall be in writing and shall be deemed given on the date received if delivered personally or by a reputable overnight delivery service, or three business days after the date postmarked if sent by registered or certified mail, return receipt requested, or on the date of transmission by fax (receipt confirmed), to the following address:



if to

**Pharma Medica Research Inc.**
**6100 Belgrave Road**
**Mississauga, ON**
**L5R 0B7**
Attn: **Latifa Yamlahi**
Telephone: **905-624-9115**
Fax: **905-624-4433**

if to

Tris Pharma, Inc,
2033 Route 130, Suite D
Monmouth Junction, NJ 08852
Attn:   Ketan Mehta, CEO
Telephone: 732-940-2800
Fax: 732-940-2855

## 17.    General Provisions

17.1.   **Insurance.**  Each Party shall maintain during the term of this Agreement adequate insurance to fulfill its obligations under this Agreement and any PSAs. Without limiting the generality of the foregoing, unless specifically provided otherwise in a PSA: (a) each party shall maintain products liability insurance with coverage of not less than $5,000,000 per occurrence, which coverage shall be in force during the term of any PSA and for a period of not less than two (2) years after completion of such PSA; provided, however, that with respect to any PSA with respect to which Services are to be performed for only non-clinical studies, Tris shall only be required to maintain in full force and effect through the completion of performance of the Services under such PSA or, if earlier, its termination, insurance in amounts appropriate to the conduct of Tris' business; and (b) CRO shall secure and maintain in full force and effect through the performance of all Services under each PSA, coverage for (i) worker's compensation, (ii) general liability and (iii) automobile liability, in each case in amounts appropriate to the conduct of its business.  At either party's request, the other party shall provide a copy of the relevant insurance policy certificate.

17.2.   **Governing Law.**  This Agreement and the obligations of the parties shall be governed by the laws of the State of New Jersey (regardless of the laws that might be applicable under conflict of law principles) as to all matters, including, but not limited to, matters of validity, construction, effect, and performance.

17.3.   **Third Party Rights.**  All third party rights are excluded and no third party shall have any right to enforce this Agreement. Any rights of a third party to enforce this Agreement may be varied and/or extinguished by agreement between the parties to this Agreement without the consent of any such third party.



17.4. **Assignment.** CRO will not assign any right or delegate any obligation under this Agreement without the prior written consent of Tris. Tris may, in its sole discretion and without CRO's consent, assign this Agreement to any Affiliate or to any successor or assigns, including, without limitation, in connection the sale of Tris' stock or assets (including the division or business with respect to which this contract pertains) or Tris' merger with or into a third party.

17.5. **Publications.** Results of projects under PSAs may not be published or referred to, in whole or in part, by CRO without the prior express written consent of Tris, except to the extent that such results relate solely to CRO's confidential information or capabilities and do not relate to Confidential Information or Tris property. Except as required by applicable law or regulation, neither party will use the other party's name in connection with any publication or promotion without the other party's prior, written consent.

17.6. **Headings.** The headings in this Agreement are for reference purposes only; they will not affect the meaning or construction of the terms of this Agreement.

17.7. **Severability.** If any parts or part of this Agreement are held to be invalid, the remaining parts of the Agreement will continue to be valid and enforceable.

17.8. **Waiver.** The failure to enforce any right or provision herein shall not constitute a waiver of that right or provision. Any waiver of a breach of a provision shall not constitute a waiver of any subsequent breach of that provision.

17.9. **Survivability.** The expiration or termination of this Agreement or any PSA shall not affect the rights or obligations of the parties under the following sections and articles of this Agreement, each of which shall survive such expiration or termination: Sections 1, 3.8, 5.2, 5.4, 10.5, 11.1,; and Articles 7, 8, 9, 14, 15 and 17. Termination of this Agreement in accordance with the provisions hereof shall not limit remedies, which may otherwise be available in law or equity or otherwise.

17.10. **Entire Agreement.** This Agreement, including the PSA(s), contains the complete and exclusive understanding of the parties with respect to the subject matter hereof, and supersedes and replaces all prior contract agreements and understandings relating to the same subject matter whether written or oral. No waiver, alteration or modification of any of the provisions hereof or any PSA will be binding unless in writing and signed by a duly authorized representative of the party to be bound. Neither the course of conduct between the parties nor trade usage will act to modify or alter the provisions of this Agreement.

18.   <u>Signatures</u>

**Pharma Medica** Research Inc.                    Tris Pharma, Inc.

Signature _____      Signature _____

Name     Latifa Yamlahi                Name     Ketan Mehta

Title     President and CEO            Title     President and CEO

Date     January 05, 2015             Date     12/31/14