IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IAN WALLACE,

    Plaintiff,

vs.       No. 4:18-cv-01859-PLC

PHARMA MEDICA RESEARCH,
INC.; TRIS PHARMA, INC.;
ROXANE LABORATORIES,
INC.;HIKMA LABS, INC.;
and WEST-WARD COLUMBUS,
INC.,

    Defendants.

VIDEOTAPED DEPOSITION OF

SHABAZ KHAN, M.D.

Taken on behalf of Plaintiffs

November 7, 2019

Reporter:  Kimberly A. Harris, CSR

M A Y   R E P O R T I N G   S E R V I C E
598 Watch Hill Road
Collinsville, Illinois 62234
618-223-8392

May Reporting Service

1

---

**APPEARANCES**

Wendler Law, P.C.,
  By:  Brian Wendler, Esq.

    For the Plaintiff


Hinshaw & Culbertson, LLP
  By:  Terese Drew, Esq.

  For the Defendant, Pharma Medica Research, Inc.


Litchfield Cavo, LLP
  By:  Brian K. McBrearty, Esq.

For the Defendants, Roxane Laboratories, Inc., Hikma
  Labs, Inc., and West-Ward Columbus, Inc.


Mudge Legal Video
  By:  John Mudge, Videographer

May Reporting Service

3

---

INDEX OF EXAMINATIONS
PAGE LINE

Examination by Mr. Wendler.............  5   10

Examination by Mr. ............. 123   7

Further Examination by Mr. Wendler....... 125  19

INDEX OF EXHIBITS
PAGE LINE

Plaintiff's Exhibit No. 1.................  52  13

Plaintiff's Exhibit No. 2.................  54  22

Plaintiff's Exhibit No. 3.................  98  11

Plaintiff's Exhibit No. 4................. 101   9

Plaintiff's Exhibit No. 5................. 105   4

May Reporting Service

2

---

STIPULATION

    IT IS STIPULATED AND AGREED by and between
counsel for Plaintiffs and counsel for Defendants
that the videotaped deposition of SHABAZ KHAN, M.D.,
may be taken pursuant to Rule 26(a) of the Federal
Rules of Civil Procedure on behalf of the Plaintiff,
on November 7, 2019 at the offices of Hinshaw &
Culbertson, LLP, 701 Market Street, Suite 1375, St.
Louis, Missouri, 63101, before Kimberly A. Harris, a
Certified Shorthand Reporter and Notary Public within
and for the County of Madison, State of Illinois;
that the issuance of notice and dedimus is waived,
and that this deposition may be taken with the same
force and effect as if all statutory requirements had
been complied with.

    IT IS FURTHER STIPULATED AND AGREED that any
and all objections to all or any part of this
deposition except objections as to the form of the
question are hereby reserved and may be raised on the
trial of this cause; and that the signature of the
deponent is not waived.

        * * * * * *

**PLAINTIFF'S EXHIBIT A**

4

1    MR. MUDGE:  We are on the record,
2  and the time is approximately 8:54.
3        MR. WENDLER:  And for the record,
4  we've all agreed to waive the videographer
5  introduction statement.
6        MS. DREW:  Correct.
7        SHABAZ KHAN, M.D.,
8  a witness, having been first duly sworn upon oath by
9  the court reporter, testified as follows:
10        [EXAMINATION]
11  QUESTIONS BY MR. WENDLER:
12    Q.    Dr. Khan, can you state your full name for
13  us, please?
14    A.    Shabaz Ali Khan.
15    Q.    And where do you live sir?
16    A.    Toronto, it's basically a suburb called
17  Stoufville.  It's north of Toronto.
18    Q.    And you understand we're here to take your
19  deposition to ask you some questions about the
20  company you work for called Pharma Medica Research --
21    A.    Yes.
22    Q.    -- Inc.; is that correct?
23    A.    Yes.
24    Q.    Is it okay if we just refer to that

5

company as Pharma Medica for today's purposes?

1  company as Pharma Medica for today's purposes?
2    A.    That's perfectly fine.
3    Q.    If you'd be so kind as to tell us what
4  Pharma Medica is, and what it does?
5    A.    Okay.  Pharma Medica is a contract
6  research organization that does clinical trials for
7  pharmaceutical companies.  So, basically they give us
8  the medication, which would be a generic or a
9  reference product.  And they do bioavailability
10  studies.  So we administer the medication to a
11  population that is specific to getting that one.  It
12  could be a general population.  It could be a patient
13  population, what is required for it based on the type
14  of clinical trial it is.
15        And then most of our studies are basically
16  pharmacokinetic studies, which means that we take the
17  blood samples to analyze the concentration of the
18  drug in their body.
19    Q.    Okay.  And where is Pharma Medica
20  headquartered?
21    A.    Pharma Medica has the headquarters is
22  basically at -- in Mississauga in -- That's our
23  corporate office, along with our analytical the lab.
24    Q.    Mississauga, where is that?

6

1    A.    Mississauga is, again, a suburb, just west
2  of Toronto.
3    Q.    Okay.  In Canada?
4    A.    In Canada, yes.
5    Q.    All right.  And I apologize.  I should've
6  asked you earlier:  Have you ever given a deposition?
7    A.    No, first time.  So that's why I was
8  seeing how this is all set up.
9    Q.    All right.  If at any point in time I ask
10  you a question that you don't understand what I'm
11  asking, just feel free to tell me, and I'll be happy
12  to rephrase it for you.  Okay?
13    A.    Sure.  Thank you.
14    Q.    Okay.  If you want take a break at any
15  time, just let me know, and we'll take a break, as
16  long as there is no questions pending.
17    A.    Definitely.
18    Q.    Okay.  Okay.  Any questions so far?
19    A.    I tend to nod my head and all instead of
20  answering.  So just let me know to speak up the
21  answer.
22    Q.    She'll hit you, if you do that.
23    A.    All right.
24        (Whereupon, an off the

7

1        record discussion was
2        held, which by direction
3        was not stenographically
4        reported.)
5    Q.    (BY MR. WENDLER)  Okay.  Did you do
6  anything, Dr. Khan, to prepare for the deposition
7  today?  Did you read anything?
8    A.    I reviewed some of the pictures, and the
9  videos, and briefly look at the --- over-viewed the
10  SAE report.
11    Q.    Reviewed the what?
12    A.    The SAERs, serious adverse event report.
13    Q.    Anything else?
14    A.    No.  The general SOPs, and procedures, and
15  all the stuff is there; right?
16    Q.    All right.  You also attended, I believe
17  by telephone, the deposition of my client,
18  Mr. Wallace; is that correct?
19    A.    No.
20    Q.    You did not?
21    A.    Only Dr. Jordan.
22    Q.    You attended the deposition of Dr. Jordan
23  by telephone; correct?
24    A.    Correct.

8

| | |
|---|---|
| 1 Q. All right. Did you bring anything with | 1 moved up to my current position. |
| 2 you, sir, to the deposition pursuant to the | 2 Q. And you do not have a medical degree from |
| 3 deposition notice? | 3 any U.S. -- |
| 4 A. No. | 4 A. No. |
| 5 Q. All right. Now, have you ever -- | 5 Q. -- medical school; do you? |
| 6 Well, strike that. | 6 A. No. |
| 7 How long has Pharma Medica been in | 7 Q. Do you have a medical degree from any |
| 8 business? | 8 Canadian medical school? |
| 9 A. '97, so 22 years. | 9 A. No. |
| 10 Q. All right. Can you tell us how that all | 10 Q. All right. Now, your medical degree is |
| 11 came about? What prompted the formation of Pharma | 11 from India. Is it -- What's the difference between |
| 12 Medica? | 12 the medical schools in India and the United States in |
| 13 A. I joined Pharma Medica in 2004. So, it | 13 terms of age requirements, and duration? |
| 14 was already up and functional at that time. | 14 A. U.S., I think it's around four to six |
| 15 Q. All right. And when you say you joined | 15 years. In Canada, also, after you finish your grade |
| 16 Pharma Medica in 2004, how did that come about? Were | 16 12, you can go and start. However, once you complete |
| 17 they just looking for someone with your | 17 a medicine program in India, for Canada and for the |
| 18 qualifications and you applied, or did you know | 18 U.S., you have to take the qualifying exams. So, |
| 19 someone, or how did this happen? | 19 there is one, two, three phases of qualifying exams |
| 20 A. No, I applied. | 20 for both Canada and the U.S. Once you complete the |
| 21 Q. All right. | 21 qualifying examination, you have to do your |
| 22 A. So basically, as far my background, I'm a | 22 internship where you can start up. So, basically you |
| 23 physician from back in India. I completed my | 23 don't have to do the whole course again. You just |
| 24 Bachelor of Medicine, Bachelor of Surgery in 2001, | 24 have to do the certification or the qualifying exams. |
| 9 | 11 |
| May Reporting Service | May Reporting Service |
| 1 worked in India for a year, moved to Canada on | 1 Q. Let me break it down, because my question |
| 2 immigration. Then I started looking for jobs. And I | 2 wasn't really clear. In India how old do you have to |
| 3 started working with another CRO, Biovail, and -- | 3 be to get into medical school, or is there an age |
| 4 Q. Another CRO what? | 4 requirement? |
| 5 A. Biovail. Another CRO called Biovail in | 5 A. You have to finish your grade 12, which is |
| 6 Toronto at that time. | 6 at least 18 years of age. Yes. |
| 7 Q. Biovail? | 7 Q. All right. So you can go straight from |
| 8 A. Yes. | 8 high school into medical school? |
| 9 Q. And what is CRO? | 9 A. Yes. |
| 10 A. Oh, clinical research organization. | 10 Q. That's not the same as it is in the U.S.; |
| 11 Q. All right. Sorry. And go ahead. | 11 is it? |
| 12 Continue. You started working for the other CRO | 12 A. U.S., I think there is a longer program |
| 13 called Biovail? | 13 that you have to do. |
| 14 A. And at that time, I was a screening | 14 Q. Right. |
| 15 technician. So the responsibilities were basically | 15 A. Maybe six years -- |
| 16 collecting blood, doing ECGs, vital signs, and all of | 16 Q. Okay. |
| 17 those ones. And it was a contract position only for | 17 A. -- you do that. |
| 18 three months. So to start it; right? | 18 Q. Okay. And then in India how long does |
| 19 But I used to be actively applying at | 19 medical school last? |
| 20 other places, hospitals, doing interviews, other CROs | 20 A. It's four and a half, plus one year. So |
| 21 and all. And then among all of them, I applied at | 21 that's five and a half years. But in order to get to |
| 22 Pharma also. And I was called in for an interview. | 22 the medical school, you do have to take an entrance |
| 23 So I went and gave the interview. I was hired as a | 23 examination. |
| 24 quality control associate. And then from there I | 24 Q. In India? |
| 10 | 12 |
| May Reporting Service | May Reporting Service |

| 1  | A.    In India, yes. |
|----|---|

1    A.    In India, yes.
2    Q.    All right. And you said you practiced in
3    India as a licensed medical doctor for how long, one
4    year?
5    A.    Approximately a year.
6    Q.    All right. And during that one year, did
7    you draw blood from patients?
8    A.    Yes. Basically doctors do not do much.
9    But yes, we do draw blood and all. There is cases
10   say where some of the patients request us to do it,
11   and we do it. We do it.
12   Q.    Did you say doctors do not do much?
13   A.    Not for the blood draws. It's basically
14   it's the nurses. In India it's the nurses. In
15   Canada and all it's the technicians who come and do
16   it. In India it's basically nurses.
17   Q.    All right.
18   A.    But doctors, yeah, especially when we are
19   interns, we do a lot so that we get the experience of
20   what arterials need to be drawn, what tests need to
21   be ordered, and we -- The nurses tend to order --
22   Like you need to attend to the patients; right? You
23   need to be with them. And definitely they'll
24   appreciate when you yourself are attending to them a

13

1    come and stay. And then the supporting departments
2    along with them, like the kitchen, the admin people,
3    the facilities and all. So all of these activities
4    take place at the clinic.
5         So all the departments in the clinic,
6    basically I oversee all the functions, which includes
7    the clinic staff, technicians, the group leader, the
8    study coordinators, the screening department, which
9    is again the technicians, screening coordinators,
10   managers, recruiters, and the kitchen staff, and
11   cleaning and all.
12   Q.    All right. And this case is about what
13   transpired at Pharma Medica's St. Charles, Missouri
14   clinic. You're aware of that; right?
15   A.    Yes, sir.
16   Q.    Were you in charge of that at the time
17   these studies were initiated?
18   A.    So basically I used to oversee both the
19   sites. However, in 2015, mid 'til almost 2017, I was
20   more based in Canada. I had a senior director who
21   was over here at this site, Louis Co. He used to
22   oversee the clinical activities.
23   Q.    And who was that?
24   A.    Louis Co.

15

1    lot more.
2    Q.    Well, how old were you when you came to
3    Canada?
4    A.    You ask. It's been back so far. So I
5    came in 2003. So I will be -- '76, '75 born, so
6    five. Around 28.
7    Q.    Twenty-eight? All right. Back to Pharma
8    Medica --
9    A.    Twenty-seven, 28.
10   Q.    What is your title at Pharma Medica?
11   A.    Vice-president clinical operations.
12   Q.    Vice-president clinical operations?
13   A.    Yeah.
14   Q.    And what does that entail? What are your
15   job duties there?
16   A.    So basically I look after our clinic
17   location. There are two locations in Canada. We
18   have a clinic location, and then we have the head
19   office, or the corporate location.
20        The clinic location basically deals with
21   all the clinical activities where we have subjects or
22   volunteers who come to participate in the study. So
23   we have a screening department. We have a recruiting
24   department. We have the clinics where the subjects

14

1    Q.    Louis Co?
2    A.    Yeah. Yes.
3    Q.    And he's no longer with Pharma Medica; is
4    he?
5    A.    No. No. No, he's not.
6    Q.    All right. Do you know, sir, was the St.
7    Charles Pharma Medica clinical operations governed by
8    the same policies and procedures as the Canadian
9    Pharma Medica clinic?
10   A.    They were very, very identical.
11   Q.    Okay.
12   A.    But there are some procedures which are
13   slightly different because of the local laws from
14   Missouri, and the U.S. and all. Not much in regards
15   to the clinical activities, but more like the human
16   resources policies, and the narcotics, and all of
17   that stuff.
18        Like, for example, in the U.S. or
19   Missouri, you can have the narcotics in the pharmacy,
20   and then you have the licenses for Schedule I, II,
21   and III.
22        In Canada it's totally different. It's a
23   qualified person in charge who keeps it separately
24   and manages it. So those are the slight differences.

16

1    Q.    Okay. The slight differences that you're
2    talking about between the Canadian Pharma Medica
3    clinic and the St. Charles, Missouri clinic, would
4    you agree they have nothing to do with what this
5    lawsuit's about, the differences?
6    A.    Yeah, I agree.
7    Q.    You agree?
8    A.    They should be very, very similar.
9    Q.    All right. My client's Mr. Ian Wallace.
10   Did you ever meet him, or ever talk to him?
11   A.    I can say yes, I have met him. Maybe
12   during the studies, prior to the 4109 and 3952,
13   before that, talked to him; could've spoken to him
14   about any of the study issues.
15   Like I do a lot of procedures on the side
16   myself, too, like asking questions, consent, and
17   these things and all. So in the course of the study,
18   yes, I would have spoken.
19   Q.    All right. Let me ask you this: Do you
20   have an independent recollection of Mr. Wallace? If
21   he walked in the door today, would you know him?
22   A.    Yes, I think I should be able to.
23   Q.    Okay. Do you have an independent
24   recollection of anything Mr. Wallace said to you, or

17

May Reporting Service

1    to anyone else --
2    A.    No.
3    Q.    -- that you heard?
4    A.    No, I can't.
5    Q.    Do you have an independent recollection of
6    anything you said to Mr. Wallace?
7    A.    No.
8    Q.    All right. And back to Pharma Medica, who
9    else --
10   Strike that.
11   Are you a part owner of Pharma Medica?
12   A.    No.
13   Q.    Okay. You are just an employee?
14   A.    Yes.
15   Q.    Are you an officer or director of Pharma
16   Medica?
17   A.    I'm the vice-president. So --
18   Q.    So, yes, you are?
19   A.    Okay.
20   Q.    All right. Who actually owns Pharma
21   Medica? I realize it's a corporation. But who are
22   the shareholders?
23   A.    I know our president and CEO, Latifa
24   Yamlahi, and Mohammed Bouhajib, who is also VP of

18

May Reporting Service

1    biomedical lab. Then Mike Panahi. I think he's a
2    silent partner.
3    Q.    And they all reside in Canada?
4    A.    Yes.
5    Q.    You don't have a U.S. medical degree;
6    correct?
7    A.    Correct.
8    Q.    Do any of the Pharma Medica owners have a
9    U.S. medical degree?
10   A.    No, I don't think so. I don't know.
11   Q.    All right. So you were telling us earlier
12   with the business Pharma Medica is, and correct me if
13   I'm wrong, but Pharma Medica works on a contract
14   basis with pharmaceutical companies to test and
15   gather data for testing pharmaceuticals that the
16   pharmaceutical companies want to try to market at
17   some point. Is that a fair summary?
18   A.    They do a comparative bioavailability
19   study, which shows that the generic and the reference
20   product -- The reference product's already marketed
21   and approved by a similar --
22   Q.    I'm sorry. Can you repeat?
23   A.    So we do a bioavailability comparative
24   studies. So where you compare a generic one, a drug

19

May Reporting Service

1    product, with a reference product, which is already
2    approved and marketed.
3    Q.    Okay.
4    A.    In that way.
5    Q.    All right. So, if you take a
6    pharmaceutical drug that's already on the market with
7    a brand name, your company does the testing of the
8    generic equivalent?
9    A.    Both of them.
10   Q.    Both?
11   A.    So, we don't do any placebo trials. So,
12   when we have a population of subjects, for example,
13   in 4109 they were receiving a drug product, which is
14   a test product, the one that is generic, and they are
15   receiving the other one that's a reference product
16   already in the market. So half of them will get the
17   test. Half of them will get the reference. And in
18   the next period, they will switch over. This is a
19   standard bioavailability comparative studies. Some
20   of them could be parallel, which they only get half
21   and half.
22   But where we compare over here the
23   concentration level of the drug are similar or not to
24   the ones in the reference one.

20

May Reporting Service

1    Q.    Okay. And you said that Pharma Medica has
2    a facility currently, a clinical facility in Canada,
3    and headquarters in Canada. Does Pharma Medica have
4    any locations in the United States currently?
5    A.    We had a site, which is not operational
6    anymore, in St. Charles. The site was closed. So
7    right now only the facility is there, the building is
8    there.
9    Q.    Only what?
10   A.    Only the building is there. There's no
11   operations over there.
12   Q.    Does Pharma Medica own that building?
13   A.    Yes.
14   Q.    All right. So, there are no Pharma --
15         Strike that.
16         There are no Pharma Medica clinical
17   facilities in operation in the United States
18   currently; is that correct?
19   A.    Correct.
20   Q.    Okay. I think that covers all the Pharma
21   Medica questions I had for you about the company.
22         So let me ask you this: In this
23   particular case, do you have any opinions that relate
24   to this lawsuit?

                                    21
                    May Reporting Service

1    Q.    All right. And I think you said, correct
2    me if I'm wrong, you listened in on Dr. Jordan's
3    deposition testimony; correct?
4    A.    Correct.
5    Q.    Is there anything that Dr. Jordan said in
6    her deposition testimony that you think is incorrect?
7    A.    No.
8    Q.    Did you have a chance to read
9    Mr. Wallace's deposition testimony?
10   A.    I think I read it long back, but I don't
11   recall much.
12   Q.    Okay. As you sit here today, is there
13   anything that you can remember in reading
14   Mr. Wallace's deposition testimony that you think is
15   incorrect?
16   A.    Can you go through it?
17   Q.    I don't think we have that much time. But
18   as you sit here today, is there anything he said that
19   you can recall was --
20   A.    I think there was a comment about -- I
21   don't know whether it was Mr. Wallace or his brother,
22   about reusing needles. That has never happened at
23   Pharma Medica, used needles.
24         And drawing blood in the dark and all.

                                    23
                    May Reporting Service

1    A.    I don't know about -- What do you mean by
2    opinions?
3    Q.    Well, do you have -- Distinguished from a
4    fact. For instance, you know Pharma Medica tested
5    Mr. Wallace. That was a fact. Do you have any
6    opinions about any sources for his contraction of
7    Hepatitis, or do you have any opinions about the
8    operations, or the procedures? Do you have any
9    opinions at all relative to this case?
10   A.    I would say no. For us, it's basically
11   what is the source documentation, and the procedures,
12   and the practices.
13   Q.    I'm sorry. After you said no --
14   A.    I don't have any specific opinions on any
15   of this portions.
16   Q.    Well --
17   A.    I can relate, and let you know the details
18   on the procedures and the practice, what was done,
19   and whatever is documented basically.
20   Q.    All right. Do you know Dr. Heather
21   Jordan?
22   A.    Yes. She's -- She was our principal
23   investigator at St. Louis -- at the St. Charles
24   location.

                                    22
                    May Reporting Service

1    That never happens. We don't do that.
2          And what else? Staff don't know what
3    they're doing? Interns don't know what they're
4    doing? No, that's not correct.
5    Q.    Okay. Anything else that Mr. Ian Wallace,
6    or his brother, Cody Wallace, said in their
7    depositions that you think is wrong?
8    A.    I didn't prepare by the depositions.
9    Reusing using needle sticks, that doesn't happen.
10   Drawing blood, chaos and all. There is not chaos.
11   We are very well organized with the -- what you
12   call -- our procedures, especially blood sample
13   collection, processing of blood samples. Our
14   documentation is very clear and organized.
15         Now, we always have a backup. Like, if --
16   We're dealing with human beings. Things can change,
17   and all this stuff. So we always make sure that we
18   have extra staff on hand to encounter any issues that
19   can happen. Like, for example, a sampling
20   difficulty. Or if someone is not feeling well, we
21   have medics on-site. We have quality control on-site
22   to make sure the procedures are being done correctly,
23   to make sure the documentation is being done
24   correctly, and in a timely manner.

                                    24
                    May Reporting Service

1      Yeah. So I don't think we are not
2  organized. We are very, very well organized, as much
3  as we can be, anyone can be.
4      Q.    All right. Is there anything else that
5  Mr. Ian Wallace said in his deposition, or that his
6  brother, Cody Wallace, said in his deposition that
7  you think is incorrect, Dr. Khan?
8      A.    Of all the things I can recall, these are
9  the things that stand out. Now, definitely, if you
10 want me to read through the one, then I can go
11 through it, and I can say more.
12     Q.    No. I just want to know the ones that you
13 can think of as you sit here today?
14     A.    These are the ones thing I can think of,
15 these are the ones.
16     Q.    All right. And I guess I should've asked
17 the question earlier. You said that you read Ian
18 Wallace's deposition. I'm assuming you also read
19 Cody Wallace's deposition --
20     A.    I did.
21     Q.    -- based on your answers; correct?
22     A.    Yeah.
23     Q.    Okay. Did you get a chance to read the
24 deposition of Dr. Jordan?

                                    25
                  May Reporting Service

1      A.    No, I did not.
2      Q.    Okay. You indicated that Pharma Medica
3  does not reuse needles?
4      A.    We do not. They are discarded
5  immediately.
6      Q.    Yeah. And the reason --
7      A.    It's not just a reused needle. Even if
8  the cap comes off, right, accidentally. If a staff
9  takes off a cap, and they don't use it, it still goes
10 in the biohazard. It's not left open.
11     Q.    And you understand that the reason you
12 don't want to reuse needles, or you don't want to use
13 a needle if the cap came off, because there's a
14 potential health hazard there. Someone could become
15 infected with a blood-borne pathogen; am I right?
16     A.    It's -- Universal precautions dictate
17 that, first and foremost, you take all the
18 precautions possible; right.
19     Q.    And that's one of them; right?
20     A.    Yeah. You do not reuse a needle. No
21 matter what, you don't. Beat it, you discard it.
22 You do not keep it open, not just for blood-borne
23 pathogen. You don't know if the needle is going to
24 be sitting open over there. How long am I

                                    26
                  May Reporting Service

1  considering this sterile? How long is it going to
2  stay? No. Even if it's one second, discard it
3  immediately.
4      Q.    Okay. And you understand that the reason
5  those rules exist is for the safety of the people who
6  might get stuck with the needles; correct?
7      A.    It's -- Yes. It's the safety of the
8  subjects who are volunteers, and of our staff, too.
9      Q.    Okay. And the staff, as well?
10     A.    Yes.
11     Q.    That's a good point.
12           And the participants in the Pharma Medica
13 studies, participants like Mr. Wallace, they have to
14 go through a screening process before they can become
15 a participant in the study; is that correct?
16     A.    Correct. Yes. They have to go through a
17 recruiting questionnaire, a screening process, which
18 includes a medical history questionnaire, medical
19 conditions, any allergies, and all those details.
20     Q.    Uh-huh.
21     A.    Along with a physical examination, blood
22 tests, vital signs, and all, ECGs and everything. So
23 whatever general we can encompass, it's done.
24     Q.    All right. And if a patient --

                                    27
                  May Reporting Service

1            Strike that. Strike that.
2            If an applicant or participant like
3  Mr. Wallace going through the screening process to
4  get into one of the studies tests positive for
5  Hepatitis C, what happens?
6      A.    So, the procedure is basically if anyone
7  tests positive for any of the infectious conditions,
8  or of the infectious communicable disease, we are
9  obligated to inform. First and foremost, inform the
10 volunteer itself, saying regard these results --
11     Q.    Inform who, sir?
12     A.    The volunteer himself, or the subject.
13     Q.    Okay.
14     A.    We use it replaceable, volunteer or
15 subject. We don't use patient because very few
16 trials are under patients. They're healthy
17 individuals; right? So, we either use volunteer or
18 subjects.
19     Q.    Okay.
20     A.    Volunteer sounds better.
21           And we inform them, first and foremost,
22 saying, 'This is the report that we got. This is
23 what our doctor has evaluated, and this is what our
24 doctor's suggestion is.'

                                    28
                  May Reporting Service

1  Also, as far as the requirement, we are
2  supposed to inform the local authorities.
3       Q.   And when you say blood-borne pathogen,
4  that includes Hepatitis C; correct?
5       A.   Blood-borne conditions are infectious or
6  communicable diseases basically.  So anything like
7  Hepatitis, HIV, tuberculosis, or anything like that
8  would come through, we have to inform them.
9       Q.   All right.  So if a participant -- I'm
10 sorry.  You said volunteer, or --
11      A.   Volunteer, yeah.  Participant, volunteer.
12 It's subject, these three.
13      Q.   Subject gets through the screening
14 process, does that necessarily mean the subject does
15 not have Hepatitis C?
16      A.   Again, Hepatitis C, HIV, and all of these
17 conditions, they all have, as for my general
18 knowledge, have a window period; right?  Immediately
19 after getting infection or something, you do not get
20 a positive result immediately.  Unless you do a vast
21 majority of tests and all, you don't.  There's a
22 window period, and the window period varies.  It's
23 also known as incubation period.  It can vary
24 anywhere between two to eight weeks.

29

1  So if the participant was tested in that
2  duration of time, in between that window period, they
3  will, or they will most probably not test positive.
4       Q.   All right.  So it's possible that one of
5  the applicants to one of the studies went through the
6  screening process, and tested negative for Hepatitis?
7       A.   (Witness nodding head.)
8       Q.   But it was in the incubation period, and
9  the study, the participant actually had the Hepatitis
10 virus in his blood, but it just was not in large
11 enough quantity to be measurable or readable; is that
12 correct?
13      A.   It could be, but a lot of our subjects
14 come back regularly.
15      Q.   Yes.
16      A.   So if they came back afterwards, they
17 would have been tested positive.  And again --
18      Q.   Yes.
19      A.   -- we do not -- It's not only the specific
20 test for, as in the case of Mr. Ian Wallace; right?
21 At the end of the study, which was approximately
22 three to four weeks, maybe five weeks after his
23 screening appointment, we did a post-study labs in
24 which we found the liver enzymes were high; right?

30

1  So definitely you will be able to see something else
2  with others, too; right?
3       Q.   Okay.  Back to my question, though.  We
4  know by the time of the second study that is at issue
5  in this case, and that is the study --
6       A.   4109.
7       Q.   4109, correct.  We know by the time of
8  that second study that Mr. Wallace could not have had
9  Hepatitis C when he tested for the first study, when
10 you screened for the first study; am I correct?
11      MS. DREW:  Object to the form.
12      Q.   (BY MR. WENDLER)  Because the incubation
13 period had already expired, and he was negative; am I
14 right?
15      MR. MCBREARTY:  I'll object to the
16 form of the question; assumes facts not in evidence;
17 assumes -- and also calls for an expert conclusion,
18 which may be beyond the scope of this witness's
19 education and training.
20      MS. DREW:  Join.
21      You can answer.
22      A.   Quick thing:  I don't remember the dates
23 of the previous study also.  And when were the
24 screening done for the study?  When were the labs

31

1  done?  Again, the incubation period could be there.
2  So I cannot comment on that.
3       Q.   (BY MR. WENDLER)  Okay.  Well, regardless,
4  you said the incubation period is anywhere from two
5  to eight weeks; am I right?
6       A.   Yeah.  There are some scholars says two to
7  10 weeks also.
8       Q.   All right.
9       A.   Some say four to six weeks also.  It's
10 varied.
11      Q.   So Mr. Wallace, on January 1 tests
12 negative for Hepatitis C, and 10 weeks go by, and
13 he's still negative for Hepatitis C.  We know that as
14 of January 1 he did not have Hepatitis C; am I
15 correct?
16      MR. MCBREARTY:  Object to the form.
17      MS. DREW:  Object to the form of the
18 question; misstates the evidence.
19      Go ahead.  You can answer.
20      A.   You can't say.  Human beings are
21 different.  Some might manifest in a week, two weeks,
22 10 days.  There's always exceptions.
23      Q.   (BY MR. WENDLER)  Okay.
24      A.   You know that our body could be a full

32

1   inverse also.  Your heart, instead of being on the
2   left side, could be right also.
3       Q.   All right.
4       A.   Everyone is different.
5       Q.   Well, let me ask it this way.
6       A.   And you cannot draw a specific conclusion
7   like, 'Oh, January 1st is eight weeks.  Okay.  You
8   were clean on that.'  You can't.
9       Q.   Okay.  Well, you told me earlier that it
10  was two to eight weeks for the incubation period.
11  Then you said --- ''
12      A.   Yes.
13      Q.   -- some scholars say up to 10 weeks?
14      A.   Yeah.  Some say four to 10 weeks, four to
15  six weeks.  It varies.
16      Q.   What's the maximum?
17      A.   I have no idea.
18      Q.   The longest incubation period?  You don't
19  know?
20      A.   No, I don't know that answer.
21      Q.   Okay.  All right.
22          Well, do you have any indication, sir, in
23  your mind that Mr. Wallace did have Hepatitis C
24  before the 4109 study?

33

1   all those?
2       A.   We only tested a specific one, Hepatitis
3   antibody test.
4       Q.   Okay.  And he was negative for that;
5   correct?
6       A.   On the test, yes.
7       Q.   Okay.  Now, earlier you told us, Dr. Khan,
8   that Pharma Medica does not draw blood in the dark.
9   And you disagreed with Mr. Wallace's testimony, or
10  his brother's testimony to that effect.  Is there
11  some reason you would not want to draw blood in the
12  dark?
13      A.   First and foremost, our procedures are
14  very, very standard and strict.  We have to ensure
15  that we take the correct sample from the correct
16  person at the correct time.  Now, over all of these
17  things, these are SOPs.  The first priority is always
18  subject safety, which is the volunteer, participant
19  safety, and the staff safety, too.  Handling in the
20  dark, you cannot ensure safety.
21      Q.   It's not a safe thing to do; is it?
22      A.   Yeah.  So it is never done in the dark.
23  We instruct -- We do have studies where the blood
24  draws are done in the night.  So we turn on the

35

1       A.   As for --
2           MS. DREW:  Object to the form of the
3   question; calls for a legal conclusion, and expert
4   opinion.
5           Strike that.
6           Object to the form of the question;
7   calls for expert opinion beyond the scope of this
8   witness's disclosure, and education, and training.
9           Subject to that, you can go ahead
10  and answer, if you know, Doctor.
11          MR. MCBREARTY:  Join.
12      A.   What was the question?  Sorry.
13          MR. WENDLER:  I'll just have the
14  court reporter read it back for us so we don't have
15  to repeat the objections.
16      A.   Oh, okay.  Sorry.
17          (Whereupon, the requested
18          portion of the record was
19          read back by the court
20          reporter.)
21      A.   I cannot comment.  I don't know.  Because
22  basically what all tests we did, there was nothing on
23  it.
24      Q.   (BY MR. WENDLER)  He tested negative for

34

1   lights.  Like, for example, the last blood draw could
2   be at 11:00, then could be a blood draw at two
3   o'clock in the morning.
4       Q.   Okay.
5       A.   So we turn on the lights in the clinic
6   area where the bloods are drawn.  And then 15 minutes
7   before, we go wake up the volunteers or the
8   participants saying, 'Your blood draw is starting.'
9           We don't wake up all of them.  We wake up
10  the ones that are at that time.  Like, for example,
11  the B group and all, and say, 'Your blood draw is
12  starting.  Please make sure you come in.  Have a seat
13  at least a few minutes before your blood draw.'
14          And then it is conducted exactly in the
15  full light with the staff supervision with all the
16  universal precautions as with all the blood draws, be
17  it night or day.
18      Q.   Were you actually at the Pharma Medica St.
19  Charles facility during the blood draws that were the
20  subject of the studies that we're here about today?
21  Were you actually present when those blood draws were
22  --
23      A.   No, I was not present for both of these
24  studies.

36

1  Q.   Okay.  Now, you said that the blood should
2  not be drawn in the dark.  Is it also correct that
3  the blood should not be drawn from a patient who is
4  sleeping, or from a study participant who is
5  sleeping?
6  A.   So, what we do is we inform the
7  participants that this drug could cause sleepiness,
8  'You could be sleepy by this drug.'  Now, certain
9  medications where they could be sleepy, or if there
10  could be any possible potential side effects, like
11  your blood-pressure could fall down because it's a
12  blood-pressure lowering drugs and all, we conduct
13  them on hospital beds, or where the subjects are on
14  the beds, and all the stuff.  And the staff goes to
15  them, and collects the sample.
16        Now, we do give them a schedule of all the
17  time points the blood samples are going to be
18  collected.  For example, you are told, 'Your sample
19  is going to be at every hour from seven o'clock in
20  the morning until 3:00, and then every two hours.'
21  So you know exactly where the time is.
22        And at the time of blood sample
23  collection, the staff will wake them up --
24  Q.   Okay.

37

1  A.   -- saying, 'Sir, I am going to be
2  collecting your sample.  Let me know if you're okay.'
3  Q.   The staff is supposed to wake the
4  participant up at the time of the blood draw;
5  correct?
6  A.   Wake the participant up, and get an
7  acknowledgement meaning saying, 'Yes.  Go ahead.'
8  Q.   Okay.
9  A.   Now, sometimes they are sleepy.  They'll
10  say, 'Yeah.  Go ahead.'  So -- But staff will get
11  that from them, verify the arm band, verify the time,
12  verify the information, everything on the tubes and
13  all, and then collect the sample.
14  Q.   Okay.  Now, is it prohibited that if the
15  participant says, 'Yes.  Go ahead,' when he or she is
16  woken up, is it prohibited for the phlebotomist, or
17  the employee of Pharma Medica to proceed with drawing
18  the blood, if the participant falls back asleep?
19  A.   No.  If they give the consent and say yes,
20  it will be within the same minute, or the minute
21  prior.
22  Q.   All right.
23  A.   But at that time, if the staff notices
24  something is happening to the subject or the

38

1  volunteer, they'll withdraw the needle immediately,
2  if it's noted they're not feeling well.
3  Q.   Okay.  And that's the rules, that's the
4  procedures, that's the protocol that the employees at
5  Pharma Medica at the St. Charles facility were
6  supposed to follow; correct?
7  A.   Will follow, yes.
8  Q.   And that was for the safety of the
9  participants, as well as the staff; correct?
10  A.   Yes.
11  Q.   All right.  Now, let me ask you this:  If
12  you found out that one of the employees of Pharma
13  Medica had violated one of those rules, one of those
14  safety rules, and was reusing a needle on two
15  participants, what would the ramifications be?
16  A.   This has not happened.  Like at least in
17  the years I have been there, I have never heard about
18  it.  And what I've heard, nothing has happened like
19  that before.
20        If anyone risks the safety of the subject,
21  or integrity of study data in Pharma Medica, we have
22  a code of conduct, and according to which the
23  employee will be immediately terminated.
24  Q.   So if an employee is caught reusing a

39

1  needle on two patients, whether it's intentionally or
2  by accident, if they're caught doing that, they're
3  fired immediately; is that correct?
4  A.   If they are, yes.
5  Q.   All right.  How about if an employee at
6  Pharma Medica is caught drawing blood in the dark, is
7  that also in violation of the code -- What did you
8  say, the code of ethics, or the code of conduct?
9  A.   Either.
10  Q.   I'm sorry?
11  A.   There is no exception.  They will be
12  terminated.
13  Q.   So if one of the Pharma Medica employees
14  that's drawing blood does it in the dark, and gets
15  caught doing that --
16  A.   That has ---
17  Q.   -- that person is fired, as well; right?
18  A.   They're -- Again, this has not happened.
19  That's what I'm trying to say.  If in case they do
20  anything like that where they are risking the
21  subject's safety, and the staff safety also, they're
22  violating our code of conduct.
23  Q.   Okay.  And you say this has not happened.
24  That's based on information relayed to you since you

40

| | |
|---|---|
| 1  were not there; correct? | 1  St. Charles facility when Dr. Jordan was there, was |
| 2      A.   Yes. | 2  she the senior leader on-site? |
| 3      Q.   If one of your employees at the St. | 3      A.   The coordinators will be there.  The study |
| 4  Charles facility learns about another employee | 4  coordinators were in charge, along with the group |
| 5  violating one of these safety rules, and is using a | 5  leaders.  And they will ensure that this information |
| 6  needle on two patients, is that employee supposed to | 6  is passed on to Dr. Jordan, myself, Louis Co, and all |
| 7  report that to someone, if they learn that some other | 7  of that stuff, along with HR. |
| 8  employee's doing this? | 8      Q.   But the chain of command is that they're |
| 9      A.   So, at every time we conduct a blood | 9  supposed to report it to the study coordinator, who |
| 10 sample collection, there is always two staff who is | 10 then reports it to Dr. Jordan -- |
| 11 doing it. | 11     A.   So --- |
| 12     Q.   Uh-huh. | 12     Q.   -- and then she reports it to you?  Is |
| 13     A.   Okay.  Along with that, we always have | 13 that how it works? |
| 14 supervisor on site. | 14     A.   No.  So basically what happens is the |
| 15     Q.   Okay. | 15 technicians and the group leaders, they will report |
| 16     A.   Which is a flow leader, or the group | 16 to the supervisor.  But they always include myself, |
| 17 leader we call it, that is there to supervise.  In | 17 Louis Co.  And I think, at that time, it was more of |
| 18 case the group leader or supervisor is not there, | 18 Louis Co because I was not there on-site.  Louis Co |
| 19 there is always a senior person, which would be a | 19 and Dr. Jordan will be informed in paddle all the |
| 20 quality control associate, or a study coordinator, or | 20 time. |
| 21 a medic always present. | 21     Q.   How are you notified since you weren't |
| 22     Q.   Uh-huh. | 22 there?  Would you get an e-mail?  Would you get -- |
| 23     A.   They will ensure that, God forbid, even | 23     A.   I would get an e-mail if any issues like |
| 24 before the staff does it, they will ensure they're | 24 that happened, definitely.  I will get a phone call. |
| 41 | 43 |
| May Reporting Service | May Reporting Service |

| | |
|---|---|
| 1  doing all the steps accordingly.  For example, making | 1      Q.   Okay. |
| 2  sure you're changing the gloves.  As soon as you | 2      A.   Definitely. |
| 3  collect the sample, you're discarding the needle off. | 3      Q.   Now, let me ask you this:  If one of the |
| 4  You're pulling the tube off.  So it's not that they | 4  employees learns that another employee's violating |
| 5  will wait until it's happened to report to us, they | 5  one of these safety rules, and is reusing the |
| 6  will stop it prior to happening. | 6  needles, or drawing blood in the dark, can that |
| 7      Q.   All right.  Well, let's assume that one of | 7  employee be fired for not relaying that information |
| 8  the employees learns from another employee that a | 8  in the chain of command like you just described? |
| 9  third employee broke the rule, and was using a needle | 9      A.   That employee, first and foremost, if |
| 10 on two patients, on two participants.  Is that | 10 anything like that, even if rumors come of it -- |
| 11 employee supposed to report that to someone -- | 11     Q.   Yes. |
| 12     A.   Yes. | 12     A.   -- like talking gossip, it will be |
| 13     Q.   -- to Dr. Jordan, or you, or someone else? | 13 investigated totally. |
| 14     A.   They have to report immediately. | 14     Q.   That's not the question, though. |
| 15     Q.   To whom? | 15          Can the employee who learns of this |
| 16     A.   To the senior person that's on-site.  So | 16 information, can that employee be fired by not |
| 17 if it's a group leader, if it's a coordinator, or if | 17 relaying the information to the supervisor, or the |
| 18 it's me or Dr. Jordan, they have to be reported to | 18 study coordinator, or the chain of command like you |
| 19 every one. | 19 described it a few minutes ago? |
| 20     Q.   So the senior leader on-site would be the | 20     A.   So again, we have to investigate.  And |
| 21 person that these reports are supposed to be relayed | 21 then basically we have to look into with HR saying |
| 22 to -- | 22 'How serious is this one?  Did the employee |
| 23     A.   Yes. | 23 intentionally try to withhold information, or was |
| 24     Q.   -- correct?  And at any given time at the | 24 missed, or was not informed properly?'  Then |
| 42 | 44 |
| May Reporting Service | May Reporting Service |

1    evaluate. But if it's intentional, yes, they will be
2    terminated.
3        Q.    All right. So if an employee
4    intentionally withholds that information, that
5    employee can be fired?
6        A.    (Witness nodding head.)
7        Q.    Correct?
8        A.    Yes.
9        Q.    All right. You mentioned something
10   earlier that the needles are never left exposed with
11   the cap off; right?
12       A.    (Witness nodding head.)
13             MS. DREW: You need to answer yes.
14       A.    Oh, yes. Sorry. Yes. Sorry.
15       Q.    (BY MR. WENDLER) And why is that?
16       A.    As I said, it's not safe to leave them
17   open. They could have accidental finger-prick
18   injury, not just for the subject, even for the staff.
19   They might try to handle it to move it, and all that.
20   So, don't. So if you have removed the cap, and then
21   you're not using the needle, put the safety cap on,
22   and discard it immediately.
23       Q.    Okay. Are the Pharma Medica employees,
24   are they also screened for blood-borne pathogens

                                    45
                        May Reporting Service

1    MS. DREW: Yeah.
2        Q.    (BY MR. WENDLER) In Missouri?
3        A.    Yes.
4        Q.    And what was the subject of that case?
5        A.    I think it was an accidental fall. The
6    case went on, and it was dismissed; right?
7              MS. DREW: Yeah.
8        A.    Dismissed.
9              MS. DREW: Dismissed with prejudice.
10   Andrew Walker.
11             MR. WENDLER: Walker?
12             MS. DREW: Filed in St. Charles
13   County.
14             MR. WENDLER: St. Charles County?
15             MS. DREW: Yes.
16       Q.    (BY MR. WENDLER) Did you testify in that
17   case, sir?
18       A.    No, I was not --- I did not.
19       Q.    All right.
20             MS. DREW: Plaintiff was pro se, and
21   it was dismissed by the court.
22             MR. WENDLER: I'm assuming by that,
23   you defended?
24             MS. DREW: I defended it, and there

                                    47
                        May Reporting Service

1    before hiring?
2        A.    No. I don't think it's allowed under
3    Missouri laws, or something like that.
4        Q.    Okay.
5        A.    They're not screened for any of these
6    conditions.
7        Q.    Now, the St. Charles Pharma Medica office,
8    the clinical office that we're here about today, I
9    understand that office closed down for business
10   approximately January of 2019; does that sound right?
11       A.    Correct. Yes.
12       Q.    Why did that facility close?
13       A.    I would say it was a business decision,
14   like amount of business, and what we had to manage
15   both the sites. So it was basically a management,
16   senior management decision to close our Pharma Medica
17   location.
18       Q.    So it was attributable only to just the
19   loss of business?
20       A.    Yes, the business.
21       Q.    Okay. Has Pharma Medica ever been sued
22   before, to your knowledge?
23       A.    I think there was a case prior, 2015 or
24   something like that. Yeah.

                                    46
                        May Reporting Service

1    was no payment.
2        Q.    (BY MR. WENDLER) Dr. Khan, although you
3    are a medical doctor licensed in India?
4        A.    Yeah.
5        Q.    You understand that there was no
6    physician-patient relationship between you and
7    Mr. Wallace; am I correct?
8        A.    Yeah, I know.
9        Q.    Am I correct?
10       A.    You're correct, sir.
11       Q.    All right. You told me earlier that you
12   have probably spoken to Mr. Wallace, but you don't
13   have any independent recollection of that. How is it
14   that you know you've spoken with him?
15       A.    I do meet a lot of volunteers or subjects
16   in the clinic. I spend a lot of my time in the
17   clinic with them, with the subjects, addressing any
18   of their questions, or things that they have. Also
19   ensuring with the staff being present to show what
20   the procedures they are conducting are according or
21   not.
22       Q.    All right.
23       A.    So I spend a lot of time. So there could
24   have been instances. I speak to a lot of subjects, a

                                    48
                        May Reporting Service

**Page 49**

1  lot of them.

2    Q.    At some point in time you learned, before

3  this lawsuit was filed, correct me if I'm wrong, that

4  Mr. Wallace had been diagnosed with Hepatitis C; am I

5  correct?

6    A.    Correct. Yes.

7    Q.    All right. When did you learn of that in

8  relation to the actual diagnosis?

9    A.    I think it was in between. Most probably,

10  I would say, around the time that he was admitted in

11  the hospital, and he was hospitalized. Around that

12  time, I would say.

13    Q.    That's the Anderson Hospital in Maryville,

14  Illinois you're talking about?

15    A.    Somewhere in Illinois, yes. Maryville,

16  Anderson, yeah.

17    Q.    So you learned about his --

18    A.    Around that duration of time.

19    Q.    All right. You learned about his

20  Hepatitis diagnosis around the same time --

21    A.    Yeah.

22    Q.    -- that he was in Anderson Hospital in

23  Maryville, Illinois?

24    A.    Basically I was informed. I was aware of

**Page 50**

1  that. I was not informed when his initial labs were

2  done saying they were slightly off and all. We asked

3  for repeat. No, they don't. However, when anyone is

4  hospitalized and all --

5    Q.    Uh-huh.

6    A.    -- they will let me know.

7    Q.    Okay.

8    A.    I think the Hepatitis diagnosis came in

9  afterwards, after he was hospitalized. When he came

10  back, discharged, then he came back to the clinic,

11  did the repeat tests at that time. So, I was

12  informed about him being hospitalized, and the

13  diagnosis of the Hepatitis C came in afterwards.

14    Q.    All right. Well, I'm trying to pinpoint,

15  as closely as we can, the time frame that you learned

16  of the diagnosis, or the potential diagnosis?

17    A.    Yes.

18    Q.    Was it while Mr. Wallace was in Anderson

19  Hospital that it was reported to you?

20    A.    That he has Hepatitis?

21    Q.    Yes.

22    A.    That was after.

23    Q.    It was after?

24    A.    Yeah.

**Page 51**

1    Q.    Okay.

2    A.    Only when we got the labs and all.

3    Q.    All right. And that would've been within

4  a week or so of him being in Anderson Hospital?

5    A.    I don't know. I have to check the dates

6  exactly.

7    Q.    Well, let me ask it this way: After you

8  learned Mr. Wallace had been diagnosed with Hepatitis

9  C, after the positive lab results came back, did you

10  make any attempt to reach out to Mr. Wallace and talk

11  to him?

12    A.    No.

13    Q.    Okay. Why not?

14    A.    Well, our staff at the site was already

15  following up with Mr. Wallace. And Louis Co, the

16  study coordinators were already following up with

17  him. And had Dr. -- Dr. Jordan had gone and seen

18  him, and visited. So I said that was sufficient. I

19  don't want to be --- That's too much, if more people

20  do it; right?

21    Q.    All right. So --

22    A.    I think that was sufficient.

23    Q.    And how did you learn that Dr. Jordan went

24  to Anderson Hospital?

**Page 52**

1    A.    I think Louis Co had informed me over the

2  phone.

3    Q.    Okay. Did Mr. Co tell you that he went to

4  the hospital also?

5    A.    Yeah. I think he mentioned both of them

6  had gone, or he had driven Dr. Jordan, or something

7  like that, yeah.

8    Q.    Okay. But this was after the fact, after

9  the hospital visit that --

10    A.    Yes.

11    Q.    -- you were notified; correct?

12    A.    Correct. Yeah.

13    Q.    Okay. Let me switch gears a little bit

14  now. I am going to hand you what we will mark as

15  Exhibit No. 1. Let's just start with the 4109 study.

16    A.    Okay.

17              (Whereupon, Plaintiff's

18              Exhibit No. 1 was marked

19              for identification by Mr.

20              Wendler.)

21    Q.    (BY MR. WENDLER) Are you familiar with

22  this document, sir?

23    A.    Yeah, this is the study protocol. Sorry.

24    Q.    Yes. And this is for the study for the

1   Roxane Laboratories product; correct?

2      A.   Correct.

3      Q.   Did you have any hand in drafting this?

4   What do you call this, a protocol, or a contract?

5   What do you call this?

6      A.   This one is the protocol. This is the

7   study protocol that we conduct the study accordingly

8   with. Now --

9      Q.   Did you have any hand in drafting this

10   document, Exhibit No. 1?

11      A.   I would say no.

12      Q.   Who drafted it, do you know?

13      A.   So, basically --

14             MR. MCBREARTY:  Off the record.

15             (Whereupon, an off the

16             record discussion was

17             held, which by direction

18             was not stenographically

19             reported.)

20      A.   So basically the drafting of the protocol

21   is -- comes in from what the sponsor wants, sponsor

22   requirements, along with our scientific affairs team.

23      Q.   (BY MR. WENDLER) Your sign what?

24      A.   Scientific affairs team at the corporate

              53

1   location. They review --

2      Q.   I'm still not understanding. Your signed

3   what?

4      A.   Scientific affairs.

5      Q.   Scientific affairs?

6      A.   The department over there.

7      Q.   All right.

8      A.   They look at that, what are the guidelines

9   of the recommendations for conducting trials. What

10   are the requirements, age, sample collection, what

11   time should it be taken, along with the principal

12   investigator. They all review it together, and draft

13   it. I do look at most of the protocols. I don't

14   think I did this one, because this one was the one

15   that we had done quite a few times, in order to

16   looking at the feasibility, and the logistics of the

17   studies.

18             (Whereupon, Plaintiff's

19             Exhibit No. 2 was marked

20             for identification by Mr.

21             Wendler.)

22      Q.   (BY MR. WENDLER) Okay. Let me hand you

23   Exhibit No. 2. And this is the protocol for the

24   study for the --

              54

1      A.   Pseudo --

2      Q.   -- protocol 3952, bearing Bates number

3   168.

4             MR. MCBREARTY:  Thank you.

5      Q.   (BY MR. WENDLER) Are you familiar with

6   Exhibit No. 2?

7      A.   Yeah. I had reviewed this protocol

8   earlier. I'd gone through it.

9      Q.   Okay. All right. And with regard to

10   Exhibit No. 2, that's the study --

11      A.   3952.

12      Q.   -- for the Tris Pharma --

13      A.   Correct.

14      Q.   -- study; correct?

15      A.   Yes.

16      Q.   All right. Did you have a hand in

17   drafting, or participating in the drafting of the

18   Exhibit No. 2, the Tris Pharma protocol?

19      A.   No, I don't think so. Not that I can

20   remember.

21      Q.   I want to ask you some questions about

22   both of these studies combined. And rather than ask

23   the same questions over and over, I'm going to ask

24   you about these Exhibits in the singular rather than

              55

1   the plural. Okay?

2      A.   Okay.

3      Q.   But the same questions will be applicable

4   to both studies.

5           Okay. First, the guidelines that are

6   created for these, for the study, who creates those

7   guidelines?

8      A.   So, basically the scientific affair team,

9   along with our protocol writing team.

10      Q.   The scientific affair team at Pharma

11   Medica?

12      A.   Yeah. They review the F.D.A. guidelines.

13      Q.   Okay.

14      A.   What is there previously, if F.D.A. had

15   issued any guidelines on conduct of these studies and

16   all. They'll review those guidelines, along with the

17   -- consultation with the sponsors.

18      Q.   The sponsor? And in this case, the

19   sponsor for Exhibit No. 1 would be --

20      A.   Is Roxane.

21      Q.   -- Roxane Laboratories; correct?

22      A.   Yes.

23      Q.   And the sponsor for Exhibit No. 2 protocol

24   study would've been Tris --

              56

| | |
|---|---|
| 1  A.  Tris. | 1  It's in agreement with -- What do you call -- |
| 2  Q.  -- Pharma; correct? | 2  Q.  F.D.A.? |
| 3  A.  Yes. | 3  A.  -- F.D.A. guidelines. |
| 4  Q.  All right.  The sponsor, you said, has | 4  Q.  Okay. |
| 5  some input in creating the guidelines; correct? | 5  A.  Then, yes. |
| 6  A.  Not the guidelines.  Guidelines are | 6  Q.  All right.  And reading through the |
| 7  provided by the F.D.A. | 7  protocol, it looks like the sponsor also has some |
| 8  Q.  All right. | 8  input on when the patients are allowed -- are allowed |
| 9  A.  All right.  Any other studies specific | 9  to eat?  I said patients.  I meant participants. |
| 10  design and all, the sponsor will have an input.  It's | 10  A.  So basically it's not allowance to eat. |
| 11  their study. | 11  It's, again, F.D.A. guidelines says for the |
| 12  Q.  For example, what does the sponsor -- | 12  bioavailability studies; right? |
| 13  A.  Well, if the sponsor says that, 'Oh, I | 13  Q.  Uh-huh. |
| 14  want to include -- what do you call -- people or | 14  A.  If it's a fed study, they're evaluating |
| 15  volunteers over the age of 55 -- | 15  concentration of the drug when the drug is taken on a |
| 16  Q.  Okay. | 16  full stomach. |
| 17  A.  -- to 60.'  Then our scientific affairs | 17  So F.D.A. has specific guidelines. |
| 18  team will check and say, 'No.  The guidelines state | 18  Actually, they state how much concentration of |
| 19  that it has to be up to 50 only.' | 19  carbohydrates, fats, and protein should be there. |
| 20  Q.  Okay. | 20  They should be taking it within 30 minutes.  So there |
| 21  A.  So we substantiate that, and tell them | 21  are very specific guidelines. |
| 22  that, 'These are the guidelines.  So we are stopping | 22  And also, these guidelines state that for |
| 23  at 50.' | 23  the majority of the studies, they have to be fasting |
| 24  Q.  Okay.  So the sponsor can create | 24  for at least -- what do you call, four hours. |
| 57 | 59 |
| May Reporting Service | May Reporting Service |
| 1  specifications, and Pharma will do it, Pharma Medica | 1  Q.  All right. |
| 2  will do it, provided it's within the F.D.A. | 2  A.  So the most engaging portion is basically |
| 3  guidelines; correct? | 3  the time of the duration that they're fasting before |
| 4  A.  Within the F.D.A. guidelines, yes. | 4  and after. |
| 5  Q.  So the sponsor can determine things such | 5  Q.  Okay. |
| 6  as age of the participants; correct? | 6  A.  Other than that, it's regular times. |
| 7  A.  Yes. | 7  Q.  Okay.  If you could look at Exhibit No. 1, |
| 8  Q.  Okay.  And the sponsor can determine when | 8  sir, turn to Page 10, Bates number 361.  Where it |
| 9  blood is to be drawn? | 9  says Table of Contents, do you see that? |
| 10  A.  No.  I don't think the sponsor can | 10  A.  Yes. |
| 11  determine when the blood is drawn, unless they have | 11  Q.  All right.  And then on Exhibit No. 2 -- |
| 12  data with them.  If they have done previous trials, | 12  A.  Uh-huh. |
| 13  and which indicates that you need these sampling time | 13  Q.  -- on Page 15, again we have a Table of |
| 14  points and all. | 14  Contents.  I want to ask you about those. |
| 15  Q.  Yes. | 15  A.  Sure.  Page 15? |
| 16  A.  So they can tell us like, 'You know what? | 16  Q.  Fifteen, right.  It's Bates numbered 0182. |
| 17  We have done trials.  This is the data we have for | 17  A.  Okay. |
| 18  these time points.  This is where we found | 18  Q.  What we're looking at in the Exhibit is |
| 19  deficiency.  And we want to add these time also into | 19  Table of Contents for the study protocol; correct? |
| 20  it, or remove time lines in those specific matters.' | 20  A.  Yes. |
| 21  Q.  By way of example, the sponsor can say, | 21  Q.  And who actually created this study |
| 22  'We want the blood samples to be drawn every hour on | 22  protocol?  Who printed it out?  I see the Pharma |
| 23  the hour.'  By way of example; am I right? | 23  Medica logo on the top of the page, but who actually |
| 24  A.  If they have data supporting that, and if | 24  printed this out? |
| 58 | 60 |
| May Reporting Service | May Reporting Service |

**Page 61**

1  A.  Printed it out, or completed it, how it
2  would be approved, and reviewed, and signed, and then
3  distributed?
4  A.  I'll go with your question. It's much
5  better.
6  Who printed it out, created it, and
7  approved it?
8  A.  Okay. So, it's different levels again.
9  We have a separate team called the protocol writers.
10  Q.  Uh-huh.
11  A.  So they are the ones who complete and
12  draft the protocols. There you will see there is a
13  page -- Is it after the Table of Contents? Over
14  here, key personnel and facilities, you'll see there
15  the name of the protocol writers on it.
16  Q.  Okay. And who is the key personnel
17  protocol writer?
18  A.  The protocol writer for this is Erangi.
19  Q.  And is that a Pharma Medica employee?
20  A.  Yes.
21  Q.  What is his name, or can you -- Erangi?
22  What's the last name?
23  A.  Tennakoon.
24  Q.  Okay. And again, he works for Pharma

**Page 62**

1  Medica?
2  A.  Yes.
3  Q.  And there's also a person here listed --
4  A.  The vice-president of quality assurance.
5  Q.  Radu?
6  A.  He's the vice-president of scientific
7  affairs, the department I was telling you, scientific
8  affairs.
9  Q.  This is on Exhibit No. 2; correct?
10  A.  Yes.
11  Q.  All right. Exhibit No. 1, who were the
12  key personnel?
13  A.  The protocol writers was Arun Mehan. The
14  vice-president of quality assurance was Mary
15  Stipancic. Vice -- Senior vice-president of
16  scientific affairs was Dr. Radu Pop. Then again,
17  vice-president of laboratory operations, Mohammed
18  Bouhajib. Our clinical trial director, Latifa
19  Yamlahl. And principal investigator, Dr. Heather
20  Renee Jordan.
21  Q.  All right. And all of those individuals,
22  with the exception of Dr. Jordan --
23  A.  Dr. Jordan.
24  Q.  -- work at Pharma Medica headquarters in

**Page 63**

1  Canada; correct?
2  A.  I think Dr. Radu is retired.
3  Q.  Okay.
4  A.  Okay.
5  Q.  Did he work at --
6  A.  He worked --
7  Q.  -- Pharma?
8  A.  -- at headquarters, yes.
9  Q.  Okay. Now, the document that we have in
10  front of us, with regard to the Table of Contents, it
11  appears that this document gives parameters, and
12  instructions, and instructions on a whole bunch of key
13  areas. If we look at -- There's a study design
14  section. Do you see that?
15  MS. DREW: Which document? Which
16  Exhibit are you using?
17  MR. WENDLER: It's in both.
18  MS. DREW: Okay.
19  Q.  (BY MR. WENDLER) Section 8.0 says study
20  design.
21  A.  Yes.
22  Q.  Do you see that?
23  A.  Yes.
24  Q.  All right. And then there's a next

**Page 64**

1  paragraph, or next entry below design says interval
2  between doses.
3  A.  Okay.
4  Q.  So this document regulates the time in
5  between doses of the drug that's being tested;
6  correct?
7  A.  Correct.
8  Q.  And then was Section 8.7 says study
9  population. That's where the geographic
10  characteristics --
11  A.  Yeah.
12  Q.  Not geographic.
13  Strike that.
14  That's where the demographic
15  characteristics of the participants are regulated and
16  restricted; correct?
17  A.  Are indicated, yes.
18  Q.  All right. Next Section, 9.0, subject
19  selection, talks about general screening, how the
20  subjects are to be screened prior to participation or
21  entry in the study; correct?
22  A.  Correct.
23  Q.  And there is the screening procedures that
24  sets out the procedures that are to be followed for

1   the screening process; correct?
2      A.   Correct.
3      Q.   And the inclusion and exclusion criteria,
4   that sets forth how someone can be admitted or not in
5   the study; correct?
6      A.   Correct.
7      Q.   And then it even regulates methods of
8   contraception?  In Section 9.5, it says effective
9   methods of contraception; correct?
10      A.   Correct.
11      Q.   So that regulates, if a female is involved
12   and she's using a contraceptive, this regulates
13   participants, depending on the type of contraceptive
14   devices they're using; correct?
15      A.   Yes.  So basically it indicates what they
16   should be using --
17      Q.   And not using?
18      A.   -- during and after the study, yes.
19      Q.   All right.  And then the next section,
20   10.0, study procedures, and it has restrictions, and
21   housing, and test procedures at check in, all of
22   these things are regulated and governed by this
23   contract, or this protocol; correct?
24      A.   Correct.

65
May Reporting Service

1      Q.   It talks about administration of food and
2   fluid.  That's also regulated by the protocol?
3      A.   Yes.
4      Q.   The study drug administration, that's also
5   regulated by the protocol; right?
6      A.   Correct.
7      Q.   What's the next category, 10.6?
8      A.   Concomitant treatment.
9      Q.   What's that about?
10      A.   So in case if any person is not feeling
11   well, they need to administer any medication and all,
12   what is allowed, what is not allowed.  Again, if any
13   medication has to be given, it has to be given.
14      Q.   All right.
15      A.   Right.  If -- That basically applies to,
16   also, if the subject is taking any medication, any
17   concomitant medication is allowed during the study
18   for them to take.
19      Q.   Fair enough.
20   This protocol regulates, it says posture
21   and physical activity.  Is that posture and physical
22   activity of the participants?
23      A.   Yes.
24      Q.   All right.  And then the next section

66
May Reporting Service

1   deals with health status monitoring, and vital sign
2   measurements, and ECG monitoring.  That's all
3   regulated --
4      A.   Yes.
5      Q.   -- during the study by this protocol;
6   right?
7      A.   Correct.
8      Q.   And then there's a category called end of
9   study procedures.  Is that for when it comes time for
10   the participants to be released from the study?
11      A.   Yes, when the study is completed.
12      Q.   There is a section called criteria for
13   removal from the study.  Again, that sets out the
14   parameters that when participants should be removed?
15      A.   Correct.
16      Q.   There is an adverse events section;
17   correct?
18      A.   Correct.
19      Q.   And there's a procedure for reporting
20   adverse events; correct?
21      A.   Correct.
22      Q.   And what Mr. Wallace had here was, in
23   fact, reported as an adverse event; correct?
24      A.   Correct.

67
May Reporting Service

1      Q.   And then there's a category called study
2   documentation that regulates how the documents for
3   the study are to be compiled and stored; correct?
4      A.   Correct.
5      Q.   And then Section 17.0, it says safety
6   evaluation?
7      A.   Uh-huh.
8      Q.   Right?
9      A.   Yes.
10      Q.   What is that about?
11      A.   Let me see.
12      Q.   Well, I looked at it, and it says under,
13   safety evaluation in the protocol, Section 17.0, the
14   first sentence says, "There be will no formal
15   evaluation of safety or tolerability."  So, I am a
16   little bit confused.
17      A.   So --
18      Q.   What does the safety evaluation deal with?
19      A.   For some studies, right, for this one
20   there was no evaluation in between the study, or at
21   the end of the study.  There are certain studies like
22   drug-drug interaction studies, those -- escalation
23   studies, single ascending dose, multiple ascending
24   dose, SAD and MAD they call it.  These studies have

68
May Reporting Service

1  the safety evaluation. So, especially like the dose
2  escalation studies where you do a portion of the
3  study, you give a particular dose, evaluate the
4  safety data. And then after that evaluation is done,
5  then you go into the next step. If there is going to
6  be another dose added, or the dose increased or
7  decreased. So these kind of studies will have the
8  safety evaluation.
9          Now, for all our protocols, there is a
10 standard template so we know exactly what is where.
11 Even if there is no safety evaluation, there is still
12 a sentence there. The paragraph will be
13 there to mention that.
14    Q.    All right.
15    A.    So this is basically applicable in dose
16 escalation studies.
17    Q.    Well, on Paragraph 17.0, it says there
18 will be no formal evaluation of safety or
19 tolerability.
20          Strike that. Let me just rephrase it.
21          Paragraph 17.0 of the protocol, under the
22 heading of safety evaluation states in the first
23 sentence, "There will be no formal evaluation of
24 safety or tolerability." Did I read that correctly?

69

1          MS. DREW: For the record, there was
2  insurance procured, and they denied the claim.
3          MR. WENDLER: Oh.
4          MS. DREW: They have insurance.
5  They had insurance in place. But when the claim was
6  submitted, the carrier denied the claim based on the
7  exclusion. I am not involved with the insurance side
8  of it ---
9          MR. WENDLER: Okay.
10         MS. DREW: --- with the denial of the
11 claim.
12         MR. WENDLER: Well, that's news to
13 me. That answers that question. You don't know why
14 it was excluded?
15         MS. DREW: No.
16         MR. WENDLER: Or why it was denied?
17         MS. DREW: No. All I -- I can look.
18 I believe it's Berkeley, but I can -- I can find out
19 which carrier it was submitted to.
20         MR. WENDLER: Uh-huh.
21         MS. DREW: And during the pendency
22 of this matter, I believe when you filed it initially
23 in St. Charles, at some point there was a
24 determination made by the carrier that there was no

72

1          right? Correct? PMRI is --
2     A.    Yes. Pharma Medica Research, correct.
3     Q.    Will have valid liability insurance at all
4  times subjects are at the clinical facility; correct?
5     A.    Correct.
6     Q.    It's been claimed that Pharma Medica had
7  no insurance to cover Mr. Wallace's injuries in this
8  case. Do you know if there is insurance?
9     A.    I'm not aware of the insurance policies
10 and all.
11    Q.    Do you know why there was no insurance
12 policy since it looks like --
13    A.    No. I don't if it's there or not. But I
14 am not aware of that much. This is something that I
15 don't deal with.
16    Q.    Okay.
17    A.    The insurance and all, it's the, yeah,
18 project management team that handles it.
19    Q.    All right. But you do agree that protocol
20 required the provision of insurance?
21    A.    Yes.
22    Q.    Okay. And whether there was insurance or
23 not, you don't know?
24    A.    There should be. But --

71

1     A.    Correct.
2     Q.    Now, next sentence says, "An assessment of
3  safety will be based primarily on the frequency and
4  severity of AEs." Correct?
5     A.    Correct.
6     Q.    AVs -- I'm sorry. AEs are adverse events;
7  correct?
8     A.    Correct.
9     Q.    So was there an assessment of safety based
10 on the reporting of Mr. Wallace's adverse event, if
11 you know?
12    A.    I'm not aware of that. I don't know.
13    Q.    All right. Okay. If you turn then to
14 Section 18.9 of the protocol?
15    A.    Insurance.
16    Q.    Are you with me?
17    A.    Yeah. Insurance; right?
18    Q.    Yes. It says insurance. Now, it says for
19 the purpose of study-related injury of subjects, the
20 sponsor will have valid insurance for the duration of
21 the study, and for at least 30 days after the end of
22 the study. Do you see that?
23    A.    Yes.
24    Q.    And it says PMRI, which is Pharma Medica;

70

| | |
|---|---|
| 1   coverage. And all I received was an e-mail saying, | 1   please provide or save a feed of that particular |
| 2   "You do not need to include me any longer. We have | 2   camera for that day, that time." |
| 3   denied the claim." | 3      Q.    Okay. |
| 4         MR. WENDLER:  Okay. | 4      A.    But no one from outside can see it, no. |
| 5      Q.    (BY MR. WENDLER) Just so I have covered | 5      Q.    All right. So none of the sponsors have |
| 6   myself here, Exhibit No. 1, that sets forth the | 6   access to the video monitoring? |
| 7   parameters of the protocol and testing procedures for | 7      A.    If there are any issues, then if it's |
| 8   the Roxane Laboratory study that Mr. Wallace was in; | 8   required, the sponsors will communicate with the |
| 9   am I correct? | 9   project management, and with the C.E.O., or our |
| 10      A.    Correct. | 10   clinical trial director, and then our team will look |
| 11      Q.    And Exhibit No. 2 sets forth the | 11   into it, and if they need to provide it for the |
| 12   parameters, and restrictions, and protocol for the | 12   sponsor, they can provide for that. |
| 13   testing that Mr. Wallace participated in for the Tris | 13      Q.    All right. So how far back can you go |
| 14   Pharma study; correct? | 14   back and capture video? |
| 15      A.    Correct. | 15      A.    I think it's -- I might be wrong, but I |
| 16      Q.    All right. Do the sponsors of the Pharma | 16   think it's approximately four weeks. |
| 17   Medica studies have the right to audit the records -- | 17      Q.    Okay. Well, let me ask you this: When |
| 18      A.    Yes. | 18   Mr. Wallace reported he had Hepatitis C -- |
| 19      Q.    -- of Pharma Medica? And do the sponsors | 19      A.    Uh-huh. |
| 20   have the right to monitor the studies? | 20      Q.    -- did anyone make any attempt to go back |
| 21      A.    Yes. | 21   for the prior four weeks, and capture any of that |
| 22      Q.    I've been informed that there was actually | 22   video footage of the testing, or whatever was going |
| 23   video cameras at the St. Charles Pharma Medica | 23   on at Pharma Medica in St. Charles? Did anyone do |
| 24   facility that enabled people from the outside to | 24   that? |
| 73 | 75 |
| May Reporting Service | May Reporting Service |
| 1   monitor via video feed; is that accurate? | 1      A.    No. Because our procedures are very much |
| 2      A.    No. | 2   in place and strictly followed, along with the |
| 3      Q.    No? | 3   universal precautions. So, there is no need to |
| 4      A.    There are cameras in the clinics, and on | 4   suspect that anyone could have ever done anything |
| 5   the periphery outside and all to monitor the | 5   like that. They were not. |
| 6   facilities, the subjects, and the staff. But these | 6      Q.    Okay. To make sure I have this correct, |
| 7   are not continuously watched by anyone. If there is | 7   you told us earlier that you have the ability to -- |
| 8   any issue, or any -- an issue comes in, like, for | 8         Strike that. |
| 9   example, subject compliance, staff issue, any theft, | 9         You told us earlier you had the ability, |
| 10   or any damage, or anything like that, then a -- what | 10   at the St. Charles facility, to go back and capture |
| 11   do you call -- a specific request would be made. | 11   video from four weeks back; am I right? |
| 12         This request has to be approved by our | 12      A.    Yes. |
| 13   C.E.O. to say that we would like to have a feed, | 13      Q.    But after Mr. Wallace reported that he had |
| 14   video feed of that particular clinic, or that | 14   contracted Hepatitis C, no one, at that point in time |
| 15   particular location to see if we have. | 15   or thereafter, made any attempt to go back and |
| 16         Now, myself, IT, and Louis Co, we did have | 16   capture the prior four weeks of video footage from |
| 17   access to the cameras, but we would not sit and watch | 17   the Pharma Medica facility; am I correct? |
| 18   the videos at all times. No one from outside could | 18      A.    Correct. |
| 19   watch it. So what our role was, if they say, 'Oh, we | 19      Q.    All right. You said that the people that |
| 20   notice the freezer door was open.' Or, 'We noticed | 20   had access to the video feed were you, Louis Co, and |
| 21   something was spilled in that location.' So what we | 21   the IT director; correct? |
| 22   do is we can go into that location, check the | 22      A.    IT department. |
| 23   cameras, inform the IT saying, 'Based on the incident | 23      Q.    IT department? And is that up in Canada? |
| 24   or the report that came in, which was approved, | 24      A.    Yes. |
| 74 | 76 |
| May Reporting Service | May Reporting Service |

| | |
|---|---|
| 1 | Q. And who is in charge of the IT department? |
| 2 | A. Our VP of IT, Mohammed Yamlahi. |
| 3 | Q. Did I see his name on one of these |
| 4 | contracts? |
| 5 | A. No. |
| 6 | Q. What did you say his last name was? Yam |
| 7 | -- |
| 8 | A. Yamlahi. That's Latifa. |
| 9 | Q. So Latifa Yamlahi has the same last name? |
| 10 | A. Yes. It's a sister. |
| 11 | Q. Latifa is his sister? Okay. And Mohammed |
| 12 | is the brother of Latifa? |
| 13 | A. Yeah. Yeah. |
| 14 | Q. Okay. And who all is in the IT department |
| 15 | under Mr. Mohammed Yamlahi in Canada? |
| 16 | A. There is John Ross. There is Mircea Vlad. |
| 17 | Q. Can you say that one again? |
| 18 | A. Mircea, M-I-R-C-E-A. John Ross, I already |
| 19 | mentioned. Mircea Vlad. Mircea. |
| 20 | Q. Last name? |
| 21 | A. Vlad, V-L-A-D. |
| 22 | Q. Vlad? Okay. |
| 23 | A. Vlad. And there is Amir, A-M-I-R, |
| 24 | Khaatan, K-H-A-T-T-A-N. And there is a David Li, |

77

May Reporting Service

| | |
|---|---|
| 1 | L-I, I think. Yeah. I think there is one or two |
| 2 | more. There are at different locations. So I don't |
| 3 | know all the staff there. But those are the ones I |
| 4 | usually communicate and all. |
| 5 | Q. And were all these people, Mr. Ross, Ms. |
| 6 | Vlad, Mr. Khaatan, Mr. Li, and the one or two more, |
| 7 | were they all employed in the IT department with |
| 8 | Mohammed -- |
| 9 | A. Yamlahi. |
| 10 | Q. -- Yamlahi during the time frame when |
| 11 | Mr. Wallace was being a participant in the St. |
| 12 | Charles studies that are at issue? |
| 13 | A. I don't know about David. I don't know |
| 14 | when he started. This is from 2016; right? |
| 15 | Q. Yes. |
| 16 | A. So I don't know when David -- Maybe, maybe |
| 17 | not. |
| 18 | Q. Okay. But the IT department consisted of, |
| 19 | at any given time, one, two, three, four, five -- at |
| 20 | least five individuals; correct? |
| 21 | A. Four to five, yes. |
| 22 | Q. Four to five individuals? Do they work |
| 23 | around the clock there? |
| 24 | A. There are standard hours, but they are |

78

May Reporting Service

| | |
|---|---|
| 1 | always available. |
| 2 | Q. Well, back during the time frame of these |
| 3 | studies, did Pharma Medica have any other study |
| 4 | facilities, other than the St. Charles facility, and |
| 5 | the facility in Canada for clinical studies? |
| 6 | A. No, we only had two sites. |
| 7 | Q. All right. Did all of these people in the |
| 8 | IT department have the ability to watch the video |
| 9 | feed in realtime? |
| 10 | A. I don't think so. I think only maybe a |
| 11 | couple of them maybe. I'm not for sure, but I think |
| 12 | Mohammed, John, and Mircea, I think. |
| 13 | Q. Okay. |
| 14 | A. Because you asked me for the IT |
| 15 | department; right? It's pretty big. They have |
| 16 | developers and all that stuff to look after in house. |
| 17 | But basically for any issues with the, I guess, |
| 18 | hardware and all, I think it's mostly Mohammed, |
| 19 | Mircea, and John Ross. |
| 20 | Q. And does John Ross and Mircea still work |
| 21 | there? |
| 22 | A. Yes. |
| 23 | Q. All right. And again, I apologize if I've |
| 24 | asked this. |

79

May Reporting Service

| | |
|---|---|
| 1 | A. Uh-huh. |
| 2 | Q. This is at the headquarters facility -- |
| 3 | A. Correct. |
| 4 | Q. -- in Toronto? Okay. |
| 5 | Louis Co, where is he these days? |
| 6 | A. He joined another pharmaceutical company |
| 7 | called BioPharma Research. Yes. BioPharma Research. |
| 8 | Q. When Ms. -- |
| 9 | A. It's BioPharma Medical Services, I think, |
| 10 | yeah. |
| 11 | Q. When Dr. Jordan testified, she said that |
| 12 | she had entered into a severance package contract |
| 13 | with Pharma Medica. Do you know anything about that |
| 14 | severance package agreement that she had? |
| 15 | A. No. Dr. Jordan reports to -- directly to |
| 16 | our C.E.O. |
| 17 | Q. Okay. |
| 18 | A. So, no, I don't. |
| 19 | Q. All right. Did Dr. Jordan ever report to |
| 20 | you for anything? |
| 21 | A. No. We worked together. We always worked |
| 22 | hand-in-hand. Like I would always consult with her. |
| 23 | She would always consult with me. Being the PI, and |
| 24 | then me being now the clinic portions, and the clinic |

80

May Reporting Service

1 setting, we always worked together. But she didn't
2 report to me.
3    Q.    Okay. When you said you always worked
4 together, is that when you were physically present
5 with each other?
6    A.    No. We would always talk, discuss. I
7 used to ask a lot of advice from her.
8    Q.    Okay.
9    A.    And then she would ask me about
10 procedures, like, 'Hey, can we do this?' But we
11 always were in constant contact.
12    Q.    Okay. Do you have any knowledge, Dr.
13 Khan, with regard to why Pharma Medica chose to use
14 needle sticks for blood draws rather than catheters?
15 Do you know why?
16    A.    So because catheters -- catheters have --
17 F.D.A. does not approve a device that is used on a
18 catheter called a mandarin or an obturator.
19    Q.    I'm sorry. You said that the F.D.A. does
20 not approve the use of catheters for --
21    A.    It approves the use of catheter. But a
22 catheter, you cannot leave it open. You have to
23 close it; right?
24    Q.    Right.

81

May Reporting Service

1    A.    So there is a specific device that is used
2 in Europe and Canada called as an obturator. So, if
3 this is a catheter, you put the obturator in there,
4 and you close it. F.D.A. does not approve the use of
5 the obturator in U.S.
6          Now, the other option for using a catheter
7 is to keep on flushing it, introducing either Heparin
8 or a saline flush. We are not that particular, and
9 it's not recommended for the scientific team to
10 always introduce saline flush, and what do you call
11 -- to use Heparin flush also, especially when it's
12 healthy individuals.
13    Q.    All right.
14    A.    Okay. So that's the reason why we cannot
15 use it. If F.D.A. approves it, we'll use it.
16    Q.    Okay.
17    A.    Or we would have used it.
18    Q.    Is there any prohibition against using
19 catheters for blood draws in studies such as are at
20 issue here?
21    A.    There is no prohibition, but because it's
22 not F.D.A. allowed, we cannot use it.
23    Q.    Well, if it's not F.D.A. allowed ---
24    A.    The obturator is not approved by F.D.A. to

82

May Reporting Service

1 be used on the catheter. That's why we cannot use
2 it.
3    Q.    But the Heparin flush is allowed?
4    A.    I don't think Heparin flush is allowed.
5    Q.    Okay. Let me ask you this: Are you aware
6 whether or not catheters are allowed to be used in
7 the U.S. for pharmaceutical studies such as at issue
8 here?
9    A.    You can use catheters, provided saline
10 flush or the Heparin flush is allowed.
11    Q.    All right. And do you know which is more
12 costly, or more expensive to use, the catheters or
13 the needle for blood draws?
14    A.    I would say they are both the same.
15    Q.    Okay. Do you know specifically why Pharma
16 Medica did not use catheters rather than the needle
17 for blood draws?
18    A.    Yeah. Because the obturator and the flush
19 were not approved.
20    Q.    Not approved by?
21    A.    The obturator are not approved to be used
22 over here in the U.S. And then we did not have the
23 approval to use the flush, saline flush.
24    Q.    Did not have approval to use the saline

83

May Reporting Service

1 flush by whom?
2    A.    By scientific affairs team, and also with
3 the drug. So if the drug concentrations are going to
4 be affected by saline flush, no, you cannot use it.
5    Q.    Okay. So what you're saying, correct me
6 if I'm wrong, is the scientific affairs and the
7 sponsor did not approve the use of the catheters;
8 correct?
9    A.    And the flush.
10    Q.    With the flush?
11    A.    Yeah.
12    Q.    Okay. And scientific affairs is Pharma
13 Medica; correct?
14    A.    Correct.
15    Q.    All right. So in order to use the
16 catheters, both would have to agree to it? The
17 sponsor would have to agree to it, and the scientific
18 affairs department at Pharma Medica would have to
19 agree to it; correct?
20    A.    Yes.
21    Q.    All right.
22    A.    Now, there are certain studies, certain
23 agencies which only strictly ask for catheters to be
24 used. For those ones, we would use bags. For these

84

May Reporting Service

**Page 85**

1   ones, we can't.
2       Q.   So you have used catheters for studies
3   when the sponsor called for it?
4       A.   When the regulatory agency where it was
5   being submitted called for it.
6       Q.   Fair enough.
7       Okay.  Do you know which is safer to avoid
8   blood-borne pathogens like Hepatitis C, that is the
9   needle draw or the catheter?  Which is safer?
10      A.   Overall for safety perspective --
11      Q.   Uh-huh.
12      A.   -- In my opinion, there might be different
13  schools that might think and all, not to avoid -- as
14  long as you take universal precautions, they both are
15  safe.  My personal preference would be needles are
16  much safer.
17      Q.   You think needles are safer?
18      A.   (Witness nodding head.)
19      Q.   Yes?
20      A.   Yes.
21      Q.   Okay.
22      A.   Safety-wise, needles.
23      Q.   Do you know, sir, in Missouri for the St.
24  Charles clinic whether there is a special certificate

85

May Reporting Service

**Page 86**

1   or license necessary to use catheters?
2       A.   No.
3       Q.   Do you know, one way or the other?
4       A.   I don't think there is a special
5   certificate or license in Missouri to use a catheter.
6       Q.   Do you know if there is a special
7   certificate or license required in Missouri to work
8   as a phlebotomist?
9       A.   Hold on.  Let me go back to the previous
10  one.
11      Q.   Sure.
12      A.   To use a catheter, there is no specific
13  license.  But in order to insert a catheter, you have
14  to be either a medic or a nurse, and -- Yeah.  All
15  else, you have to be at least IV certified.
16      Q.   You have to be what certified?
17      A.   IV, intravenous certified.
18      Q.   And that's not required for the needle
19  sticks?
20      A.   Needle sticks, they need to have a
21  phlebotomy certificate, or certified phlebotomy
22  completion.
23      Q.   All right.
24          MR. WENDLER:  Let's take five.  Take

86

May Reporting Service

**Page 87**

1   a break.
2          (Whereupon, a brief recess
3              was taken.)
4          MR. MUDGE:  We are back on the
5   record, and the time approximately 10:24.
6       Q.   (BY MR. WENDLER)  Dr. Khan, at the St.
7   Charles Pharma Medica facility, is it true that there
8   were timers that were present to regulate the time
9   allotted for blood draws per participant?
10      A.   No, we did not have timers to regulate the
11  blood draw.  We had clocks --
12      Q.   Fair enough.
13      A.   -- to document the time samples was
14  collected.
15      Q.   But there was not an allotted time limit
16  for a person to draw blood, and if they couldn't get
17  it done, for instance, in one minute, the next
18  participant moved into the seat?
19      A.   So, basically everything was scheduled.
20  It was all scheduled.
21      Q.   Uh-huh.
22      A.   Every procedure the person would do would
23  be scheduled based on the scheduled dosing time.  So
24  if a person is scheduled to be dosed at seven

87

May Reporting Service

**Page 88**

1   o'clock, and the blood draws are every hour, for
2   example, the person is scheduled to be dosed at 7:01,
3   the blood draw is supposed to be, as per the
4   protocol, collected hour -- every hour, then the
5   scheduled times would be 8:01, 8:02 -- Sorry.  8:01
6   9:01, 10:01.
7          Now, it is always preferred to draw the
8   sample on the minute.  However, if you are not able
9   to draw the sample on the minute, no matter for
10  whatever reason, it's a sampling difficulty, or the
11  subject was in the restroom, or they're late to come
12  in, then what we would do is we would send them over
13  to a backup table where they'll be a -- backup staff
14  would be present.  They would collect the blood.
15  Whatever time it was collected would be documented.
16      Q.   Okay.
17      A.   So there was no restriction that, oh, you
18  have to take the sample at 8:01.  If you don't take
19  the sample, sample is missed.  No.
20      Q.   So how is it determined when the person
21  goes to the backup table?
22      A.   So, basically the way the tables are set
23  up, there is two staff on each table.  So if this is
24  a table, there is one staff here, and one staff over

88

May Reporting Service

1 here. All the odd numbers will come on that side,
2 all the even numbers will come.
3 So, number one, if his sample time is
4 8:01, he will come on that side. Then staff A will
5 collect that sample at 8:01.
6 Q. Okay.
7 A. Okay. Number two will come over here to
8 the second staff to be taken at 8:02. Then a third
9 person would come to staff A. So they have two
10 minutes in between.
11 Q. Okay?
12 A. That should be sufficient to collect a
13 single tube.
14 Q. So how was it then determined whether the
15 person goes to the backup table --
16 A. So --
17 Q. -- if they can't get the blood, for
18 whatever reason, within that time frame?
19 A. So there are two different scenarios at
20 this time. So if subject number one comes to staff
21 A, and staff A gets ready, puts on the gloves, takes
22 a needle, tube, verifies all the information. And
23 8:01, he goes in, could not collect the sample. The
24 vein might have collapsed --
89
May Reporting Service

1 Q. Okay.
2 A. -- or anything at that time. So then he
3 will take it off. It will still be within in the
4 same minute, or possible. He will take it off, close
5 with a cotton ball, or Band-Aid, or whatever, and
6 then send the person over. Because he tried, he
7 could not get it.
8 Q. That's when they go to the backup table?
9 That's scenario number one?
10 A. Scenario number one.
11 Q. What's the second one?
12 A. The second scenario is, okay. Everything
13 checked. 8:01, you push the needle in. The tube
14 starts filling. However, if it takes more time for
15 the tube to fill in, the vein is small, the amount of
16 blood coming into the tube is slow. But he already
17 has the blood flow established. At that time, he
18 realizes, 'You know what? I'm already off my
19 minute.' Though, he's taking the sample. 'I might
20 be getting late for the next person.'
21 Q. Yes.
22 A. So either he or the supervisor, the person
23 who is over the QC or the GL, they will call the
24 person over. 'Okay. Number three, you come over
90
May Reporting Service

1 here. Staff A, you carry on with your blood draw.'
2 Q. Okay.
3 A. So they will take -- So these are the two
4 scenarios that would happen.
5 Q. Do you know how many video cameras there
6 were at the Pharma Medica facility in St. Charles?
7 A. I don't know the actual count.
8 Q. Are they still there?
9 A. I think they should be there. I don't
10 know if all of them are there or not, but they should
11 be there. Most of them should be there.
12 Q. Okay. Do you know if the video cameras
13 were situated such that they would actually capture
14 the blood draws?
15 A. No, the cameras would not capture the
16 blood draws. I would say there were approximately
17 three to four cameras in each -- I am trying to
18 think; right? Three to four cameras in each clinic.
19 One would be in the dosing area where we administer
20 the medication. And there would be one to two in the
21 main area where the subjects are seated. Not
22 specifically focused on the blood draw tables, no.
23 They'll be in the general area. And there would be
24 at least one in the processing area where the staff
91
May Reporting Service

1 separated the plasma and stored it in the freezers.
2 Q. But to your knowledge, there were no video
3 cameras pointed to the area where the blood draws
4 were done; am I correct?
5 A. Not exactly. They would take a broader
6 area, but not focusing on the blood draw tables, no.
7 Q. Okay. When you say broader area, did it
8 encompass the area --
9 A. It could.
10 Q. -- where the blood draws were done?
11 A. It could.
12 Q. Okay. Did you ever make a phone call to
13 the St. Charles Pharma Medica facility to report
14 something that you saw on a video feed?
15 A. No. I was asked to check. So, I would go
16 in and check. And then I would see if the -- ask IT
17 to save the video. But not monitor, and then look at
18 the camera, and say, 'This is wrong.' Oh, no.
19 Q. Okay.
20 A. I would not -- We would not sit down and
21 watch videos.
22 Q. So if you saw something wrong on a video
23 that you observed, you would ask them to save that so
24 that it could be used for what, instructional
92
May Reporting Service

```
 1   purpose?
 2        A.   Yes.  If I would see anything as a part of
 3   If I'm looking at something else, like why the
 4   samples were put in late or something, documentation
 5   is missed, or something like that.  And while seeing
 6   that, if I see anything like that, I would ask them
 7   to save a portion of that clip.
 8        Q.   And so why were the video cameras
 9   installed to begin with?
10        A.   So basically it's multiple reasons.  So,
11   monitoring the subjects, safety monitoring of the
12   subjects, too.
13        Q.   Okay.
14        A.   Along with subject, staff safety, along
15   with the perimeters outside.  PMRI assets; right?
16   Any theft, any break-in, any damage.  And also study
17   data, study documentation is there in the clinic.
18   Our samples are there in the freezer rooms and all.
19   So to monitor all of those things, God forbid
20   something happens.
21        Q.   Did you ever have to do any of the firing
22   of any employees at the St. Charles Pharma Medica
23   facility?
24        A.   I would be consulted, definitely, if
```
                                          93

                   May Reporting Service

```
 1   anyone's employment has to be terminated.
 2        Q.   Okay.
 3        A.   We'd always do it with the presence of HR.
 4   And I would always inform our clinical trial
 5   director, our president, and C.E.O.  And, yes, there
 6   are instances where I was present for some of them.
 7   And at some points where I was consulted, and I give
 8   my opinion saying, 'Yes, I think the employment has
 9   to be terminated.'
10        Q.   Were any of the phlebotomists ever
11   terminated?
12        A.   Yes, we did have some who were terminated.
13        Q.   For what reasons?
14        A.   Various reasons.
15        Q.   And a phlebotomist is a person who
16   specializes in drawing blood; correct?
17        A.   Collecting blood sample, yes.
18        Q.   All right.  When you say for various
19   reasons, what various reasons?
20        A.   I think the biggest issue we had was
21   reliability, or attendance.
22        Q.   Okay.  Any other reasons you can think of?
23        A.   No, not for the phlebotomists over here.
24        Q.   Okay.  What do you know about the training
```
                                          94

                   May Reporting Service

```
 1   of the phlebotomists that were hired by Pharma
 2   Medica?
 3        A.   So, we have specific training department,
 4   or basically a training supervisor.  He or she will
 5   basically, when the new employees come in, they will
 6   first, a couple of days, they will be with the HR,
 7   going through the overall HR orientation, which goes
 8   through it more of the policies, work-place safety
 9   policies and all, along with setting them up on the
10   system for time sheets, and all the stuff.
11        And then there's a training, who will be
12   our group leader, who was very good with her work and
13   all.  She would take in those people.  We would not
14   take more than two or three at a time.  Only after
15   that person's, two or three individual's training are
16   completed, then they'll go on the floor.  So she will
17   go through all the trainings.
18        Q.   Who was this trainer?
19        A.   Her name was Elizabeta.  Elizabeta, A-L --
20   E-L-I-Z-A-B-E-T-T-A, Kameric.  I might not spell it
21   correctly.  It's K-A-M-E-R-I-C.  She was the person
22   who was mostly in charge with the training.  However,
23   the other GLs, supervisors would be in charge, and
24   look after the training after that.
```
                                          95

                   May Reporting Service

```
 1        Q.   Is Ms. Kameric, is she employed by Pharma
 2   Medica currently?
 3        A.   No.  We don't have any staff at St. Louis
 4   anymore; right?
 5        Q.   So she was exclusively at the St. Charles
 6   facility?
 7        A.   Yes.
 8        Q.   All right.  Did Pharma Medica in St.
 9   Charles use any interns for blood draws?
10        A.   We had interns who came from schools.  I
11   think most of them were from St. Charles Community
12   College.  But in order for them to come in, the
13   interns were basically a part of the co-op placement
14   program of the phlebotomy course.  So after they had
15   completed in classrooms, they had a specific amount
16   of numbers of needles they had to get, or blood
17   collections.  So, maybe 30 sticks, or 50 sticks, or a
18   hundred sticks, something like that, based on that.
19   After they have completed all of those programs, then
20   they will come to us as part of placement from that
21   college.
22        Q.   Well, were there any people at Pharma
23   Medica in St. Charles who were drawing blood who had
24   never drawn blood --
```
                                          96

                   May Reporting Service

| | | | |
|---|---|---|---|
| 1 | A. No. | 1 | supervisor, group leader, or he was the group leader |
| 2 | Q. -- on a human before? | 2 | manager. |
| 3 | A. No. They all have to have certain number | 3 | No, he's not there on this one. At that |
| 4 | of needles or sticks, they call it, on each other, on | 4 | time, maybe he was part-time medic. But -- Let me go |
| 5 | live human beings before they come to us. | 5 | through this. These are non-managerial. Deandre, |
| 6 | Q. So -- And that minimum number was what? | 6 | DeAndrea, Dallas, Tabron, Jasmine, Shun-Ta, Steve. |
| 7 | A. It varies. I think it was something, 50 | 7 | No. |
| 8 | or 60, but I won't be able to give the exact number, | 8 | Q. You don't see his name on the list? |
| 9 | which I would have known the exact numbers and all. | 9 | A. No. |
| 10 | Q. And who actually made the hiring decisions | 10 | Q. Okay. Let me ask you this: I think you |
| 11 | on the phlebotomists and the interns? | 11 | told me this earlier, but correct me if I'm wrong, |
| 12 | A. So phlebotomists and the interns, our | 12 | when the employees were hired to work for Pharma |
| 13 | supervisors, there was a supervisor was present, | 13 | Medica at the St. Charles facility, none of them were |
| 14 | supervisor for lab assistants. | 14 | tested for Hepatitis, or any other blood-borne |
| 15 | Q. And who was that? | 15 | pathogen at the time of, or prior to hiring; am I |
| 16 | A. It was my Michelle Ballwin. | 16 | correct? |
| 17 | Q. Okay. Who else? | 17 | A. Correct. |
| 18 | A. There was also --- What is the name? I | 18 | Q. All right. Did any of your St. Charles |
| 19 | forgot her name. I'm forgetting the name. Oh, my | 19 | Pharma Medica employees transfer to other shops when |
| 20 | God. He was a group leader. Well, he was -- The | 20 | the St. Charles Pharma Medica shop closed down? |
| 21 | supervisor, Michelle Ballwin was the supervisor. And | 21 | A. Sorry. Did they transfer to where? |
| 22 | there was another person who was the assistant | 22 | Q. To Canada, or to any other --- |
| 23 | supervisor. When I remember his name, I will tell | 23 | A. No. |
| 24 | you for sure. | 24 | Q. -- Pharma Medica facilities? |
| | 97 | | 99 |

| | | | |
|---|---|---|---|
| 1 | Q. I might have a list here. If I could find | 1 | A. No. |
| 2 | it. | 2 | Q. Did Pharma Medica have another facility |
| 3 | A. He was a paramedic, and Michelle was a | 3 | somewhere else in the U.S. at one point? |
| 4 | nurse. They would actually go over with HR to the | 4 | A. No. |
| 5 | St. Charles Community College where the interns are | 5 | Q. Okay. Do you consider yourself an expert |
| 6 | coming in, interview them, see how their | 6 | on Hepatitis C? |
| 7 | understanding and skills are there. They would | 7 | A. No. |
| 8 | interview maybe seven, eight, or whatever are there. | 8 | Q. Do you know what the long-term health |
| 9 | From those, they will select a handful, three or | 9 | effects of Hepatitis C are? |
| 10 | four, two or three. | 10 | MS. DREW: Object to the form of the |
| 11 | Q. I will just hand you Exhibit No. 3 -- | 11 | question; vague. |
| 12 | (Whereupon, Plaintiff's | 12 | A. No. |
| 13 | Exhibit No. 3 was marked | 13 | MS. DREW: But you can answer. |
| 14 | for identification by Mr. | 14 | A. No. |
| 15 | Wendler.) | 15 | Q. (BY MR. WENDLER) Okay. Did you have any |
| 16 | Q. (BY MR. WENDLER) --- which is the same as | 16 | conversations with Dr. Jordan about her conversation |
| 17 | Exhibit No. 6 from Dr. Jordan's deposition. That's a | 17 | with Mr. Wallace at the hospital in Maryville, |
| 18 | list of the Pharma Medica St. Charles employees. If | 18 | Illinois? |
| 19 | you can find that person's name on the list that you | 19 | A. I think I did. |
| 20 | were thinking of? | 20 | Q. What did she tell you? |
| 21 | A. So Elizabeta is the one -- the one I said | 21 | A. I can't recall. I think she said she went |
| 22 | was doing the training. | 22 | and saw him, met him, and just asked him how he was |
| 23 | Q. Yes. | 23 | doing. But I cannot recall the exact conversation |
| 24 | A. Andrew -- Andrew Janis was the previous | 24 | and all. |
| | 98 | | 100 |

1    Q.    Okay. You did not tell Dr. Jordan or
2  Louis Co to go to the hospital; am I correct?
3    A.    No.
4    Q.    Am I correct?
5    A.    I did not say that.
6    Q.    Okay. Have you seen any of the written
7  reports by Dr. Hull regarding this case?
8    A.    No, I did not get a chance to see that.
9    Q.    Okay. I'm going to hand you Exhibit No.
10  4, sir.
11              (Whereupon, Plaintiff's
12               Exhibit No. 4 was marked
13               for identification by Mr.
14               Wendler.)
15    Q.    (BY MR. WENDLER) This is a document that
16  was produced to us by Roxane Laboratories. It says
17  Master Agreement. Are you familiar with that?
18    A.    I heard about Master Agreement, but I
19  don't go through it with them. It's basically the
20  project management team and the sponsor have it.
21    Q.    All right. Can you tell me how this
22  Master Agreement is different from, or has --
23  provides different regulations than Exhibit No. 1,
24  the protocol?
                                                    101
                    May Reporting Service

1    A.    So this is study specific, how the
2  particular study and all is going to be conducted.
3    Q.    Exhibit 1 is, the protocol?
4    A.    Yes, the protocol.
5    Q.    All right.
6    A.    Master Agreement, this is the first time
7  reading it. I haven't read it ever before.
8    Q.    That's fine.
9    A.    It's basically -- I think it's the
10  understanding with Pharma Medica and the sponsor.
11    Q.    So it's your understanding that this
12  Master Agreement that we've marked as Exhibit No. 4
13  provides a different --
14              Strike that.
15              Is it your understanding that the Master
16  Agreement that we have marked as Exhibit No. 4
17  provides additional guidelines that Pharma Medica was
18  to follow in the testing of Roxane Laboratories
19  medications?
20              MS. DREW: Object to the form of the
21  question; calls for speculation. Dr. Khan's already
22  said he's never seen the document before.
23              MR. MCBREARTY: Join.
24    A.    Yeah.
                                                    102
                    May Reporting Service

1              MS. DREW: You can go ahead and see
2  --
3    A.    No, I have to read through it, and then
4  let you know.
5    Q.    (BY MR. WENDLER) Go ahead, and skim
6  through it, if you want, or read through it.
7    A.    No. No. I have to read it. It's large.
8    Q.    I -- This was just produced to us in
9  discovery.
10    A.    Yeah.
11    Q.    I'm trying to figure out what it is. I
12  thought you might be able to help me.
13    A.    No. Basically I don't get the Master
14  Agreements. It's between project management and the
15  sponsor. They have it, and they save it.
16    Q.    Okay.
17    A.    So for us, it's always the protocol that
18  dictates the study's specific conduct.
19    Q.    All right. You said the Master Agreement
20  is between who?
21    A.    The project management team of Pharma
22  Medica and the sponsor.
23    Q.    And who is the project management team?
24    A.    Our director of project management is
                                                    103
                    May Reporting Service

1  Marianna Colalillo, and then the other project
2  managers who work with her. So there is Amin,
3  Maureen. There's Joanna. There is Whitney. There
4  is Fareen. Yeah.
5    Q.    How many employees does Pharma Medica
6  have?
7    A.    Right now in Canada we have approximately
8  around 200-plus or so.
9    Q.    Did you read through the adverse event
10  reports relative to Mr. Wallace?
11    A.    Yes, I had reader earlier the SAERs,
12  adverse event report that was generated.
13    Q.    All right. Well, let me ask you this:
14  When Mr. Wallace's AST was reported on June 15 at the
15  rate of 59, do you agree that's above the normal
16  range?
17    A.    Can I see the report? Because it'll have
18  the ranges in there.
19    Q.    If I can find it, I'll show it to you.
20  Let's see. Okay. We'll make this as Exhibit No. 5.
21              MR. MCBREARTY: Which one?
22              MR. WENDLER: Bates number 422. It
23  was Exhibit 4 from the Dr. Jordan deposition.
24              (Whereupon, Plaintiff's
                                                    104
                    May Reporting Service

1  Exhibit No. 5 was marked
2  for identification by Mr.
3  Wendler.)
4  Q.  (BY MR. WENDLER)  Exhibit No. 5, that's
5  the adverse event report; do you agree?
6  A.  **Hold on here.  This is --**
7  Q.  Just tab that page.  That's the one I want
8  to ask you about.
9  A.  **Yeah.  But this is not the one that we**
10 **completed.  I think this is the one that the sponsor**
11 **completed --**
12 Q.  All right.
13 A.  **-- for F.D.A.  We drafted the other SAE**
14 **report.**
15 Q.  Okay.  Well, I don't have that with me, or
16 I don't have it handy.  So let's just go with this
17 one.  On Page --
18 A.  **Sorry.**
19 Q.  On Page 3, that tabbed page?
20 A.  **Let's see if the ranges are there.**
21 Q.  Yeah.  It indicates Mr. Wallace's AST was
22 59.  What is AST?
23 A.  **Aspartate aminotransferas, it's a liver**
24 **enzyme.**

105

1  Q.  Okay.  You'd agree that that report of 59
2  was above the normal range?
3  A.  **So this one, "No other complaints were**
4  **reported during the remainder of the post-dose time**
5  **frame.  The subject completed his post-study lab**
6  **procedures on 14th of June, 2016.  Are you talking**
7  **about 2014?  I'm sorry.  June 14?**
8  Q.  Excuse me.  She's trying to keep up with
9  you.
10 A.  **Oh, sorry.**
11 Q.  You have to talk louder and slower.
12 A.  **Okay.  Are you talking about this 14 June**
13 **2016 --**
14 Q.  Yes.
15 A.  **-- in which AST and ALT levels were found**
16 **to be elevated?  AST is 59 units per liter.**
17 Q.  Yes.
18 A.  **With a reference range of 10 to 40.**
19 Q.  Yes.
20 A.  **So his value was 59.  It was elevated.**
21 Q.  All right.  So it was above the normal
22 range; correct?
23 A.  **Yes.**
24 Q.  All right.  And that's an indication that

106

1  something is not normal; right?
2  A.  **Correct.**
3  Q.  And what's an elevated AST liver enzyme
4  indicate?
5  A.  **So, it can be multiple things.  Basically**
6  **the liver enzymes are higher, the liver is working**
7  **more.  It could also be due, for example, a high fat**
8  **diet.  It could be multiple reasons.**
9  Q.  Okay.
10 A.  **So it's not specifically indicative of**
11 **one.  And it's very transient, too.  It goes up and**
12 **down pretty fast.**
13 Q.  Fair enough.
14 Could a high AST liver enzyme reading be
15 indicative of Hepatitis?
16 A.  **It could be, but not always.**
17 Q.  All right.  On that particular date when
18 Mr. Wallace's AST was 59, above the normal range of
19 10 through 40, should Dr. Jordan have reported that
20 to you?
21 A.  **No.  Because this is a not as**
22 **significantly high.**
23 Q.  Okay.  How about on the next reading where
24 his ALT -- I'm sorry.  Where is AS --

107

1  Well, strike that.
2  How about when his ALT was at 103 with a
3  normal range of being nine through 46, should Dr.
4  Jordan have reported that to you?
5  A.  **Dr. Jordan does not need to report to me**
6  **any of these things.  She's the principal**
7  **investigator.**
8  Q.  Does she need to report to anyone?
9  A.  **It's her call --**
10 Q.  Okay.
11 A.  **-- about this.  But if I would have seen,**
12 **and if any of us would have found, it would've been**
13 **given to Dr. Jordan.**
14 Q.  Okay.
15 A.  **As long as Dr. Jordan, principal**
16 **investigator, is aware of it, and she's following up**
17 **with it, that's correct.  Now --**
18 Q.  What is the ALT?
19 A.  **It's again a liver enzymes.  It's alanine**
20 **aminotransferase.**
21 Q.  Okay.  How about, if you turn to the next
22 page?  I believe it's the next page where it talks
23 about the liver enzyme was -- The AST level was 253,
24 when normal is 10 through 40.  Should that have been

108

1  reported by Dr. Jordan to anyone?
2      A.   So, it's here at the same page.
3      Q.   Same page? Thank you.
4      A.   Yeah. Here it was --
5      Q.   Should that have been reported by Dr.
6  Jordan to anyone? This is on June 21. Should she
7  have reported that to anyone?
8      A.   Again, it's her call. As long as she
9  informed the subject, the subject was informed of it
10 and updated.
11     Q.   Yes.
12     A.   And being followed up, and if it's being
13 done.
14     Q.   So there is no requirement that Dr. Jordan
15 was to notify a supervisor, or the sponsor, or anyone
16 that Mr. Wallace's AST and ALT levels were way beyond
17 normal range?
18     A.   No.
19          MS. DREW: Object to the form of the
20 question; vague as to way beyond.
21          Subject to that, you can -
22          MR. WENDLER: I'll rephrase it.
23     Q.   (BY MR. WENDLER) So there was no
24 obligation on the part of Dr. Jordan by Pharma Medica
                                                    109
                 May Reporting Service

1  requirements, protocols, procedures, or expectations
2  that she report Mr. Wallace's AST liver enzyme level
3  was 253 when the normal range was 10 through 40?
4  There's no requirement for her to report that?
5      A.   I don't know if this protocol has a
6  specific requirement like that. Some protocols do.
7  Some sponsors have requests.
8      Q.   I'm not talking about the protocol. I'm
9  talking about Pharma Medica's policies, and
10 procedures, and requirements, and expectations?
11     A.   Yes. So as per this one, it's the
12 principal investigator's decision, which is Dr.
13 Jordan.
14     Q.   Totally up to her?
15     A.   Yeah. But certain protocols do dictate
16 that you need to inform immediately of these
17 increased values.
18     Q.   All right. And on this particular day --
19     A.   Sorry. I'm just going to continue.
20          I don't know if Dr. Jordan informed the
21 sponsor or the project management at this stage or
22 not.
23     Q.   On this particular day, June 21, when
24 Mr. Wallace's ALT level was 471 when the normal range
                                                    110
                 May Reporting Service

1  was nine through 46, again, same answer: There was
2  no obligation for her to report that to anyone at
3  Pharma Medica in Canada, to your knowledge?
4      A.   I think she would have reported it to the
5  project management, at least.
6      Q.   She would have, or should have?
7      A.   I would say would have.
8      Q.   Should she have, if she didn't?
9      A.   I think she would have.
10     Q.   That's a different question.
11     A.   I know.
12     Q.   Should she have, if she didn't?
13     A.   Sorry. What is the question is?
14     Q.   Should Dr. Jordan have reported, on June
15 21, that Mr. Wallace's ALT level was 471, that is his
16 liver enzymes were 471, when the normal range is nine
17 through 46, should she have reported that to Pharma
18 Medica in Canada?
19     A.   I cannot say it should be a should or not,
20 until the protocol specifically dictates. It's again
21 her judgment call --
22     Q.   All right.
23     A.   -- she being the principal investigator.
24     Q.   Well, that's what I'm trying to figure
                                                    111
                 May Reporting Service

1  out, whether there is any restrictions on her
2  judgment call?
3      A.   No. Because if --- Yes. If the protocol
4  states anything specifically, she would have, and she
5  should have.
6      Q.   Okay. And if the protocol does not state
7  specifically, there is no obligation on her part,
8  unless she chooses to, to report to Pharma Medica
9  that any participant's liver enzymes are extremely
10 high; am I right?
11     A.   Yes, sir.
12     Q.   All right. So then on June 25, four days
13 later when his AST level reached 900, when the normal
14 range is 10 to 40, same answer: There was no
15 obligation on her part to report that to Pharma
16 Medica, unless it was in the protocol?
17     A.   I think that by due diligence, she would
18 have reported.
19     Q.   She would have, or should have?
20     A.   Would have.
21     Q.   All right. And if she didn't, should she
22 have?
23     A.   I think she did.
24     Q.   You think she did?
                                                    112
                 May Reporting Service

```
 1       A.    Yeah, with these values.
 2       Q.    Okay.  And why do you say you think she
 3  did?
 4       A.    I don't understand.  I'm not sure.
 5       Q.    Okay.  If she did not report the 900 AST
 6  level liver enzyme rate in Mr. Wallace when the
 7  normal range is 10 to 40, if she did not report that
 8  high 900 range reading, should she have?  Should she
 9  have reported that to Pharma Medica?  And I'm talking
10  about Dr. Jordan here?
11       A.    I know.  I know I would have.
12       Q.    Okay.  If Dr. Jordan did not report that,
13  should she have?
14       A.    I think she should have.
15       Q.    Okay.  Why do you think that?
16       A.    It's an -- It's not going down, and it's
17  going up basically.  I don't know how was the
18  examination, or the examination done.  The values are
19  high compared to --
20       Q.    It's dangerously high; is it not?
21             MS. DREW:  Object to the form of the
22  question; vague.
23       A.    It's high.
24       Q.    (BY MR. WENDLER)  Is it dangerously high?
                                                    113
```

```
 1             MS. DREW:  Same objection.
 2       A.    No.  I have seen higher values.
 3       Q.    (BY MR. WENDLER)  Okay.  How about on the
 4  same day when his ALT level was 1,800, when the
 5  normal ranges was nine through 46, should Dr. Jordan
 6  have reported that to Pharma Medica on June 25?
 7       A.    I would say she should have.
 8       Q.    Okay.  Do you know if she did?
 9       A.    I can't recall.
10       Q.    All right.  Now, let me ask you this:
11  When Mr. Wallace talked to Pharma Medica, he was
12  asked to come in for a fourth round of tests on June
13  26 rather than go to the nearest emergency room,
14  despite all of these levels and readings that we just
15  went through.  Do you know why he was told to go back
16  to Pharma Medica in St. Charles rather than go to the
17  nearest emergency room?
18       A.    Okay.  We always advise the subjects,
19  first and foremost, whenever we follow-up with
20  them --
21       Q.    Uh-huh.
22       A.    -- to make sure how they're feeling first.
23       Q.    Okay.  Yes.
24       A.    'Are you feeling all right?  Do you have
                                                    114
```

```
 1  any problems?  We did your repeat.  The repeat is
 2  high.  It is not going down.  It is high.  How are
 3  you feeling?  If you are not feeling well,
 4  immediately go to your nearest hospital or emergency
 5  department.'
 6       Q.    That's what's required?
 7       A.    Yes.
 8       Q.    That's the protocol; right?
 9       A.    Yes.
10       Q.    All right.
11       A.    And that's always what we tell them.
12       Q.    Yes.
13       A.    Okay.
14       Q.    That's what should happen?
15       A.    And we say -- What do you call?  'And also
16  if you're feeling all right, if everything is fine,
17  can you drop by for a -- to the clinic to do the
18  repeat test, and see our doctor.  You can always come
19  back to the clinic.  You can always come and see our
20  doctor.  But keep in mind your safety is your first
21  priority.'
22       Q.    Yes.
23       A.    'So always seek medical attention
24  immediately, if you're not feeling well.'
                                                    115
```

```
 1       Q.    Okay.  So do you know if Mr. Wallace was
 2  told, 'Do not go to the nearest emergency room.'?
 3       A.    I wouldn't --
 4       Q.    And he was told instead to go back to
 5  Pharma Medica for a fourth round of tests on June 26?
 6  Would that be contrary to your expectations for the
 7  Pharma Medica facility in St. Charles, given these
 8  high readings that we went through?
 9       A.    We would not tell anyone not to seek
10  medical attention.  So he would not be told, 'Oh,
11  don't go to the hospital.  Come us -- come to us.'
12  No, he won't be told.
13       Q.    So if he was told, 'Don't go to the
14  hospital,' that would be contrary to your
15  expectations of the Pharma Medica employees in St.
16  Charles; am I right?
17       A.    Yeah.  Our employees would not say that.
18       Q.    Okay.  Well, you kind of changed my
19  question.
20       A.    Sorry.
21       Q.    If the employee that he spoke to told him,
22  'Don't go to the nearest emergency room.  Don't go to
23  the hospital.  Instead come to Pharma Medica.'  If
24  that was, in fact, said to Mr. Wallace, that would be
                                                    116
```

| | |
|---|---|
| 1 contrary to your expectations of how the Pharma | 1 positive. |
| 2 Medica employees should have treated Mr. Wallace? | 2    Q.    Okay. And do you know who that was? |
| 3    Q.    (BY MR. WENDLER) Am I correct? | 3       MS. DREW: Object to the form of the |
| ... | ... |

---

**Page 117**

1 contrary to your expectations of how the Pharma
2 Medica employees should have treated Mr. Wallace?
3     Q.    (BY MR. WENDLER) Am I correct?
4        MS. DREW: Object to the form of the
5 question; speculation; assumes facts not -- that will
6 not be in evidence.
7        You can go ahead and answer.
8        MR. MCBREARTY: Join.
9     Q.    (BY MR. WENDLER) Am I correct?
10    A.    It would be contrary to what we do.
11    Q.    Contrary to your expectations?
12    A.    Expectations. Thank you.
13    Q.    Yes?
14    A.    Yes.
15    Q.    Okay. What do you know about any other
16 adverse event study reports for any other
17 participants at the Pharma Medica facility in St.
18 Charles, if anything?
19        MS. DREW: Object to the form of the
20 question; vague; over broad.
21    A.    To what kind of adverse event report are
22 you --
23        MR. WENDLER: I'll just withdraw
24

117

**Page 118**

1 that.
2     Q.    (BY MR. WENDLER) Do you know of anyone
3 else who reported positive for Hepatitis C at the St.
4 Charles facility?
5     A.    I think -- I don't remember specifically
6 the names, and dates, and years and all, but there
7 were a few for Hepatitis C. Both at screening stage,
8 and I think there was one post-dose also.
9     Q.    At screening stage, and one what?
10    A.    Post-dose. So, participated in a study,
11 and tested positive at the post-study.
12    Q.    At post-study?
13        (Whereupon, an off the
14         record discussion was
15         held, which by direction
16         was not stenographically
17         reported.)
18    Q.    (BY MR. WENDLER) Post-dose?
19    A.    Post-dose, yeah.
20    Q.    And post-dose means they got through the
21 screening process, and then tested positive for
22 Hepatitis C after the screening process; right?
23    A.    After they got study drug, they took part
24 in the study, at the end of the study they tested

118

**Page 119**

1 positive.
2     Q.    Okay. And do you know who that was?
3        MS. DREW: Object to the form of the
4 question; violates HIPPA.
5        MR. WENDLER: I'm not asking for a
6 name. I'm just asking does he know.
7        MS. DREW: Okay.
8     A.    I don't remember, but I can check.
9     Q.    (BY MR. WENDLER) Do you know when it was?
10    A.    20 -- Late 2016, early '17.
11    Q.    And do you know if that person was in any
12 of the studies with Mr. Wallace?
13    A.    No.
14    Q.    You don't know?
15    A.    No. I mean that person was not in any of
16 the studies with Mr. Wallace. Sorry.
17    Q.    And how are you able to determine that, if
18 you don't know the person's name?
19    A.    Because most of the subjects that
20 participated with Mr. Wallace on these two studies, I
21 think that the personnel asked; right? We checked,
22 and they, none of them had Hepatitis.
23    Q.    Okay. Have any of the Pharma Medica
24 employees been tested for Hepatitis C, whether it's

119

**Page 120**

1 required by Pharma Medica or not, to your knowledge?
2     A.    Yes. There is a procedure where we do
3 test our staff for Hepatitis, or all of them,
4 Hepatitis A, B, C, Hepatitis B, C, and HIV in case if
5 we have any needle-stick injury.
6     Q.    Okay. And was that done at the St.
7 Charles facility ever?
8     A.    No. St. Charles we did not have any
9 needle-stick injuries.
10    Q.    Okay.
11    A.    We had a couple, I think at least three or
12 four, in Canada in all of this duration of time where
13 we ensure we have the consent for the staff and the
14 subject where we do collect both the staff and
15 subject sample to test.
16    Q.    You said there were three or four
17 needle-stick injuries in Canada?
18    A.    To my recollection, in the past several
19 years.
20    Q.    Is that during your tenure at Pharma
21 Medica?
22    A.    (Witness nodding head.)
23    Q.    Yes?
24    A.    Yes.

120

May Reporting Service

1    Q.    And I'm sorry. When did you start there?
2    A.    February, 2004.
3    Q.    Okay. And in those situations where there
4  were needle-stick injuries at the Canadian Pharma
5  Medica --
6    A.    Yes.
7    Q.    -- clinical facility, the employees were
8  then tested for blood-borne pathogens?
9    A.    So, we tested the employee and the
10  subject.
11    Q.    Yes.
12    A.    Who -- whose needle was accidentally came
13  in contact with the staff. We tested them for
14  Hepatitis and HIV.
15    Q.    Okay. And this was -- This happened three
16  or four times?
17    A.    During the whole time, yes.
18    Q.    Yes. Did anyone at Pharma Medica tell
19  Mr. Wallace that his treatment would be paid for by
20  Pharma Medica?
21    A.    I don't recall. I'm not aware of.
22    Q.    Do you know Nancy Erickson is?
23    A.    No.
24    Q.    Do you know who Andrew Aronsohn,

121

1  A-R-O-N-S-O-H-N, is? Do you know who he is?
2    A.    No.
3    Q.    You've never spoken to either of those
4  people; have you?
5    A.    Nancy Erickson? No. I think the name
6  sounds familiar, Nancy Erickson. But, no.
7    Q.    Okay. Do you have any marks or strikes
8  against your medical license, sir?
9    A.    No.
10    Q.    Do you have any criminal --
11    A.    No.
12    Q.    -- history?
13    A.    No.
14    Q.    Okay. Is there anything else, sir, about
15  this case, or about Mr. Wallace that you think is
16  important that we have not covered in your testimony
17  here today?
18    A.    No. If you want to ask me anything, or is
19  there anything else?
20    Q.    Nothing?
21    A.    No. Sorry.
22        MR. WENDLER: Okay. That's all the
23  questions I have then. Thank you, sir.
24        (Whereupon, an off the

122

1        record discussion was
2        held, which by direction
3        was not stenographically
4        reported.)
5        MR. MUDGE: We are back on the video
6  record, and the time is approximately 11:01.
7        [EXAMINATION]
8  QUESTIONS BY MR. MCBREARTY:
9    Q.    Dr. Khan, my name is Brian McBrearty, and
10  I represent Hickma Labs, Roxane Labs, and West-Ward
11  Columbus in this case. I have a very few questions
12  for you, and they're just of a clarification manner.
13        If I understand your testimony correctly,
14  all participants prior to entering the study are
15  tested for blood-borne pathogens, including
16  Hepatitis?
17    A.    Correct.
18    Q.    All right. In the St. Charles facility,
19  was Mr. Wallace and one other individual were the
20  only participants who tested positive for Hepatitis C
21  either before or after --
22    A.    No.
23    Q.    -- testing?
24    A.    After participating in a study, I'm aware

123

1  of these two, Mr. Wallace and the other person, who
2  had completed -- who had been dosed for a study. And
3  at the completion of the study they tested positive.
4        There were individuals who tested positive
5  prior to participating. When they come in for the
6  initial screening appointment, they were individuals
7  who tested positive, but they did not get into the
8  study.
9    Q.    I was going to follow-up. They were
10  excluded?
11    A.    Excluded, correct.
12    Q.    So they would not have been in any studies
13  with Mr. Wallace?
14    A.    Correct.
15    Q.    And the other individual that you
16  discovered who tested positive post-participating in
17  the study was not involved in any of the studies with
18  Mr. Wallace?
19    A.    I only checked the individuals who were
20  with Mr. Wallace in these two studies. And they were
21  not positive for Hepatitis at any time.
22    Q.    Another way of saying it is: Nobody else
23  who was with Mr. Wallace ever tested positive for
24  Hepatitis C?

124

1    MR. WENDLER:  Objection; lack of
2  foundation.
3    A.    No.  I did not -- Mr. Wallace, I think,
4  participated at least around six, seven studies.
5    Q.    (BY MR. MCBREARTY)  I'm talking about
6  these two studies that we're talking about?
7    A.    These two studies?  No.
8            MR. WENDLER:  Same objection.
9    Q.    (BY MR. MCBREARTY)  So for those two
10  studies, Mr. Wallace was the only one who tested
11  positive for Hepatitis C?
12    A.    Correct.
13    Q.    Okay.
14            MR. MCBREARTY:  Thank you.  No
15  further questions.
16            MR. WENDLER:  A couple more
17  questions, unless you have any, Teri?
18            MS. DREW:  I have nothing.
19            [FURTHER EXAMINATION]
20  QUESTIONS BY MR. WENDLER:
21    Q.    A couple more questions:  With regard to
22  the other persons who participated in these two
23  studies that are at issue with Mr. Wallace, those
24  persons who participated with him, do you know about

125

May Reporting Service

---

1    any testing those persons have undergone for
2  Hepatitis C, outside of Pharma Medica?
3    A.    No.  I don't know about outside Pharma
4  Medica.
5    Q.    All right.  And then you said that this
6  one other person tested positive for Hepatitis C, but
7  it was after Mr. Wallace was no longer in the study.
8  And this is a separate study, and it was later;
9  correct?
10    A.    To my knowledge, I think this was
11  something later in 2016.
12    Q.    Were there any changes in the
13  blood-drawing procedures or policies by Pharma Medica
14  between the time of Mr. Wallace testing positive for
15  Hepatitis C and this other person testing positive
16  for Hepatitis C?
17    A.    No.
18    Q.    Okay.  So the same policies applied?
19    A.    Yeah.
20    Q.    Okay.
21            MR. WENDLER:  That's all I have.
22  Thanks.
23            MS. DREW:  We will read and sign.
24            MR. MUDGE:  We are off the video

126

May Reporting Service

---

1    record.  The time is approximately 11:05.
2            * * * * * * * *
3            [Witness excused.]
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

127

May Reporting Service

---

1            COMES NOW THE WITNESS, SHABAZ KHAN, M.D.,
2  and having read the foregoing transcript of the
3  deposition taken on the 7th day of November, A.D.,
4  2019, acknowledges by signature hereto that it is a
5  true and accurate transcript of the testimony given
6  on the date hereinabove mentioned.
7
8
9            _____
10            SHABAZ KHAN, M.D.
11
12
13  Subscribed to before me this _____ day of
14  _____, 2019.
15
16
17
18
19            _____
20            [Notary Public]
21
22  My Commission Expires:_____
23
24

128

May Reporting Service

```
 1       I, Kimberly A. Harris, Certified Shorthand
 2   Reporter and Notary Public of the County of Madison,
 3   State of Illinois, do hereby certify that SHABAZ
 4   KHAN, M.D. came before me on the 7th day of November,
 5   A.D., 2019, at the offices of Hinshaw & Culbertson,
 6   LLP, 701 Market Street, Suite 1375, St. Louis,
 7   Missouri, 63101, and swore before me to testify to
 8   the truth, the whole truth, and nothing but the truth
 9   regarding his knowledge touching upon the matter in
10   controversy.
11            I do further certify that I did take
12   stenographic notes of the questions propounded to
13   said witness and his answers thereto and that said
14   notes were afterwards transcribed by computer-aided
15   transcription under my direction and supervision.  I
16   do further certify that the attached and foregoing is
17   a true, correct, and complete copy of my notes and
18   that said testimony is now herewith returned.
19            Dated this 19th day of November, A.D.,
20   2019, and given under my hand and seal.
21
22
23   ------------------------------------------
24       KIMBERLY A. HARRIS, CSR
                                              129
              May Reporting Service
```