IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IAN WALLCE,

    Plaintiff,

vs.    No. R4:18-cv-1859 PLC

PHARMA MEDICA RESEARCH,
INC.,

    Defendants.

DEPOSITION OF

HEATHER JORDAN, M.D.

Taken on behalf of Plaintiff

July 30, 2019

Reporter:  Kimberly A. Harris, CSR

H A Y   R E P O R T I N G   S E R V I C E
598 Watch Hill Road
Collinsville, Illinois 62234
618-223-8392

Hay Reporting Service

1

---

A P P E A R A N C E S

Wendler Law, P.C.
    By:  Brian Wendler, Esq.

       For the Plaintiff

Hinshaw & Culbertson LLP
    By:  Terese A. Drew, Esq.

       For the Defendants

Also Present:

Ian Wallace, Plaintiff

Dr. Shabaz Khan, via telephone

May Reporting Service

3

---

INDEX OF EXAMINATIONS
PAGE LINE

Examination by Mr. Wendler.............  6    6

INDEX OF EXHIBITS
PAGE LINE

Plaintiff's Exhibit No. 1.............  20   16

Plaintiff's Exhibit No. 2.............  28    7

Plaintiff's Exhibit No. 3.............  71   15

Plaintiff's Exhibit No. 4.............  75    9

Plaintiff's Exhibit No. 5.............  115    4

Plaintiff's Exhibit No. 6.............  123   24

INDEX OF CERTIFIED QUESTIONS
PAGE LINE

1. Certify............................  115   10

2. Certify............................  119   22

3. Certify............................  122    8

4. Certify............................  123    6

May Reporting Service

2

---

STIPULATION

    IT IS STIPULATED AND AGREED by and between
counsel for Plaintiffs and counsel for Defendants
that the deposition of HEATHER JORDAN, M.D., may be
taken pursuant to Rule 26(a) of the Federal Rules of
Civil Procedure on behalf of the Plaintiff, on July
30, 2019 at the offices of Hinshaw & Culbertson LLP,
701 Market Street, Suite 1375, St. Louis, Missouri,
63101, before Kimberly A. Harris, a Certified
Shorthand Reporter and Notary Public within and for
the County of Madison, State of Illinois; that the
issuance of notice and dedimus is waived, and that
this deposition may be taken with the same force and
effect as if all statutory requirements had been
complied with.

    IT IS FURTHER STIPULATED AND AGREED that any
and all objections to all or any part of this
deposition except objections as to the form of the
question are hereby reserved and may be raised on the
trial of this cause; and that the signature of the
deponent is not waived.

* * * * * *

HEATHER JORDAN, M.D.,

May Reporting Service

4

PLAINTIFF'S
EXHIBIT
B

a witness, having been first duly sworn upon oath by the court reporter, testified as follows:

[EXAMINATION]

QUESTIONS BY MR. WENDLER:

Q. I'll hand this back to you, Doctor.
Okay. Can you state your full name for us, please?
A. **Heather Renee Jordan.**
MS. DREW: Dr. Khan, can you hear okay?
DR. KHAN: Yes, I can hear, but thank you for asking.
Q. (BY MR. WENDLER) Dr. Jordan, what, if anything, did you do to prepare for this deposition today?
A. **I reviewed the documents here briefly. I reviewed the blood -- blood drawing SOP from Pharma Medica.**
Q. Is that in that pile that is there to your right?
A. **I believe so, sir.**
Q. Okay.
A. **I know there's SOPs in here.**
Q. Can you slide that pile over to me real

quick?
MR. WENDLER: For the record, the pile mile is Bates numbered PMRI 00001 through 005666.
Q. (BY MR. WENDLER) Is there anything else that you reviewed, Doctor, to prepare for this deposition? Sorry.
A. **Other than just a phone call last week, that was it.**
Q. All right. Phone call with the attorney?
A. **Yes.**
Q. Okay. And how long did that phone call last?
A. **About an hour.**
Q. Okay. And during that phone call, did you review anything, or just verbal?
A. **Just verbal.**
Q. Okay. Now, have you hired your own lawyer for this case?
A. **No.**
Q. Okay. Have you ever testified in a deposition or a trial before?
A. **Yes.**
Q. How many times, and what are the details?

A. **One deposition from my office in Hazelwood when I worked for Mercy Medical Group.**
Q. What were the circumstances of why you were being deposed?
A. **One of my patients was in a car accident, and there was just some questions about the extent of the car accident.**
Q. So you were testifying as a treating physician?
A. **Yes.**
Q. You've never been sued before; have you?
A. **I have.**
Q. How many times?
A. **Twice.**
Q. And you never testified in either of those cases?
A. **No.**
Q. Either of those cases still pending?
A. **No.**
Q. Did you bring any records with you to the deposition pursuant to the Deposition Notice?
A. **No.**
Q. Did you see the Deposition Notice?
A. **I did.**

Q. Do you have any of the records that were requested?
A. **I have no records.**
Q. What is today? July 30th, 2019. When did you first learn that we wanted to take your deposition, ma'am?
A. **Earlier this month.**
Q. Okay. Mr. Wallace is sitting here to my right. But do you have an independent recollection of him, outside of reading through the records?
A. **I remember him from our studies.**
Q. You do? Okay.
A. **Uh-huh.**
Q. Okay. I guess before we go any further, do you have any opinions as it pertains to this case, or Mr. Wallace's participation in the studies at Pharma Medica? Do you have any opinions at all at this point?
A. **I guess I don't quite understand the question.**
Q. Well, it's --
A. **An opinion?**
Q. It's intended to be open-ended. So, you can tell me any opinion that you have with respect to

1    Ian Wallace, or his contraction of Hepatitis C or his
2    treatment in general. Any opinions at all that you
3    have?
4        A.    It's such a general question. I mean, we
5    had a wide variety of subjects. I remember Ian from
6    our studies. I remember the -- the circumstances of
7    his -- of his last study. I don't know that I have
8    strong opinions about, you know, other than just
9    remembering what happened.
10       Q.    Okay.
11       A.    I know Pharma Medica's operational
12   procedures.
13       Q.    Okay.
14       A.    I can't imagine how you would get
15   Hepatitis C at our facility. I don't know that I
16   have any other opinions.
17       Q.    Okay. Is it your opinion -- Well, let me
18   ask it this way: Do you have an opinion as to
19   whether or not Mr. Wallace contracted Hepatitis C
20   through participation in any studies at Pharma
21   Medica? Do you have an opinion either way?
22       A.    We used standard precautions. We use new,
23   fresh needles. I do not believe he contracted
24   Hepatitis C at our facility.

9

May Reporting Service

1        Q.    Are you saying it's not possible that he
2    contracted Hepatitis C through his participation in
3    the studies at Pharma Medica, or just not likely?
4        A.    Well, that's why we have standard
5    precautions so that we all follow the same
6    procedures. So that we wear gloves. You use a new
7    needles. New needles do not -- They've never been
8    used before. They're brand new. You don't get
9    Hepatitis C in that circumstance.
10       Q.    So, are you saying it's impossible for him
11   to have contracted Hepatitis C at the Pharma Medica
12   facility?
13       A.    I don't see how you can get Hepatitis C --
14       Q.    Okay.
15       A.    -- using clean needles.
16       Q.    That doesn't quite answer my question.
17   Are you saying it's not possible that he contracted
18   Hepatitis C at the Pharma Medica?
19       A.    I don't think it's possible.
20       Q.    Okay. Do you have an opinion as to how it
21   was Mr. Wallace did contract Hepatitis C?
22       A.    I don't know how he contracted Hepatitis
23   C.
24       Q.    Are you of the opinion that he did, in

10

May Reporting Service

1    fact, have Hepatitis C?
2        A.    Yes.
3        Q.    Okay. Okay. You understand that you're
4    not a defendant in this lawsuit; right?
5        A.    Yes.
6        Q.    What is your home address, ma'am?
7        A.    515 Possum Trot Road.
8        Q.    Is that in Bug Tussle?
9        A.    O'Fallon, Missouri.
10             MR. WENDLER: I think you got that
11   one. But you're probably not old enough.
12       Q.    (BY MR. WENDLER) Do you know what Bug
13   Tussle is?
14       A.    No, sir.
15       Q.    Did you ever watch the Beverly
16   Hillbillies?
17       A.    A long time ago.
18       Q.    Okay. Your education and training, ma'am,
19   let's switch subjects, and go to that. Where did you
20   graduate from med school?
21       A.    UMKC.
22       Q.    When?
23       A.    2000.
24       Q.    Where are you from originally?

11

May Reporting Service

1        A.    O'Fallon, Missouri.
2        Q.    Where did you go to undergraduate?
3        A.    So, UMKC is a six year combined program
4    where you do your undergraduate and your medical
5    school together in six years.
6        Q.    Okay. Prior to working for Pharma Medica,
7    have you ever worked in a pharmaceutical testing
8    facility?
9        A.    No.
10       Q.    And when did you first start working for
11   Pharma Medica?
12       A.    March of 2015.
13       Q.    And when did you stop working there?
14       A.    My last day was towards the end of May
15   this year.
16       Q.    And why did you leave the employ of Pharma
17   Medica?
18       A.    Pharma Medica closed their St. Louis
19   location.
20       Q.    Okay. Did you leave on good terms?
21       A.    Yes.
22       Q.    Did you have a written contract when you
23   worked for Pharma Medica?
24       A.    I had a letter of employment.

12

May Reporting Service

1    Q.    And that laid out the terms of your
2  employment?
3    A.  ·Yes.
4    Q.    Did that letter get revised every year, or
5  was it the same letter?
6    A.    It was the same one.
7    Q.    Now, in terms of how you were paid by
8  Pharma Medica, was it a flat salary --
9    A.    Yes.
10   Q.    -- or did you get bonuses?  Did you get
11 incentive pay?
12   A.    It was a flat salary.  One time we
13 received a year-end bonus.
14   Q.    And what was that bonus based on, as you
15 understood it?
16   A.    I don't -- I don't believe I was told what
17 the basis of the bonus was.
18   Q.    Okay.  Did you ever ask why there were no
19 other year-end bonuses, other than the one year?
20   A.    No.
21   Q.    Did anyone ever tell you?
22   A.    No.
23   Q.    Did anyone ever tell you why you got the
24 bonus for the one year?

13

1  Medical Group in Kansas City, Missouri from 2009 to
2  2015.
3    Q.    And how did you find out about the Pharma
4  Medica position?
5    A.    It was a job ad that I replied to.
6    Q.    Okay.  And what prompted you to want to go
7  to work for Pharma Medica?
8    A.    Just the climate of medicine had changed,
9  and I wanted to do something different.
10   Q.    Okay.  Was it an increase or a decrease in
11 pay for you?
12   A.    That was part of it.
13   Q.    What was part of it?
14   A.    A decrease in pay.
15   Q.    It was a decrease for you to go to work
16 for Pharma Medica?
17   A.    No.  No, I'm sorry.  A decrease in pay was
18 part of my looking for some other place to work.
19   Q.    All right.  So going to Pharma Medica
20 increased your pay?
21   A.    Yes.
22   Q.    Can you tell me, percentage-wise, how
23 much?  Ball park's fine?
24   A.    I don't recall.

15

1    A.    No.
2    Q.    Do you know if other people got bonuses
3  that year, or was it just you?
4    A.    No.  Other people got bonuses, as well.
5    Q.    Okay.  Who determined what the bonuses
6  were, and who got them?  Do you know?
7    A.    I do not.
8    Q.    How did you find out about the bonus?
9    A.    When it was presented to me in my office.
10   Q.    And who presented it to you?
11   A.    Mo Yamlahi, he was the VP of our site.
12   Q.    You have to spell that for me.
13   A.    It's -- We always called him Mo, M-O, and
14 Yamlahi, Y-A-M-L-A-H-I.
15   Q.    How did you find out about the -- Well,
16 strike that.
17         You graduated from UMKC medical school in
18 2000; correct?
19   A.    Yes.
20   Q.    And you began working for Pharma Medica in
21 2015.  What did you do from 2000 to 2015?
22   A.    I was in residency from 2000 to 2003.  And
23 then I worked for Mercy Medical Group in Hazelwood
24 from 2003 to 2009.  Then I worked for St. Luke's

14

1    Q.    Was that more than a 50-percent raise?
2    A.    No.
3    Q.    Okay.
4    A.    Maybe 10 percent.  I -- I don't know
5  that's that a hundred percent accurate.  I wouldn't
6  want to --
7    Q.    Okay.  So, you read about the job, and you
8  applied for it.  And then what happened from there?
9  Did you have an interview, or what happened?
10   A.    I had a phone interview with the VP of QA.
11   Q.    And who is that?
12   A.    At that time, it was Mary Stipancic.
13   Q.    Can you spell that one for us?
14   A.    I don't know if I can.  I can give you my
15 best estimate, S-T-I-P-A-N-C-I-C.
16   Q.    Okay.  And after that, what happened?
17   A.    After that, I had an in-person interview
18 with the C.E.O.
19   Q.    Is that Dr. Khan?
20   A.    No.
21   Q.    Who was is that?
22   A.    Latifa Yamlahi.
23   Q.    Can you spell that one for us?
24   A.    L-A-T-I-F-A, and Y-A-M-L-A-H-I.

16

**Page 17**

1  Q.  And then did Mr. Yamlahi offer you a job
2  on the spot, or did you have to wait, or what
3  happened next?
4  A.  I was offered the position by Latifa that
5  day.
6  Q.  Okay.  Let me ask you this, Dr. Jordan:
7  You are familiar with the Hippocratic Oath; right?
8  A.  Yes.
9  Q.  Tell me, in your own words, what is the
10  Hippocratic Oath?
11  A.  That the needs of the patient come first,
12  and that you don't do things to harm the patient.
13  That's it's what the patient needs is primary.
14  Q.  Okay.  And you understand that your
15  relationship with Mr. Wallace was not governed by the
16  Hippocratic Oath because you were not a treating
17  physician; is that correct?
18  A.  I was not his treating physician.
19  Q.  Okay.
20  A.  But as principal investigator, subject
21  safety is primary.
22  Q.  Okay.  So, you were governed by the
23  Hippocratic Oath or not?
24  A.  I see the Hippocratic Oath as a physician

**Page 18**

1  general, not excluded in research.
2  Q.  Okay.  So, the answer to my question is:
3  You felt that you were obligated to adhere to the
4  Hippocratic Oath while you were in charge of the
5  studies at Pharma Medica?
6  A.  Correct.  Yes.
7  Q.  All right.
8  A.  Yes.
9  Q.  Okay.  The studies that we're here about,
10  you know that there are two studies that are at issue
11  in this lawsuit; right?
12  A.  Yes.
13  Q.  Is it okay if we refer to them as Study
14  No. 1 and Study No. 2?
15  A.  So, I would know them by the study
16  numbers.  So --
17  Q.  Okay.
18  A.  So the first study, No. 1, do you mean
19  3952?
20  Q.  That's exactly correct.
21  A.  Okay.
22  Q.  Would you prefer we refer to it as 3952?
23  A.  Well, as long as we define that as Study
24  No. 1, it can be study No. 1.

**Page 19**

1  Q.  That's perfect.  And then Study No. 2
2  would be 4109?
3  A.  Yes.
4  Q.  All right.  We'll refer to that as Study
5  No. 2.  Is that okay?
6  A.  Okay.
7  Q.  Okay.  The sponsors of those studies, do
8  you know who they were?  Starting with Study No. 1?
9  A.  Study --
10  MS. DREW:  And it's not a memory
11  game.  So, you can --
12  (BY MR. WENDLER)  That's right.  You can
13  look at those records, if you need to.
14  A.  Study No. 1 was Tris.  I don't -- Let me
15  check Study No. 2.  I believe I know who study No. 2
16  was.  So, yes, I know who both the sponsors are.
17  Q.  Was Tris No. 1?
18  A.  Yes.
19  Q.  And No. 2 was Roxane?
20  A.  Yes.
21  Q.  How many studies, other than those two,
22  did you supervise or oversee when you were working
23  for Pharma Medica?
24  A.  I don't -- I couldn't give you an exact

**Page 20**

1  number.  We did studies on a regular basis.
2  Q.  Just give me your best estimate?  You can
3  give me a range, if that's easier for you.
4  A.  I would guess I supervised at least a
5  hundred studies in the time that I was there.
6  Q.  Okay.  Now, the studies that we're here
7  about, Study No. 1 and Study No. 2, came with
8  guidelines that the sponsors put out; correct?
9  A.  What do you mean by guidelines?
10  Q.  Well --
11  (Whereupon, Plaintiff's
12  Exhibit No. 1 was marked
13  for identification by the
14  court reporter.)
15  Q.  (BY MR. WENDLER)  I'm going to show you
16  what we'll mark as Exhibit 1.
17  MS. DREW:  Thank you.
18  MR. WENDLER:  You're welcome.
19  Q.  (BY MR. WENDLER)  And this was part of the
20  documents that you reviewed to prepare for the
21  deposition today; correct?
22  A.  Yes.
23  Q.  This was what was supplied to us from
24  Pharma Medica's attorneys as the study guidelines,

Case: 4:18-cv-01859-PLC    Doc. #: 101-2    Filed: 07/23/20    Page: 6 of 39 PageID #: 882

| | |
|---|---|
| 1  And you see your signature on Page 2, Bates numbered | 1  is a safety concern, then as a principal |
| 2  00169? | 2  investigator, I'm able to order safety testing. |
| 3     A.    So, we would call this the study protocol. | 3     Q.    Okay. And that would be in compliance |
| 4     Q.    The protocol? Thank you. So, each of | 4  with the protocol; right? |
| 5  those studies had a protocol that was provided by the | 5     A.    Yes. |
| 6  sponsor; correct? | 6     Q.    Okay. So, basically the protocol |
| 7     A.    The protocol was written, and approved by | 7  guidelines govern how the entire study is to be |
| 8  the sponsor. | 8  conducted; correct? |
| 9     Q.    Okay. And if you turn to Page 2, that's | 9     A.    Correct. |
| 10  your signature; correct? | 10     Q.    Okay. It determines how the participants |
| 11     A.    Yes. | 11  are to be selected, as well; right? |
| 12     Q.    And it says, "I am aware of the | 12     A.    Yes. |
| 13  information in this protocol, and agree to comply | 13     Q.    And the pre-screening testing; right? |
| 14  with all of the procedures contained therein." | 14     A.    Yes. |
| 15  Correct? | 15     Q.    Okay. Do the study protocols determine |
| 16     A.    Yes. | 16  what records are to be kept? |
| 17     Q.    Okay. What did you understand that to | 17     A.    So, the records are kept according to the |
| 18  mean when you signed that? | 18  guideline of the regulatory authority. |
| 19     A.    That means that I will see that the study | 19     Q.    Okay. |
| 20  is conducted according to what is written in the | 20     A.    Such as the F.D.A., or the E.M.A. |
| 21  protocol. | 21     Q.    Okay. And that's the only guideline for |
| 22     Q.    Okay. And the protocol governs terms such | 22  recordkeeping that you're aware of? |
| 23  as when blood is to be drawn; correct? | 23     A.    I believe that's in the ICH, as well, as |
| 24     A.    Yes. | 24  far as duration of recordkeeping. |
| 21 | 23 |
| May Reporting Service | May Reporting Service |
| 1     Q.    And it governs matters such as when the | 1     Q.    What's ICH? |
| 2  participants are supposed to have meals; correct? | 2     A.    International Conference of Hominization. |
| 3     A.    Yes. | 3     Q.    Okay. Any other guidelines that pertain |
| 4     Q.    Does it govern procedures such as when the | 4  to recordkeeping that you're aware of for these |
| 5  participants are supposed to sleep, or does it vary | 5  studies? |
| 6  study to study? | 6     A.    Those are the main ones that I'm aware of. |
| 7     A.    There's not typically a specific time when | 7     Q.    Are there any minor ones? |
| 8  the protocol would tell a subject to sleep. | 8     A.    Well, Health Canada in Canada. |
| 9     Q.    Okay. Well, the study guidelines govern | 9     Q.    Okay. Do the study sponsors have the |
| 10  everything ranging from when the medication is to be | 10  right to have additional recordkeeping guidelines |
| 11  administered to the time the blood is to be drawn and | 11  over and above what the other ones require? If you |
| 12  tested; is that correct? | 12  know? |
| 13     A.    That's correct. | 13     A.    I don't recall. |
| 14     Q.    Does the study guidelines determine how | 14     Q.    Okay. Do the sponsors have the right to |
| 15  the blood is to be drawn in terms of using a needle, | 15  come in and conduct audits? |
| 16  or using a catheter? | 16     A.    Yes. |
| 17     A.    Yes. | 17     Q.    Do the sponsors have the right to come in |
| 18     Q.    Okay. Does the study -- Strike that. | 18  and monitor the studies, if they want? |
| 19        Do the study guidelines determine when the | 19     A.    Yes. |
| 20  participants are to be re-tested, if necessary? | 20     Q.    How about the -- Well, let me ask you |
| 21     A.    Re-tested for what? | 21  this: I was told that there were video cameras at |
| 22     Q.    For anything? | 22  the Pharma Medica facility. Were you aware of those? |
| 23     A.    The protocol isn't going to necessarily | 23     A.    Yes. |
| 24  have a provision to re-test for anything. If there | 24     Q.    Were those video cameras operational? |
| 22 | 24 |
| May Reporting Service | May Reporting Service |

1     A.     Yes.

2     Q.     Do you know if the sponsors have the right

3   to observe the studies through the video feeds,

4   through the video cameras at Pharma Medica?

5     A.     That I do not know.

6     Q.     Okay.  Do you know if any of the sponsors

7   -- I'm sorry.

8     A.     So, I'm trying to recall.  I don't -- That

9   was -- I don't believe that that was something that

10   was ever done, to my recollection.

11     Q.     Okay.  That was my next question:  Do you

12   know if that occurred?  And you just don't know?

13     A.     I don't know.

14     Q.     All right.  Well, let's talk about those

15   video cameras.  You said they were operational.  What

16   were they there for, to your knowledge?

17     A.     They were there -- They were pointed in

18   different places.  So, like at the parking lots to

19   make sure that the site was safe.  They did have them

20   in dosing rooms to make sure that dosing was

21   appropriate, if there were any concerns about the

22   dosing procedures.

23     Q.     Okay.

24     A.     Beyond that, I know that there were some

25

1   done through the IT department.  I know that Mo and

2   Louis had access, as well as Shabaz.  Besides that, I

3   don't know if anyone else had access.

4     Q.     Shabaz is Dr. Khan?

5     A.     Yes.

6     Q.     And Mo is Yamlahi?

7     A.     Yes.

8     Q.     And Louis is?  What's his last name?

9     A.     Louis Co.

10     Q.     Co?  Is Louis Co a doctor?

11     A.     No.

12     Q.     Is Mo Yamlahi a doctor?

13     A.     No.

14     Q.     How about Dr. Shabaz Khan, is he a doctor?

15     A.     Yes.

16     Q.     Do you know if he's licensed in the U.S.

17   anywhere?

18     A.     No.

19     Q.     He's not?

20     A.     He's not.

21     Q.     Okay.  Is he licensed in Canada?

22     A.     I don't know.

23     Q.     Okay.  For housekeeping purposes, I'm

24   going to hand you what we will mark as Exhibit 2.

27

1   directed at like where the staff would sign in to

2   make sure that sign-in was appropriate.

3     Q.     How about the blood draw area?

4     A.     I don't know that I could say they were

5   specifically aimed at the blood draw area.

6     Q.     Do you know if the video cameras recorded

7   what was going on, or was it just a video feed so

8   that someone could monitor?

9     A.     My understanding is that it was a video

10   feed.  And if nothing was done, it was re-recorded

11   over.

12     Q.     If nothing was done?  In other

13   words somebody would have to affirmatively --

14     A.     So, if that wasn't saved, it was

15   re-recorded over.

16     Q.     Do you know what the duration was before

17   it was recorded over?

18     A.     I do not.

19     Q.     And do you know who determined whether the

20   video was saved or not?

21     A.     I don't know.

22     Q.     Do you know who was on the other end of

23   the camera watching, if anyone?

24     A.     You had to have certain access that was

26

1               (Whereupon, Plaintiff's

2                Exhibit No. 2 was marked

3                for identification by the

4                court reporter.)

5          MS. DREW:  Thank you.

6     Q.     (BY MR. WENDLER)  And that is the cover

7   page and signature sheet for the second study that

8   we're doing today.  Do you see that?

9     A.     Yes.

10     Q.     And do you recognize on Page 2 your

11   signature?

12     A.     Yes.

13     Q.     Okay.  Each of these protocols, Dr.

14   Jordan, had a requirement that there be insurance.

15   Were you aware of that?

16     A.     Yes.

17     Q.     Do you know why there was no insurance for

18   this claim?  At least it's been reported there was no

19   insurance for this claim.  Do you know why?

20     A.     I do not know why.

21     Q.     Do you know if there was insurance for

22   either of these studies?

23     A.     Typically, that would be something done at

24   the business level between the business part and the

28

**Page 29**

1 sponsor who would take care of the insurance.

2     Q.    And who was at the business level?

3     A.    So, that would be like the project

4 management group.

5     Q.    Okay. Who was that? Give me some names,

6 please?

7     A.    That would be out of the head office in

8 Canada. The head of the -- of the project manager

9 group -- I can see her face. Marianna Colalillo.

10     Q.    Can you spell that one?

11     A.    I believe it's C-O-L-L-A-I-L-O. I

12 believe.

13     Q.    And you said that at the business office

14 in Canada. So, that's where doctor Khan's office is?

15     A.    He works out of the clinic in Canada,

16 which is a separate location.

17     Q.    Have you ever been to any of the Canadian

18 offices of Pharma Medica?

19     A.    One time.

20     Q.    Which one did you go to?

21     A.    I was -- I visited both locations.

22     Q.    Okay. Back to the insurance issue. To

23 the extent there was supposed to be insurance, but

24 there was not, is it your testimony that was not your

May Reporting Service

**Page 30**

1 responsibility?

2     A.    I'd have to look in the protocol. Which

3 one are you speaking about?

4     Q.    Either one. I can point you to a specific

5 page, if that'll help?

6     A.    It would.

7     Q.    If you need to take that phone call, I

8 don't care.

9     A.    I don't know who it is, no.

10     Q.    Look at Bates No. 389, or 221.

11     A.    So, this says under the insurance, "For

12 the purpose of study-related injuries, the sponsor

13 will have valid insurance for the duration of the

14 study." So, that part would be through the sponsor.

15 And ---

16     Q.    The next study?

17     A.    The next study is Roxane. The next

18 sentence, "PMR will have valid liability insurance at

19 all times."

20     Q.    PMRI is?

21     A.    Pharma Medica Research.

22     Q.    Pharma Medica Research?

23     A.    Yes.

24     Q.    So, it says the sponsor and Pharma Medica

May Reporting Service

**Page 31**

1 will have liability insurance?

2     A.    To my understanding, that it was written

3 in the protocol. It's my understanding that PMRI

4 does have liability insurance.

5     Q.    Okay. But the question was: To the

6 extent there is no liability insurance to cover this

7 claim, is it your testimony that that was not your

8 job to arrange for that?

9     A.    That would not typically be within my job

10 description to arrange for liability insurance for

11 the studies.

12     Q.    Okay. And did you do anything to,

13 compliance with the protocol, determine whether or

14 not there was insurance?

15     A.    No.

16     Q.    Okay. I should've explained this to you

17 earlier. But if at any point in time I ask a

18 question that's not completely clear to you, let my

19 know, and I'll be glad to rephrase it for you.

20     A.    Okay.

21     Q.    So far you're doing fine.

22     Let me ask you this about the studies that

23 Mr. Wallace participated in. Do you agree that

24 Mr. Wallace did not have Hepatitis C when he first

May Reporting Service

**Page 32**

1 screened for the Study No. 1?

2     A.    He had a negative Hepatitis C antibody

3 blood test.

4     Q.    And does that mean he did not have

5 Hepatitis C?

6     A.    There was no evidence of Hepatitis C at

7 that time.

8     Q.    Okay. How about Study No. 2, when

9 Mr. Wallace first screened for Study No. 2, that is

10 Study No. 4109, do you agree he did not have

11 Hepatitis C at that time?

12     A.    He had a negative antibody test for

13 Hepatitis C.

14     Q.    So again, he did not have Hepatitis at

15 that point; right?

16     A.    He had no evidence of Hepatitis at that

17 time.

18     Q.    When you say he had no evidence of

19 Hepatitis, does that mean he did not have Hepatitis,

20 or it is possible that he had it, and it just didn't

21 read?

22     A.    There are circumstances where you have an

23 antibody test that's negative, but you might have

24 Hepatitis C virus in your blood, but the antibody

May Reporting Service

1   test is negative.
2      Q.   Okay.  And tell me, what are those
3   circumstances where that could occur?
4      A.   If you have an earlier exposure, I have
5   Hepatitis C in my blood, and I haven't had enough
6   time to develop an antibody response.
7      Q.   Okay.  And how much time does it take?
8      A.   That is variable.
9      Q.   Variable from what to what?
10     A.   From the amount of the exposure to the
11  person, and a person's immune system.
12     Q.   What's the shortest and the longest time
13  frames?
14     A.   From my understanding, it could be two to
15  six months.
16     Q.   Two to six months?  And where did you
17  acquire that understanding?
18     A.   To me, I believe that's general knowledge
19  about Hepatitis C.
20     Q.   Okay.  Did you -- Can you cite me to any
21  studies, or any reports, or any medical journals that
22  support that?
23     A.   I don't know that I could give you a
24  specific example.  The one that I most commonly use
                                                      33
                     May Reporting Service

1   would be UpToDate.  It's a computer program called
2   UpToDate.
3      Q.   And do you use that in your general
4   practice as a --
5      A.   Uh-huh.
6      Q.   -- physician?  And that's yes?
7      A.   Yes.
8      Q.   You find that authoritative?
9      A.   I'm sorry.
10     Q.   Do you find that authoritative, the
11  UpToDate program?
12     A.   I do think it's a good reference source.
13     Q.   Okay.  Have you ever done any research
14  specifically to determine what the period is that you
15  can have the Hepatitis C virus, and still have a
16  negative antibody?
17     A.   I have not personally done specify
18  research on that.
19     Q.   Okay.  Do you consider yourself an expert
20  in Hepatitis C?
21     A.   No.
22     Q.   All right.  So, we're in agreement that
23  Mr. Wallace tested negative before Study No. 1, and
24  before Study No. 2 for the Hepatitis C --
                                                      34
                     May Reporting Service

1      A.   Yes.
2      Q.   -- antibody; correct?
3      A.   Yes.
4      Q.   And you do agree that Mr. Wallace did have
5   Hepatitis C on June 26th, 2016 when he was at
6   Anderson Hospital?
7      A.   Yes.
8      Q.   Yes?  Okay.  We kind of hit on this
9   earlier, but the studies that Mr. Wallace
10  participated in, they used, at Pharma Medica, needles
11  rather than catheters to draw blood; correct?
12     A.   Correct.
13     Q.   Do you know that other study groups use
14  catheters rather than needles?  Were you aware of
15  that?
16     A.   We -- In Pharma Medica in Canada, they use
17  catheters.
18     Q.   Okay.
19     A.   We've had a few studies that have used
20  catheters here, but they were IV catheters, and it
21  was specific to that study.  I don't -- It was
22  neither one of these studies.
23     Q.   Neither one of the two studies that we're
24  here about today; correct?
                                                      35
                     May Reporting Service

1      A.   Correct.
2      Q.   All right.  What determines -- Strike
3   that.
4           At Pharma Medica, what determined whether
5   you used needles or catheters?  Was it in the
6   sponsor's protocol?
7      A.   The times in Pharma Medica where we've
8   used catheters, it was based on the regulatory
9   guidance of the study.  And that was Anvisa studies
10  require that subjects be given the option of a
11  catheter.
12     Q.   Okay.  Was that more expensive to use the
13  catheters rather than the needles?
14     A.   I don't know.
15     Q.   Okay.  Was Mr. Wallace given the option of
16  catheter or needles?
17     A.   Not in these studies.
18     Q.   Okay.  So, pardon me, I didn't understand
19  you.  But what determines whether a catheter or a
20  needle is used during the Pharma Medica studies that
21  you were in?
22     A.   At our St. Louis site, our standard was
23  direct vena puncture, or a needle.  We did a few
24  what's Anvisa studies.  Anvisa is like the Brazilian
                                                      36
                     May Reporting Service

| | |
|---|---|
| 1 | F.D.A. |
| 2 | Q. Anvisa? |
| 3 | A. A-N-V-I-S-A. |
| 4 | Q. Is that one word? |
| 5 | A. Yes. |
| 6 | Q. Okay. |
| 7 | A. I believe it's an acronym. I don't know |
| 8 | what it stands for. |
| 9 | Q. And these are Brazilian studies? |
| 10 | A. Yes. |
| 11 | Q. Okay. And they required the use of |
| 12 | catheters in the Brazilian studies? |
| 13 | A. I believe the wording is that they |
| 14 | required catheters be offered. So, a volunteer could |
| 15 | decline a catheter, and still have a direct stick. |
| 16 | Q. Okay. In those studies, did most of the |
| 17 | participants opt for the catheters? |
| 18 | A. I don't know that I could tell you the |
| 19 | number. I don't -- I wouldn't want to tell you |
| 20 | something that's not true. |
| 21 | Q. What's the difference between using the |
| 22 | needles and the catheters, other than the needle you |
| 23 | have to be stuck every time blood is drawn? |
| 24 | A. The catheter, it just stays there. |

37

May Reporting Service

| | |
|---|---|
| 1 | Q. Okay. |
| 2 | A. So, it's -- If I'm doing other things, if |
| 3 | I'm on my computer, it might be irritating to my arm. |
| 4 | Q. Okay. But you only get stuck once with a |
| 5 | catheter; correct? |
| 6 | A. Not necessarily. So, if they were able to |
| 7 | place the catheter on the first stick, then that |
| 8 | would be true. |
| 9 | Q. Yes. |
| 10 | A. Sometimes they have to stick you more than |
| 11 | once to get the catheter. Sometimes that catheter |
| 12 | stops working, and requires another stick to get |
| 13 | another catheter. |
| 14 | Q. Well, I was reading in some of these |
| 15 | studies that Mr. Wallace participated in, there were, |
| 16 | in one occasion, 20 blood draws. And another case, I |
| 17 | forgot how many blood draws. If he had a catheter |
| 18 | in, the blood could be drawn through the catheter |
| 19 | without the need to have a needle inserted in the |
| 20 | vein; correct? |
| 21 | A. Assuming that the catheter functioned the |
| 22 | entire study. |
| 23 | Q. Yes. |
| 24 | A. If there were outpatient visits, we would |

38

May Reporting Service

| | |
|---|---|
| 1 | not allow a subject to leave our building with a |
| 2 | catheter -- |
| 3 | Q. Of course. |
| 4 | A. -- in place. |
| 5 | Q. But most of the studies, the participants |
| 6 | stay in while the blood draws are occurring; correct? |
| 7 | A. They would be in for a period of time. |
| 8 | And then some studies have return blood draws on an |
| 9 | outpatient visit, depending on the sequence of blood |
| 10 | draws -- |
| 11 | Q. Okay. |
| 12 | A. -- and their timing. |
| 13 | Q. When the catheters were used at the Pharma |
| 14 | Medica facility in the other studies, not the studies |
| 15 | that we're here about today, did that require any |
| 16 | additional licensure or training for employees? |
| 17 | A. Catheter studies, you have to have been |
| 18 | trained to place a catheter. |
| 19 | Q. Okay. |
| 20 | A. So that would be paramedics and nurses. |
| 21 | Q. All right. And for the needle stick, who |
| 22 | can do that? |
| 23 | A. That would be someone who has been trained |
| 24 | as a phlebotomist. |

39

May Reporting Service

| | |
|---|---|
| 1 | Q. Do you know what the difference, if any, |
| 2 | there is in the pay for the paramedics and nurses |
| 3 | versus the phlebotomists? |
| 4 | A. I do not. |
| 5 | Q. Do you do any of the hiring or firing of |
| 6 | the Pharma Medica employees at the St. Charles |
| 7 | facility? |
| 8 | A. I hired and fired the sub investigators. |
| 9 | Q. The sub? |
| 10 | A. The subject investigators. |
| 11 | Q. And what did they do? |
| 12 | A. They would be physicians who would monitor |
| 13 | the studies. |
| 14 | Q. Did you do any hiring and firing of anyone |
| 15 | else? |
| 16 | A. No. |
| 17 | Q. Who did that? |
| 18 | A. We had an HR department. |
| 19 | Q. At St. Charles, or was it in Canada? |
| 20 | A. We have one in both. |
| 21 | Q. Okay. And you hired and fired the sub |
| 22 | investigators? Can you give me the name of some of |
| 23 | the sub investigators that you hired? |
| 24 | A. I hired Dr. Milford, and Dr. Markollari. |

40

May Reporting Service

1   Q.   Can you spell that one?
2   A.   M-A-R-K-O-L-L-A-R-I-A.  There was Dr.
3   Tables.
4   Q.   Spelled like it sounds?
5   A.   Yes.  And Dr. Buchanan.  There was also a
6   Dr. Scaduto, who I did not hire.  He started at the
7   same time as me, and was hired by Latifa.
8   Q.   Can you spell Scaduto?
9   A.   S-C-A-D-U-T-O.
10  Q.   Okay.  Did you have to fire any of those
11  doctors?
12  A.   Dr. Scaduto.
13  Q.   And what was the reason for his
14  termination?
15  A.   He had problems with his licensure.
16  Q.   Was Dr. Scaduto involved in either of the
17  studies that we're here about, Study 1 or Study 2?
18  A.   No.
19  Q.   Okay.  Back to the hiring and firing.  You
20  didn't participate in any of the hiring or firing of
21  anyone, other than sub investigators; am I correct?
22  A.   Correct.
23  Q.   Okay.  Did you ever have any input on any
24  termination decisions on any of the other Pharma

41

1   In a study like this where there are a lot of needle
2   sticks versus one catheter, which is safer for the
3   patient?  Or for the study participant, I should say?
4       MS. DREW:  Object to the form of the
5   question; vague.
6           You can go ahead and answer.
7   A.   Universal precautions are used.  You're
8   using new needles for each stick.  There shouldn't be
9   a difference.
10  Q.   (BY MR. WENDLER)  Okay.  And if universal
11  precautions are not used, which is safer for the
12  participant?
13      MS. DREW:  Object to form of the
14  question; vague as to what isn't being followed by
15  universal precautions.
16          Subject to that, you can go ahead
17  and answer.
18  A.   I can't -- Universal precautions is such a
19  standard in medicine.  I can't imagine not following
20  universal precautions.  I can't.
21  Q.   (BY MR. WENDLER)  And the reason you want
22  to follow the universal precautions is you want to
23  try to avoid transferring blood-borne pathogens like
24  Hepatitis C; correct?

43

1   Medica employees?
2   A.   If I saw something that I was concerned
3   about their job performance, I would certainly say --
4   talk to that individual, and report it to that
5   individual's supervisor.
6   Q.   Okay.  And had that ever happened when you
7   were employed by Pharma Medica?
8   A.   Yes.
9   Q.   Under what circumstances?
10  A.   I don't know that I can give you a
11  specific example.  I was at Pharma Medica on a
12  full-time basis, and I was in the clinics.  I would
13  observe things.  Probably the most common would be a
14  mouth check by a phlebotomist that I didn't think was
15  done properly.
16  Q.   Okay.  Can you think of any other examples
17  where you had to talk to a phlebotomist's supervisor
18  about the phlebotomist's work?
19  A.   I can't think of any other, off the top of
20  my head.
21  Q.   Okay.  With regard to avoiding the
22  transfer of blood-borne pathogens like Hepatitis C,
23  which do you feel is safer for the patient, the
24  needle stick or the catheter in a situation where --

42

1   A.   Correct.
2   Q.   All right.  So, if those universal
3   procedures are followed, there is no risk of transfer
4   of blood-borne pathogens like Hepatitis C; am I
5   correct?
6   A.   Correct.
7   Q.   Okay.  If the universal procedures are not
8   followed, which is the safer option for the study
9   participant, the needle sticks or the catheter?
10      MS. DREW:  Same objection.
11  A.   I don't know that I have an answer for
12  that.  I can't think of a circumstance where I would
13  not follow universal precautions.
14  Q.   (BY MR. WENDLER)  Okay.  Well, were you
15  constantly monitoring all of the phlebotomists when
16  you worked at Pharma Medica?
17  A.   Was I constantly monitoring them?  No.
18  Q.   Okay.
19  A.   I had other job responsibilities.
20  Q.   Okay.  So you said you can't imagine a
21  situation where you wouldn't follow the universal
22  procedures.  But if there is a situation where one of
23  the phlebotomists is not following the universal
24  procedures at Pharma Medica, which is the safer

44

```
 1   avenue for the participant, the needle sticks or the
 2   catheters?
 3            MS. DREW:  Object to the form of the
 4   question as to what part of the universal precautions
 5   not being followed.
 6            Subject to that, go ahead and
 7   answer.
 8       A.   I understand that you're saying there was
 9   more needle sticks --
10       Q.   (BY MR. WENDLER)  Yes.
11       A.   -- than with a catheter.  I don't know
12   that I can assume that one is necessarily safer than
13   another.  And our phlebotomists were trained in
14   universal precautions.
15       Q.   Okay.  Well, let me ask you this:  The
16   phlebotomists that were trained, did Pharma Medica
17   ever use any interns for phlebotomists?
18       A.   Yes.
19       Q.   Did Pharma Medica ever use phlebotomists
20   who had no prior experience on real human, sticking
21   needles into veins before they came to work at Pharma
22   Medica?
23       A.   I don't know the training of the
24   interns --
                                                    45
```

```
 1   precautions training.
 2       Q.   Okay.
 3       A.   The blood-borne pathogens training.  As
 4   far as what their education was before they stepped
 5   in the door, I can't speak to their education before
 6   they arrived.
 7       Q.   Okay.  The universal precautions training
 8   and the blood-borne pathogens training, in those
 9   training procedures, do they ever stick needles into
10   live human being's arms?
11       A.   No.
12       Q.   Okay.  So is it fair to say then that you
13   don't know, Dr. Jordan, if any of the phlebotomists
14   hired by Pharma Medica had prior experience sticking
15   needles into live human being's arms before coming to
16   work for Pharma Medica?  You don't know if that
17   happened or not; am I correct?
18       A.   You had been talking about interns.
19       Q.   Uh-huh.
20       A.   So, interns were there for a short period
21   of time.  They weren't necessarily going to be
22   continued to be hired on, and to continue to work.
23       Q.   Fair enough.  I did switch.  Is there a
24   difference between a phlebotomist and an intern?
                                                    47
```

```
 1       Q.   Okay.
 2       A.   -- that were used.
 3       Q.   All right.  Do you know anything about the
 4   training that the interns received before coming to
 5   work for Pharma Medica?
 6       A.   So, they would be trained at whatever
 7   school of phlebotomy that they were going to.
 8       Q.   Yes.  Okay.
 9       A.   So, I've not visited those schools.  I
10   have not seen their --
11       Q.   Specific training?
12       A.   Uh-huh.
13       Q.   Correct?
14       A.   Correct.
15       Q.   So, back to the question:  Do you know if
16   there were ever any interns that were used by Pharma
17   Medica who, prior to coming to work for Pharma
18   Medica, had never inserted a needle into a live human
19   being's vein before coming to work at Pharma Medica?
20   Do you know if that happened?
21       A.   Again, I was not involved in their -- When
22   the interns came to Pharma Medica --
23       Q.   Uh-huh.
24       A.   -- they would do our on-site universal
                                                    46
```

```
 1       A.   Yes.
 2       Q.   All right.  What's the difference?
 3       A.   An intern is still in training.
 4       Q.   Okay.  So, back to my question:  Do you
 5   know if there were any interns that were brought into
 6   Pharma Medica who had no prior experience sticking a
 7   needle in a live human being's arm before coming to
 8   work at Pharma Medica?  Do you know, either way?
 9       A.   And I didn't bring the interns in.  I
10   didn't interview the interns.  I wasn't the one who
11   was involved in bringing them in.  I don't know what
12   their training location entailed.
13       Q.   Okay.  Then You don't know what their
14   experience entailed in terms of sticking needles into
15   live human being's arms; correct?
16       A.   I do not.
17       Q.   All right.  The phlebotomists, do you know
18   if they had any prior experience in sticking needles
19   into human being's arms, that is living human being's
20   arms, before coming to work at Pharma Medica?
21       A.   So, I did not hire the phlebotomists.
22       Q.   Uh-huh.
23       A.   So, I did not interview them about their
24   exact background and training.
                                                    48
```

1   Q.   And therefore, you don't know if they had
2 any experience; correct?
3   A.   Correct.
4   Q.   All right. You said there was universal
5 precautions training, and blood-borne pathogens
6 training for the interns to follow --
7   A.   Uh-huh.
8   Q.   -- when they came to -- came onto Pharma
9 Medica; right?
10   A.   Yes.
11   Q.   By the way, were the interns paid, or were
12 they there just for the credit hours?
13   A.   I believe it's for credit hours.
14   Q.   Okay. Who taught the interns the
15 universal precautions training, and the blood-borne
16 pathogens training?
17   A.   I believe that was done through our HR
18 administrator.
19   Q.   And who was that?
20   A.   Debbie Elderton.
21   Q.   Can you spell her last name?
22   A.   E-L-D-E-R-T-O-N.
23   Q.   There are currently no Pharma Medica
24 employees that worked at the St. Charles facility
49
May Reporting Service

1 where you worked that are still employed by Pharma
2 Medica, to your knowledge?
3   A.   No.
4   Q.   Am I right?
5   A.   To my knowledge, correct. Yes. Dr. Khan
6 still works for Pharma Medica. He was here on-site
7 for a bit, but he's back in Canada.
8   Q.   Anyone else, besides him?
9   A.   No.
10   Q.   Okay. Now, since you worked at Pharma
11 Medica on a regular basis, is it correct that there
12 were actually in the blood draw areas -- What do you
13 call the blood draw areas?
14   A.   Call it the blood draw area.
15   Q.   Okay. Were there timers set up there so
16 that the participants would come in, and they would
17 have to have their blood drawn within a certain time?
18   A.   Uh-huh.
19   Q.   Yes?
20   A.   Yes.
21   Q.   Okay. Do you know what that time limit
22 was?
23   A.   So, the protocol would list certain time
24 points that the blood was to be drawn, based on their
50
May Reporting Service

1 dosing time.
2   Q.   Okay. I guess my question wasn't quite
3 clear. My understanding was that the participants
4 would have a tee shirt on with a number on the shirt;
5 correct?
6   A.   Yes.
7   Q.   And they would be called up for their
8 blood draw by the shirt number; correct?
9   A.   Yes.
10   Q.   And the phlebotomists or the interns would
11 have a certain time limit to get the blood drawn; is
12 that correct?
13   A.   The goal is to draw it on the dosing
14 minute. But if there was difficulty with the blood
15 draw, that didn't always happen. But we recorded the
16 time that the blood was drawn.
17   Q.   Okay. And my understanding, and correct
18 me if I'm wrong, but there was a timer that allowed
19 for one minute for the blood draw for each
20 participant. Is that your understanding?
21   A.   We want to draw the blood sample according
22 to their dosing minute.
23   Q.   Okay.
24   A.   So, yes.
51
May Reporting Service

1   Q.   Okay. And what happened if you couldn't
2 get the blood drawn within that minute? Do you tell
3 the participant to go elsewhere, and pull up the next
4 participant, or what happened?
5   A.   We typically would have what we would call
6 a backup draw person. So, if there was difficulty
7 drawing a subject's blood, they would be directed to
8 go to the next table, and the backup draw person
9 would draw the blood.
10   Q.   Okay. And just so I'm clear, where the
11 blood draw area was, did you say there were no video
12 cameras observing that area?
13   A.   I know that I've seen video cameras
14 directed to the parking lots, into the dosing areas.
15 I don't know that it was specifically pointed at the
16 blood drawing area.
17   Q.   Was there a place at Pharma Medica in St.
18 Charles where you could actually watch the video feed
19 on a TV screen, or a monitor?
20   A.   You would have to log into a computer
21 network access.
22   Q.   So, you could do that through your
23 computer?
24   A.   You know, Mo said he was going to give me
52
May Reporting Service

```
 1   access.  I never, never used it from my office.  So I
 2   never viewed that.  If I needed to view something, I
 3   would typically have gone to either Mo or Shabaz's
 4   office to view it.
 5        Q.    All right.  So at Mo's office, or Shabaz's
 6   office you could watch the video feed that Pharma
 7   Medica had in St. Charles; correct?
 8        A.    You could.
 9        Q.    And Mo and Shabaz had an office in St.
10   Charles; correct?
11        A.    Yes.
12        Q.    And that's where you would --
13        A.    Uh-huh.
14        Q.    -- on occasion watch the video feeds;
15   correct?
16        A.    Uh-huh.
17        Q.    Yes?
18        A.    Yes.
19        Q.    Do you -- And as you sit here today, you
20   just don't recall whether there was a video feed for
21   the blood draw area; correct?
22        A.    We had multiple different clinics.  When
23   you look at the screens, there's multiple different
24   areas where videos were.  I couldn't tell you with
```
                              53

```
 1   certainty, 'Did it that get this blood draw area?'
 2   It might have.  It might not have.
 3        Q.    When you say there were multiple different
 4   clinics, are you talking about there were different
 5   studies going on simultaneously?
 6        A.    Yes.
 7        Q.    Okay.  And then you said that you never
 8   accessed the video feed from your computer at your
 9   office.  Did you ever access the video feeds from
10   your computer at home?
11        A.    Oh, no.
12        Q.    Could you, if you had wanted to?
13        A.    No.
14        Q.    Do you know who occupies the Pharma Medica
15   facility currently?  The St. Charles facility, that
16   is?
17        A.    No.
18        Q.    Did you ever receive a phone call from Dr.
19   Khan, or anyone else, to report they saw something on
20   a video-camera feed, and wanted to draw your
21   attention to it?  Did that ever happen?
22        A.    Can you say that one more time?  I'm
23   sorry.
24        Q.    Sure.  Did you ever get a phone call from
```
                              54

```
 1   Dr. Khan, or anyone else, and the person at the other
 2   end of the phone would say, 'Hey, I just saw on the
 3   video feed something happened, and I want to draw
 4   your attention to it.'  And the something could be
 5   anything?
 6        A.    I don't believe so.
 7        Q.    Do you know if that ever happened to
 8   anyone at Pharma Medica in St. Charles, that they
 9   received a phone call from someone who was watching
10   the video feed, and wanted to bring their attention
11   to some problem?
12        A.    I don't know.
13        Q.    Did anyone ever tell you, Dr. Jordan, why
14   the video cameras were there in the first place?
15        A.    I don't know that they specifically told
16   me why they were there.
17        Q.    Generally, did anyone tell you?
18        A.    Other than just to know that they were
19   there, so if there was problems with the dosing, or
20   if they were directed at the parking lot, as well, if
21   there was any problems in the parking lot.
22        Q.    Okay.  What would the parking lot
23   problems, what would that entail?
24        A.    Well, people's cars were out there.  If
```
                              55

```
 1   there was any reports that someone's car had been
 2   tampered with, that there was --
 3        Q.    Okay.
 4        A.    -- cameras.
 5        Q.    Did you ever ask anyone, Dr. Jordan, if
 6   there is any video recordings made of the needle
 7   stick area during Study 1 or Study 2 that we're here
 8   about today?
 9        A.    Did I ever ask anyone?
10        Q.    Right.
11        A.    No, I didn't ever ask anyone.
12        Q.    You want to check that?
13        A.    That's okay.
14        Q.    All right.  During your employment at
15   Pharma Medica, at any time, have you ever been
16   alerted to a needle stick from any employee, or
17   intern, or phlebotomist that was not in compliance
18   with the universal precautions training, and
19   blood-borne pathogens training?
20        A.    No.
21        Q.    You never heard of someone sticking a
22   participant with a needle, and then using the same
23   needle on another participant?
24        A.    No.
```
                              56

| 1 | Q.    No one ever reported to you that one of |
| 2 | the people drawing blood used a needle on one |
| 3 | participant, and tried to use it on a second |
| 4 | participant?  That was never reported to you? |
| 5 | A.    That was not reported to me. |
| 6 | Q.    Okay.  And just so I'm clear, when you say |
| 7 | that that was never reported to you, it was never |
| 8 | reported to you that someone at Pharma Medica in St. |
| 9 | Charles drew blood from one patient, and used the |
| 10 | same needle to draw blood on another patient, or |
| 11 | attempted to use the same needle to draw blood on |
| 12 | another patient or participant, either by a |
| 13 | participant himself or herself, or by an employee, or |
| 14 | an intern; am I correct? |
| 15 | A.    Certainly no employees.  I do not recall |
| 16 | any -- any volunteers telling me that.  But certainly |
| 17 | no employees. |
| 18 | Q.    Okay.  How about participants?  Did any |
| 19 | participant ever tell you, 'Hey, look.  That woman |
| 20 | tried to use the same needle on two participants, or |
| 21 | the woman did use the same needle on two |
| 22 | participants.'? |
| 23 | A.    No. |
| 24 | Q.    That never happened? |

57

May Reporting Service

| 1 | A.    No. |
| 2 | Q.    Okay.  If you had observed an employee or |
| 3 | an intern at Pharma Medica using the same needle on |
| 4 | two different study participants, what would you have |
| 5 | done? |
| 6 | MS. DREW:  Object to the form of the |
| 7 | question; improper hypothetical. |
| 8 | You can go ahead and answer. |
| 9 | A.    That would've been very shocking to see. |
| 10 | If I would've seen someone not change the needle, I |
| 11 | would've said, 'No, don't stick that.  You've already |
| 12 | used that.' |
| 13 | Q.    (BY MR. WENDLER) Okay.  What if you saw |
| 14 | someone using the needle on the second participant, |
| 15 | and the needle was already in the patient's -- in the |
| 16 | participant's arm?  What would you do? |
| 17 | A.    You would tell them to take the needle |
| 18 | out.  And then you would have to handle the |
| 19 | situation, which would be -- if there is concern |
| 20 | about a needle-stick injury, there are procedures to |
| 21 | follow. |
| 22 | Q.    And what are those procedures? |
| 23 | A.    It would be to draw blood tests to |
| 24 | determine their antibody level now, and then in the |

58

May Reporting Service

| 1 | future, and to check the source individual, if they |
| 2 | give you authorization.  And in the case of HIV, |
| 3 | there is pre -- I'm sorry.  Post-exposure prophylaxis |
| 4 | that can be offered.  So, there are definitely |
| 5 | procedures that you would follow, if that were to |
| 6 | happen. |
| 7 | Q.    Okay.  And you would follow all of those |
| 8 | procedures, because you know that if a person uses |
| 9 | the same needle on two participants, the second |
| 10 | participant has a risk of contracting blood-borne |
| 11 | pathogens from the first participant; correct? |
| 12 | A.    I know that that first participant |
| 13 | would've been screened so that they should have been |
| 14 | healthy to be in the study.  But still, there is a |
| 15 | risk, if there is a needle stick, and you would still |
| 16 | address that risk. |
| 17 | Q.    Okay.  And you said the first patient had |
| 18 | been screened, but you told me earlier that there is |
| 19 | a possibility that somebody can test negative for the |
| 20 | Hep C antibody, but still have Hep C; correct? · |
| 21 | A.    That is correct. |
| 22 | Q.    All right.  So, you would follow the |
| 23 | procedures, if you saw the same needle being used |
| 24 | twice on two different participants, because you knew |

59

May Reporting Service

| 1 | the second participant ran the risk of contracting a |
| 2 | blood-borne pathogen from the reuse of the needle; |
| 3 | correct? |
| 4 | A.    Correct. |
| 5 | Q.    I asked you earlier if you had ever fired |
| 6 | anyone.  And you said that you were in charge of the |
| 7 | sub investigators only.  But do you know if anyone |
| 8 | else at Pharma Medica ever fired any phlebotomists? |
| 9 | A.    I do know phlebotomists were terminated. |
| 10 | Q.    Okay. |
| 11 | A.    I was not typically involved in that |
| 12 | decision. |
| 13 | Q.    Do you know why any of them were |
| 14 | terminated? |
| 15 | A.    We had a wide number of phlebotomists.  I |
| 16 | believe the most common reason was for attendance. |
| 17 | Q.    Okay.  Do you know if any of the |
| 18 | phlebotomists were ever fired for not following the |
| 19 | blood-borne pathogen -- |
| 20 | A.    I'm not aware. |
| 21 | Q.    -- procedures? |
| 22 | A.    I'm not aware of the individual reasons |
| 23 | why all of the phlebotomists were fired. |
| 24 | Q.    Okay.  Who was in charge of hiring and |

60

May Reporting Service

**Page 61**

1 firing the phlebotomists? Do you know?
2    A.    Typically, our HR department would be.
3    Q.    Debbie again?
4    A.    She was part of the HR team.
5    Q.    Again, would she be in charge of hiring
6 and firing the phlebotomists?
7    A.    It would be Donna Hileman.
8    Q.    Donna Hileman? H --
9    A.    -- I-L-E-M-A-N.
10    Q.    What about the interns? Who was in charge
11 of bringing in and getting rid of the interns?
12    A.    I know that Donna did that, as well.
13    Q.    Do you agree, Dr. Jordan, that it's not
14 safe to let different study group participants share
15 the same unmarked plastic cups to dispose of bloody
16 cotton balls when drinking cups on the tables are
17 identical?
18         MS. DREW: Object to the form of the
19 question; improper hypothetical.
20         You can go ahead and answer.
21    A.    So, I'm sorry. Say that question again.
22    Q.    (BY MR. WENDLER) Sure. Let me just back
23 up and preface it by a little explanation.
24         I've seen photographs of the blood draw

**Page 62**

1 area where there was a cup for bloody cotton balls
2 that they used to, you know, absorb the blood after
3 the needle sticks. Do you know what I'm talking
4 about?
5    A.    Yes.
6    Q.    Okay. And on those tables there would
7 also be a water cup for the participant. Do you know
8 what I'm talking about?
9    A.    Yes.
10    Q.    Do you think it's unsafe to let different
11 participants share the same unmarked plastic cup to
12 dispose of bloody cotton balls when the drinking cups
13 on the tables are identical to the bloody cotton ball
14 cups? Do you think that's unsafe?
15         MS. DREW: Same objection.
16    A.    Are you asking if I think a subject would
17 try to drink a --
18    Q.    (BY MR. WENDLER) No?
19    A.    -- thing of cotton balls.
20    Q.    No. No, I'm asking you: Do you think
21 it's safe or unsafe to have identical cups for bloody
22 cotton balls and water cups on the same table?
23         MS. DREW: Same objection.
24    A.    You know, you have -- You're bleeding.

**Page 63**

1    Q.    (BY MR. WENDLER) Uh-huh.
2    A.    Most participants did not want to have
3 tape on their arm.
4    Q.    Right.
5    A.    Because of the multiple blood draws, tape
6 on and off would be irritating. So, they would use
7 the cotton balls. The cotton ball would have to go
8 somewhere.
9    Q.    Right.
10    A.    If they were on a seated restriction, they
11 would commonly put it on a cup on the table that
12 staff would come by and collect the cup to put it in
13 the -- to dispose of them.
14    Q.    Right. So back to my question: Do you
15 think it's safe or unsafe to use the same type of
16 cups for bloody cotton balls as water drinking cups
17 on the same tables?
18    A.    I guess I don't --
19         MS. DREW: Same objection.
20         You can answer.
21    A.    I can't see how a subject would try to
22 drink the bloody cotton balls.
23    Q.    (BY MR. WENDLER) Okay. So you think it's
24 safe to have that, the same type of cups for bloody

**Page 64**

1 cotton balls as for water cups on the same table?
2 You think it's safe?
3         MS. DREW: Same objection;
4 argumentative.
5         You can answer.
6    A.    I mean, I clearly don't want a subject to
7 ingest someone else's blood. That's not appropriate.
8 I don't --
9    Q.    (BY MR. WENDLER) Not safe?
10    A.    Yeah.
11         MS. DREW: Object to the form.
12    A.    Not safe.
13    Q.    (BY MR. WENDLER) Okay.
14    A.    Not safe for a subject to drink -- to
15 ingest someone else's cotton ball.
16    Q.    The interns that Pharma Medica used, do
17 you know how they were recruited?
18    A.    I do not.
19    Q.    All right. Do you know if any of the
20 interns were tested for blood-borne pathogens before
21 coming onboard and working at Pharma Medica?
22    A.    I do not.
23    Q.    How about the regular employees, the
24 phlebotomists or other employees, do you know if they

| | |
|---|---|
| 1  were tested for blood-borne pathogens before coming | 1     Q.    Okay.  There were never any Hepatitis C |
| 2  to work for Pharma Medica? | 2  trials at Pharma Medica -- |
| 3     A.    I do not. | 3     A.    No. |
| 4     Q.    Generally speaking, Dr. Jordan, as a | 4     Q.    -- in St. Charles, to your knowledge? |
| 5  person trained in medicine, do you agree that a | 5     A.    No. |
| 6  needle should never be reused in a clinical testing | 6     Q.    Right. |
| 7  lab environment like Pharma Medica? | 7     A.    No. |
| 8     A.    Yes. | 8     Q.    Correct? |
| 9     Q.    Okay.  Do you agree that Mr. Wallace | 9     A.    Correct. |
| 10  would've never gotten into a study at Pharma Medica | 10     Q.    Was Mr. Wallace tested for Hepatitis C |
| 11  if he had tested positive for Hepatitis C? | 11  before each Pharma Medica study that he participated |
| 12     A.    Yes. | 12  in? |
| 13     Q.    And do you agree that now that he has | 13          MS. DREW:  Object to the form of the |
| 14  tested positive for Hepatitis C he is no longer | 14  question; speculation to the extent of her time |
| 15  eligible to participate in paid studies by Pharma | 15  period at Pharma Medica. |
| 16  Medica? | 16          Go ahead. |
| 17     A.    So, our St. Louis site is closed down. | 17     A.    That's true. |
| 18     Q.    Okay. | 18          Part of the general screening criteria at |
| 19     A.    There are Hepatitis C trials going on. | 19  Pharma Medica would be to test for Hepatitis C |
| 20     Q.    Okay. | 20  antibodies. |
| 21     A.    Are they doing them at Pharma Medica | 21     Q.    (BY MR. WENDLER)  And that has always been |
| 22  Canada?  I can't -- I don't know what studies they're | 22  the case since you worked for Pharma Medica? |
| 23  doing there. | 23     A.    Since I worked for Pharma Medica, yes. |
| 24     Q.    So in order to get into a Hepatitis C | 24     Q.    So, if Mr. Wallace wanted to get into |
| 65 | 67 |
| May Reporting Service | May Reporting Service |
| 1  trial, do you have to have a history of having | 1  Pharma Medica's study during the time you worked for |
| 2  Hepatitis C? | 2  Pharma Medica, he had to be pre-tested or |
| 3     A.    It would be in the inclusion criteria. | 3  pre-screened, and not test positive for Hepatitis C; |
| 4     Q.    Okay.  And how many of those studies are | 4  am I correct? |
| 5  there, do you know? | 5     A.    Yes. |
| 6     A.    I don't know. | 6     Q.    Okay.  Can you tell me, Dr. Jordan, what |
| 7     Q.    Okay.  Are they few and far between, or | 7  are the symptoms one would expect, if they had |
| 8  are they pretty -- | 8  Hepatitis C? |
| 9     A.    I don't know. | 9     A.    The vast majority of people who have |
| 10     Q.    Okay.  Other than the Hepatitis C trials, | 10  Hepatitis C are asymptomatic. |
| 11  are you aware that Mr. Wallace is no longer eligible | 11     Q.    Okay.  How about the ones that have |
| 12  to participate in any clinical studies because he has | 12  symptoms?  What are the common symptoms in those |
| 13  tested positive for Hepatitis C? | 13  people? |
| 14          MS. DREW:  Object to the form of the | 14     A.    The common symptoms would be fatigue, |
| 15  question; speculation. | 15  nausea, jaundice, pale stools, dark urine, and |
| 16          You can answer, if you know. | 16  abdominal pain. |
| 17     A.    Again, it would depend on the | 17     Q.    Did Mr. Wallace have all of those? |
| 18  inclusion/exclusion criteria of the study.  If it's a | 18          MS. DREW:  Object to the form of the |
| 19  healthy-volunteer study, then he wouldn't qualify. | 19  question; speculation. |
| 20     Q.    (BY MR. WENDLER)  Okay.  And the | 20          If you know. |
| 21  hundred-plus Pharma Medica studies that you did in | 21     A.    I couldn't say that he had all of them.  I |
| 22  St. Charles, were they all healthy-volunteer criteria | 22  know he had several symptoms. |
| 23  studies? | 23     Q.    (BY MR. WENDLER)  Okay.  Can you tell |
| 24     A.    They were. | 24  me -- I know you told me before that you're not an |
| 66 | 68 |
| May Reporting Service | May Reporting Service |

1  expert on Hepatitis C. But can you tell me, what are
2  the long-term health consequences of Hepatitis C, if
3  you know?
4         MS. DREW:  Object to the form of the
5  question; to the extent there are different types of
6  Hepatitis C.
7         Go ahead.  You can answer.
8      A.   Okay.  So, the long-term consequences of
9  Hepatitis C?  The long-term consequences could be
10 cirrhosis, fibrosis, and cancer.
11     Q.   (BY MR. WENDLER)  Have you ever heard of
12 Hepatitis C causing arthritis?
13     A.   I don't know that I can say that I've
14 specifically heard of it causing arthritis.
15     Q.   Do you know, either way, whether Hepatitis
16 C can cause or contribute to arthritis?  Do you know,
17 either way?
18     A.   Cirrhosis can be involved in a lot of
19 other processes.  Arthritis does not sound familiar
20 as a common association with Hepatitis C, to my
21 knowledge.
22     Q.   All right.  On the morning of June 26th,
23 2016, I'll take you back to when you went to Anderson
24 Hospital in Maryville.  Do you remember that day?
                                              69
                    May Reporting Service

1      A.   I do.
2      Q.   Okay.  What was the purpose of that visit?
3      A.   So, as the principal investigator, subject
4  safety is my job.  And if one of my subjects ended up
5  in the hospital, I'm concerned about them, and I want
6  to see how they are.
7      Q.   Okay.
8      A.   The sponsor needs to be aware if there is
9  any serious adverse events.  And to be able to
10 communicate to the sponsor that one of the subjects
11 had something happen to them.  The sponsor wants to
12 know those things.
13     Q.   Were you concerned, at that point, that
14 perhaps Mr. Wallace had had an adverse event from the
15 medication that was administered by Pharma Medica?
16     A.   At the time that I was going, I didn't
17 know the whole story.  I had heard he was in the
18 hospital.  Most of the subjects in our studies don't
19 end up in the hospital.
20     Q.   Well, what did you know when you went to
21 the hospital?  What did you know?  Before you arrived
22 there, what did you know about Mr. Wallace's
23 condition?
24     A.   I would have to look back in the record to
                                              70
                    May Reporting Service

1  find specifically.  I do remember that he had had
2  elevated liver enzymes.
3      Q.   Are you looking for the adverse --
4      A.   I'm looking past this stuff.
5      Q.   Adverse event reports, is that what you're
6  looking for?
7      A.   I think it'd probably be there.
8      Q.   I probably have that marked for you, if
9  you -- Okay.  Do you have the West-Ward one in front
10 of you?
11     A.   That's not the one that -- That would've
12 been, I believe, the sponsor is the one who does
13 that.
14     Q.   Here, let me just mark as Exhibit No. 3
15 the adverse event report.  I think that might be what
16 you're looking for.
17                      (Whereupon, Plaintiff's
18                       Exhibit No. 3 was marked
19                       for identification by the
20                       court reporter.)
21     A.   Yes.
22     Q.   (BY MR. WENDLER)  Okay.  And that is the
23 adverse event report related to Mr. Wallace that you
24 helped create; am I correct?
                                              71
                    May Reporting Service

1      A.   Correct.
2      Q.   And if we look on Page 1, which is Bates
3  numbered 00261, it lists the sponsor as Roxane
4  Laboratories, Inc., and the investigator, Dr. Heather
5  Jordan; correct?
6      A.   Yes.
7      Q.   All right.  So, I guess the question that
8  brought us here is:  What symptoms were you aware of
9  that Mr. Wallace was having before you arrived at
10 Anderson Hospital on June 26, 2016?
11     A.   We had done blood tests to show that his
12 liver enzymes were elevated.
13     Q.   Uh-huh.
14     A.   And I -- My understanding was after -- Let
15 me find it here.  So, reviewing the record, I'm just
16 trying to find the day that he had -- He had blood
17 drawn on the 25th that was markedly elevated.  And so
18 we added on blood tests to see if we could determine
19 if there was -- what the cause of the elevation of
20 those liver enzymes were.
21     Q.   Uh-huh.
22     A.   And then the next day, it was reported to
23 me that he had been -- I don't know that it was that
24 next day.
                                              72
                    May Reporting Service

1      This adverse event report says that it was
2   the 27th that we found out he had been admitted to
3   the hospital. And being admitted to the hospital
4   does meet the criteria for a serious adverse event.
5      Q.   Okay. Just for point of clarification, I
6   think you went to Anderson Hospital on the 26th of
7   June; did you not? Oh, I'm sorry. Your report says
8   the 27th of June.
9           MS. DREW: Correct. Yeah.
10     Q.   (BY MR. WENDLER) Okay. Well, let me ask
11  you this: How did you know Mr. Wallace was at
12  Anderson Hospital?
13     A.   The study coordinator had told me early in
14  the morning that he had been admitted to the
15  hospital.
16     Q.   And who was the study coordinator?
17     A.   We had three study coordinators at that
18  time. I can't recall if it was Stacey or Israa. But
19  one of them let me know that he was in the hospital.
20     Q.   What's Stacey's last name?
21     A.   Miner.
22     Q.   M-I --
23     A.   M-I-N-E-R.
24     Q.   And what's Israa?

73

1      A.   Bio Pharma Services.
2      Q.   Okay. And let me ask you this, in
3   general, about the adverse event report. Are these
4   sent to the federal government?
5      A.   So, we document it, and send it to the
6   sponsor. The sponsor does have reporting
7   requirements to the F.D.A.
8      Q.   All right. And we have -- I'm going to
9   mark as Exhibit 4, which appears to be a lot of
10  duplication of Exhibit 3. The West-Ward Himka
11  adverse event report.
12           (Whereupon, Plaintiff's
13           Exhibit No. 4 was marked
14           for identification by the
15           court reporter.)
16     Q.   (BY MR. WENDLER) Is this Exhibit 4, is
17  this what was submitted to the federal government
18  with regard to Mr. Wallace's condition?
19     A.   This would have been done by the sponsor.
20     Q.   Yes.
21     A.   So it would -- It appears that it is.
22     Q.   All right. So the study that you helped
23  create, the adverse event report that we've marked as
24  Exhibit No. 3, was not sent to the federal

75

1      A.   I-S-R-A-A.
2      Q.   Last name?
3      A.   Diab, D-I-A-B.
4      Q.   Okay. One of those two persons told you
5   that Mr. Wallace was at Anderson Hospital in
6   Maryville; right?
7      A.   Yes.
8      Q.   And you then, on June 27th, or June,
9   whatever the specific date was, you drove over to
10  Anderson Hospital; correct?
11     A.   I rode with Louis.
12     Q.   Okay. Louis what?
13     A.   Louis Co.
14     Q.   C-O?
15     A.   Uh-huh.
16     Q.   Yes?
17     A.   Yes.
18     Q.   What's his position?
19     A.   He was our senior director of clinical
20  operations.
21     Q.   Do you know what he does now for a living?
22     A.   I know he works for a different company.
23  I don't know his job title.
24     Q.   Do you know the name of the company?

74

1   government. Instead it was sent instead to the
2   sponsor; correct?
3      A.   Correct.
4      Q.   And the sponsor, in turn, created a report
5   that duplicates, in large part, what your report
6   says, and then sent it to the federal government;
7   correct?
8      A.   Yes.
9      Q.   Okay. Do you know, Dr. Jordan, if these
10  reports, are they supposed to be confidential? I'm
11  just curious, if they're sent to the federal
12  government?
13     A.   So, in the ICF, there is a statement about
14  who would have access to your records.
15     Q.   Okay.
16     A.   So, it says, "The following people will
17  have access to your study records: The study doctor,
18  the study monitor, auditor, sponsor company, or
19  research institution, the United States F.D.A.
20     Q.   What's the Bates number of the page you're
21  reading from?
22     A.   PMRI 00012.
23     Q.   Okay. And just so we're clear, Exhibit 3
24  and Exhibit 4 related to Study No. 2 that Mr. Wallace

76

1  was in; correct?
2      A.     Correct. That language is standard for
3  the informed consent. So it would be in the informed
4  consent for Study No. 2, as well.
5      Q.     Okay. And it says that you were the
6  investigator on the adverse event report. What does
7  that mean, you were the investigator?
8      A.     That means that I was a principal
9  investigator of the study.
10     Q.     Okay. Is that your title at Pharma Medica
11 for all purposes, or just for adverse event reports?
12     A.     No, for all purposes.
13     Q.     Okay. All right. According to this
14 document that we've marked as Exhibit No. 3, on Page
15 3 it says on June 15 Mr. Wallace's AST was 59.
16 First, what is an AST?
17     A.     That's a shortened name of a common liver
18 enzyme.
19     Q.     And it says that his AST on June 15 was
20 59, and the normal range is between 10 and 40;
21 correct?
22     A.     Correct.
23     Q.     Did you tell Mr. Wallace, or did anyone
24 tell Mr. Wallace, at that point in time, that his

77

May Reporting Service

1  that his ALT reading was more than double the high
2  end of the normal range?
3      A.     No.
4      Q.     According to the same document, on June 21
5  Mr. Wallace's AST, his liver enzyme score was 253.
6  Again, the normal range is 10 to 40. Do you see
7  that?
8      A.     Yes.
9      Q.     Did anyone tell Mr. Wallace on June 21
10 that his liver enzyme reading was more than six times
11 the high end of the normal range?
12     A.     What I read on the documentation, the
13 staff attempted to contact the subject at 16:00 on
14 June 21st, but the subject was unable to be reached,
15 and a message was left.
16     Q.     Okay. So other than leaving the message,
17 no one told Mr. Wallace?
18     A.     We attempted to contact Mr. Wallace.
19     Q.     When participants like Mr. Wallace sign up
20 for your studies, did they give an emergency contact,
21 alternate number to reach?
22     A.     They do.
23     Q.     Did someone try to contact Mr. Wallace's
24 emergency contact?

79

May Reporting Service

1  liver enzymes were high?
2      A.     So, it looks like that -- So, I would say
3  that level, when it comes to liver enzymes, is
4  outside of the normal range.
5      Q.     Yes.
6      A.     It's not a level that would be a panic,
7  urgent phone call to contact the subject. It would
8  be, 'You need to come follow-up, and do that not
9  necessarily on an emergent basis.
10     Q.     Okay.
11     A.     So according to this, it looks like he was
12 contacted on the 19th.
13     Q.     Okay. So, back to my question: On June
14 15 when Mr. Wallace's liver enzyme level was at 59,
15 and the normal range is 10 to 40, no one told him on
16 June 15 of that abnormal reading; am I correct?
17     A.     That's correct.
18     Q.     All right. On the same day, June 15, it
19 says Mr. Wallace's ALT was 103. What is ALT?
20     A.     That's another form of a liver test.
21     Q.     And it says his ALT was 103, and the
22 normal range is nine to 46; correct?
23     A.     Correct.
24     Q.     Did anyone tell Mr. Wallace on June 15

78

May Reporting Service

1      A.     That was not documented.
2      Q.     So therefore, it didn't happen?
3             MS. DREW: Object to the form of the
4  question; misstates the evidence.
5             You can answer.
6      A.     Not to my knowledge.
7      Q.     (BY MR. WENDLER) Okay. On June 21, the
8  records of Pharma Medica indicate Mr. Wallace's ALT
9  reading was 471, which is more than 10 times the
10 maximum for the normal range. On June 21 did anyone
11 contact and tell Mr. Wallace, or his emergency
12 contact person?
13     A.     Again, we attempted to contact Mr. Wallace
14 at 16:00 on June 21st.
15     Q.     Okay. Do you know who attempted that --
16 Strike that.
17            Do you know who attempted that contact?
18     A.     I can --
19     Q.     And how many times they called?
20     A.     That would be documented in our adverse
21 events. So, I'm sorry. Can you please repeat the
22 date?
23     Q.     Sure. On June 21 you indicated that
24 someone attempted to call Mr. Wallace because his ALT

80

May Reporting Service

Case: 4:18-cv-01839-PLC   Doc. #: 101-2   Filed: 07/23/20   Page: 21 of 39 PageID #: 897

1 and AST scores were extremely high; correct?
2    A.    Yes.
3    Q.    Who? Who attempted to call him on June
4 21?
5    A.    On June 21, I -- I don't see -- I don't
6 know who tried to call him on June 21.
7    Q.    All right. Well, the adverse event report
8 says, "Staff attempted to contact the subject at
9 16:00 June 21, but the subject was unable to be
10 reached, and a message was left." Do you see that?
11   A.    Yes.
12   Q.    You don't know who that staff member was?
13   A.    I do not.
14   Q.    And since it says 16:00, is it safe to
15 assume that there was only one attempt made, a single
16 phone call?
17   A.    I would say that's correct.
18   Q.    Okay. And you were looking at some
19 records to try to figure out who made that call.
20 What are you looking at?
21   A.    This is the medical adverse event comments
22 page.
23   Q.    Should there be a notation in there to
24 document who made that call on June 21?

81

1    A.    Typically, this is where I would look. I
2 don't know if it were --- If it was documented
3 somewhere else. Perhaps it was documented on a lab
4 page. I don't know where that time came from.
5    Q.    Okay. Well, who would be the typical
6 person to make a call like that to Mr. Wallace? Is
7 there someone who is charged with that kind of
8 responsibility?
9    A.    Typically, it would be a study
10 coordinator.
11   Q.    Okay. And who were the study
12 coordinators?
13   A.    That was Stacey, Israa, and then I believe
14 Ben was a study coordinator, at that time, as well.
15   Q.    And what's Ben's last name?
16   A.    Swan.
17   Q.    And why do you say it was their job to
18 make those calls as --
19   A.    Typically, that's --- I would assess the
20 labs. I would take the labs to the study
21 coordinator. If there was any that were particularly
22 out of range, I would say, 'Call that to their
23 attention,' this person needs to be contacted
24 regarding these results.

82

1    Q.    Okay. So, were you the person that
2 actually received the lab results?
3    A.    So, the lab results would come to our
4 printer. Then the study coordinator would bring them
5 to me, and I would sign them.
6    Q.    Okay. And then you would look at the lab
7 results, and determine whether the participant needs
8 to be contacted; right?
9    A.    Yes.
10   Q.    And when you saw the numbers of Mr. AST
11 of 253, and ALT of 471, you knew those were alarming
12 numbers, and you said someone needs to contact
13 Mr. Wallace; correct?
14   A.    Yes.
15   Q.    All right. Did you expect they would only
16 attempt to contact him once?
17   A.    We have a protocol as far as how we can
18 contact subjects. So, typically you would contact
19 them at the time. And then we can't keep calling
20 someone over and over again because that could be
21 viewed as harassment. If they don't choose to take
22 our phone call, we can't make them.
23   Q.    So your expectation was only one call
24 would be made?

83

1    A.    We called him more than once. We called
2 him --
3    Q.    On June 21?
4    A.    Uh-huh. Oh, on June 21? I think that's a
5 reasonable, that we called and left a message, and
6 you can hear the message, and call us back.
7    Q.    Okay. So just so I'm clear, it was your
8 expectation on June 21 when you saw those alarming
9 numbers that only one call need be made to
10 Mr. Wallace, and if he didn't answer, just leave a
11 message, and that was sufficient?
12        MS. DREW: Object to the form.
13   Q.    (BY MR. WENDLER) That was your
14 expectation?
15        MS. DREW: Object to the form of the
16 question. I believe it misstates her testimony. She
17 did not say alarming.
18        Subject to that, you can go ahead
19 and answer.
20   Q.    (BY MR. WENDLER) Go ahead.
21   A.    My expectation was we call the subject,
22 and get ahold of the subject, and talk to them, and
23 take care of what needed to be done at that time.
24 That was my expectation. If the subject doesn't

84

1   answer their phone call, then we need to leave a
2   message.
3        Q.    Okay.  And is there a reason you didn't
4   contact Mr. Wallace's emergency contact person?  Just
5   never occurred to you?
6             MS. DREW:  Object to the form of the
7   question.
8        A.    I -- We just -- I can't answer that.  I
9   don't know.
10       Q.    (BY MR. WENDLER)  Okay.  All right.  Let's
11  move on to next readings.  It looks like on June 25
12  we have some more readings that came in; correct?
13       A.    Yes.
14       Q.    And on that -- Strike that.
15             On June 25 when Mr. Wallace's new results
16  came in, his AST was now 900 when the normal range it
17  10 to 40; correct?
18       A.    Correct.
19       Q.    And his ALT on June 25 was 1,800 when the
20  normal range is 9 to 46; correct?
21       A.    Correct.
22       Q.    Were you there when his blood was drawn on
23  the 24th of June?
24       A.    I don't recall.

85

May Reporting Service

1        Q.    Right.
2        A.    The INR, the muscle enzymes, the renal
3   panel, and the Hepatitis panel to get a broader
4   picture.  And some people would be symptomatic, and
5   so that was -- I need to see him.  I need to see how
6   he's feeling.  I remember that I was like, "When can
7   he come in?"  And so they told me he could come in
8   the next day.  So, I will be there.  I need to take
9   care of him, and make sure he is -- is okay.
10       Q.    Okay.  You understood Mr. Wallace lived in
11  Illinois; right?
12       A.    I -- I don't know that I knew where he
13  lived at the time.
14       Q.    Okay.  Well, regardless of where he lived,
15  is there a reason that you thought it important that
16  he come back to Pharma Medica in St. Charles,
17  Missouri, rather than go to the nearest emergency
18  room or nearest hospital to get treatment for these
19  high liver enzyme readings?
20       A.    So, our site is in St. Charles.
21       Q.    Uh-huh.
22       A.    And if I'm taking care of you, I'm going
23  to take care of you on our site.  If you are
24  symptomatic, which at the time, I don't believe that

87

May Reporting Service

1        Q.    Do you know if anyone told him on the 24th
2   of June about these high numbers that pre-dated June
3   24?  Do you know?
4        A.    I don't know the person's name.  If we are
5   calling you back to do repeat testing, we wouldn't do
6   repeat testing for no reason.
7        Q.    Okay.
8        A.    So it should've been told to him that,
9   'Your liver enzymes are high.  We need to re-test
10  them.'
11       Q.    Okay.  So the reason that he came in for
12  the third sample on June 24 was because the liver
13  enzymes were so high; right?
14       A.    Yes.
15       Q.    Okay.  And is there a reason why you had
16  him come back to Pharma Medica in St. Charles, rather
17  than just go to the nearest emergency room or
18  hospital?
19       A.    So, when I see liver enzymes high --
20       Q.    Uh-huh.
21       A.    -- the thought is we need to investigate
22  further, which we ordered the further blood tests.
23       Q.    Okay.
24       A.    The blood count, the liver enzymes.

86

May Reporting Service

1   I was aware that he had symptoms.  If I'd had known
2   he had symptoms, I would've been like, 'Well, you can
3   go to the emergency room.'  That's always an option.
4   I'd never tell somebody they couldn't go to the
5   emergency room, if they were having severe symptoms.
6        Q.    But you weren't taking care of him as a
7   treating doctor.  You told me that earlier; right?
8        A.    Correct.
9        Q.    Okay.  So --
10       A.    But if he is having an adverse event, if
11  we did end of study labs, we're seeing them get
12  worse, that's my responsibility.  I need to take care
13  of that.  And if there's -- If there is something
14  else that is so severe you need to go to the
15  hospital, then that's what we do.
16       Q.    Okay.  Well, did Pharma Medica do anything
17  to dissuade Mr. Wallace from going to the hospital
18  emergency room at any point in time?
19       A.    Would I personally ever tell someone, 'No,
20  you can't go.'?  No.
21       Q.    Okay.  That's not the question.  Did
22  Pharma Medica, not just you, but did anyone at Pharma
23  Medica, to your knowledge, ever do anything to
24  dissuade Mr. Wallace from going to a local hospital

88

May Reporting Service

| | |
|---|---|
| 1 emergency room for these high liver enzyme | 1      Q.   That's not quite --- |
| 2 conditions? | 2      A.   I wouldn't -- |
| 3      A.   To me, that seems like a broad question. | 3      Q.   Sorry. Go ahead and finish. |
| 4      Q.   It is. | 4      A.   No. No. What is your question? I'm |
| 5      A.   I can say what I did. I would not | 5 sorry. |
| 6 dissuade. If someone -- If I am seeing elevated | 6      Q.   You're not quite answering my question. |
| 7 liver enzymes, and I'm like, 'Are you sick? Then you | 7      First of all, did you want Mr. Wallace to |
| 8 can go to the emergency room.' That's an acceptable | 8 return to Pharma Medica for a fourth round of tests |
| 9 thing to do. | 9 on June 26th rather than go to the nearest emergency |
| 10      Q.   Okay. And you said you would not dissuade | 10 room? Did you want that? |
| 11 him from going to the local emergency room. Why | 11      A.   I wanted him to be assessed by someone |
| 12 would you not dissuade him from doing that? | 12 medical. And when you are in the study that I am |
| 13      A.   If someone is ill and in need of | 13 leading, I'm happy to do that assessment. You are |
| 14 treatment, that's -- You do -- You take care of the | 14 welcome to come here, and I will assess you. |
| 15 patient. That's what's necessary. | 15      Q.   Okay. So you didn't do anything to |
| 16      Q.   Did anyone from Pharma Medica tell you | 16 dissuade him from going to the nearest emergency room |
| 17 that they tried to dissuade him from going to the | 17 on June 26th; am I correct? |
| 18 local emergency room, and instead tried to get him to | 18      A.   Correct. |
| 19 come back to Pharma Medica for yet another blood | 19      Q.   Okay. All right. When you arrived at |
| 20 draw? Did anyone ever tell you that? | 20 Anderson Hospital, you wanted Mr. Wallace to sign a |
| 21      A.   Not to my knowledge. | 21 medical records release form; correct? |
| 22      Q.   Would that be contrary to what you | 22      A.   It would be helpful. So, when he had been |
| 23 expected of the Pharma Medica people when you worked | 23 admitted, he had by definition -- |
| 24 there? | 24      Q.   I'm not asking you why. I'm just asking |
| 89 | 91 |
| May Reporting Service | May Reporting Service |
| 1      A.   Yes. | 1 you: Did you? |
| 2      Q.   Okay. And is it your testimony that you | 2      A.   Yes. |
| 3 did not want Mr. Wallace to return for a fourth round | 3      Q.   Did you want -- |
| 4 of tests on June 26th rather than go to the nearest | 4      A.   Yes. |
| 5 emergency room? | 5      Q.   -- Mr. Wallace to sign a medical records |
| 6      A.   It was clear that he needed further | 6 release form at -- |
| 7 follow-up and testing. | 7      A.   Yes, I did. |
| 8      Q.   Uh-huh. | 8      Q.   --- Anderson Hospital? Yes? |
| 9      A.   If I can see him, and evaluate him, and | 9      A.   Yes. |
| 10 see does he look well? Does he need a liver | 10      Q.   Okay. And when you arrived at Anderson |
| 11 ultrasound? Does he need a CT? Those are things | 11 Hospital -- Strike that. |
| 12 that I can do. | 12      Why did you want him to sign that medical |
| 13      Q.   Uh-huh. | 13 records release form? |
| 14      A.   If I see him and he is not well, and he | 14      A.   So, he was admitted to the hospital. |
| 15 needs urgent care, then I can take care of that. | 15      Q.   Right. |
| 16      Q.   Okay. So back to my question, though: Is | 16      A.   So, part of the reporting criteria is that |
| 17 it your testimony that you did not want Mr. Wallace | 17 I needed to give the sponsor the necessary |
| 18 to return to Pharma Medica for a fourth round of | 18 information so they could report it to the F.D.A. |
| 19 tests on June 26th rather than go to the nearest | 19      Q.   Okay. And Mr. Wallace declined to sign |
| 20 emergency room? | 20 that medical records release form; correct? |
| 21      A.   We contacted him to notify him that his | 21      A.   I don't -- I can't remember if he did or |
| 22 liver enzymes were elevated, and that he needed to be | 22 not. I think he -- Let's see. I don't recall if he |
| 23 seen, and that I could see him. That I could see | 23 signed it or not. |
| 24 him, and this says the 26th. | 24      Q.   Okay. Fair enough. |
| 90 | 92 |
| May Reporting Service | May Reporting Service |

| | |
|---|---|
| 1       You said that you rode to Anderson | 1     A.    No. |
| 2   Hospital with Louis Co? | 2     Q.    During the screening process, if a |
| 3     A.    Uh-huh. | 3   participant tests positive for Hepatitis C, does |
| 4     Q.    Right? | 4   Pharma Medica report that to the state? |
| 5     A.    Yes. | 5     A.    Typically, they would. |
| 6     Q.    Did he drive, or did you drive? | 6     Q.    Okay. And has that occurred before, where |
| 7     A.    He drove. | 7   Pharma Medica reported a participant or participants, |
| 8     Q.    And where was he when you went in the | 8   plural, for testing positive for Hepatitis C? |
| 9   hospital? | 9     A.    Yes. |
| 10     A.    I don't -- I think he was in the hospital. | 10     Q.    Who was it that reported them? Was that |
| 11   I don't know where in the hospital he was. | 11   your job, or someone else's? |
| 12     Q.    You went into Mr. Wallace's room; correct? | 12     A.    That would typically be, if it was at |
| 13     A.    Correct. | 13   screening, it would be the screening manager who |
| 14     Q.    Did Mr. Co come with you into the room? | 14   would typically do that. |
| 15     A.    I don't believe so. I think it was just | 15     Q.    A screening manager? And who would be a |
| 16   myself. | 16   screening manager? |
| 17     Q.    Okay. | 17     A.    The person's name? |
| 18       MR. WENDLER: Why don't we take a | 18     Q.    Yes. |
| 19   break? | 19     A.    Kim clause. |
| 20       MS. DREW: Sounds good. | 20     Q.    Ken? |
| 21       (Whereupon, a brief recess | 21     A.    Kim. |
| 22       was taken.) | 22     Q.    Kim? |
| 23     Q.    (BY MR. WENDLER) Okay, Dr. Jordan, let | 23     A.    K-I-M. |
| 24   me go back and ask a couple questions that I | 24     Q.    K-L-A-U-S? |
|                  93 |                  95 |
|      May Reporting Service |      May Reporting Service |
| 1   should've asked earlier, but it occurred to me during | 1     A.    K-L-A-S-S. |
| 2   the break. | 2     Q.    And you said if that was found positive at |
| 3       But first of all, you told me earlier that | 3   the screening. Would there be any other situations |
| 4   when the study participants are screened, they're | 4   where someone would test positive for Hepatitis C |
| 5   tested for Hepatitis C; right? | 5   where Pharma Medica would report it to the state? |
| 6     A.    Correct. | 6     A.    Yes. |
| 7     Q.    That's in the screening process; correct? | 7     Q.    When? |
| 8     A.    Correct. | 8     A.    So in this case, it would be reported to |
| 9     Q.    Are the study participants also tested | 9   the state, but it would be the study coordinators |
| 10   again when they check in for the study? | 10   that would do it. |
| 11     A.    Tested for? | 11     Q.    Okay. How about during the study itself, |
| 12     Q.    For Hepatitis C? | 12   has it ever -- Has it ever occurred that someone |
| 13     A.    Not unless it's specified by the protocol. | 13   tested positive in the middle of a study for |
| 14   That would not be a routine test in most protocols. | 14   Hepatitis C? |
| 15     Q.    Okay. Can you tell me in Study No. 1 | 15     A.    We don't routinely test for Hepatitis C in |
| 16   whether that was a required test? | 16   the middle of a study. |
| 17     A.    No. | 17     Q.    Okay. At the end of the study, do you |
| 18     Q.    It was not? | 18   test for Hepatitis C? |
| 19     A.    No. | 19     A.    Not routinely. |
| 20     Q.    Okay. How about in Study No. 2, was a | 20     Q.    Okay. |
| 21   blood-borne pathogens test required at the time of | 21     A.    Again, that would be determined by the |
| 22   check-in for participants -- | 22   protocol. |
| 23     A.    No. | 23     Q.    All right. And how was Mr. Wallace's |
| 24     Q.    -- for Study No. 2? | 24   Hepatitis C discovered? |
|                  94 |                  96 |
|      May Reporting Service |      May Reporting Service |

1   A.   Because his liver enzymes were elevated.

2   Q.   Okay.  And that prompted additional

3   testing?

4   A.   Correct.

5   Q.   Okay.  Did you turn -- Strike that.

6        Did you report Mr. Wallace to the State of

7   Missouri for being Hepatitis C positive?

8   A.   Yes.

9   Q.   Okay.  In your career at Pharma Medica,

10  approximately how many times have you reported

11  patients to the State of Missouri for testing

12  positive for Hepatitis C?

13  A.   I don't think I could give you an exact

14  number.

15  Q.   Just ball park is fine?

16  A.   At screening, maybe two or three per year

17  through screening --

18  Q.   Okay.

19  A.   -- would be an estimate.

20  Q.   And how about after screening?

21  A.   So, like after a study?

22  Q.   Right.

23  A.   I can only recall one other time that

24  there was a Hepatitis C after screening -- after

97

1   study.

2   Q.   Okay.  Do you remember that patient's

3   name, or are you at liberty to stay?

4        MS. DREW:  I'm going to instruct her

5   not to answer as to the patient's name.

6   Q.   (BY MR. WENDLER)  Okay.  Let me just ask

7   you.  Without telling me the patient's name, do you

8   know the patient's name?

9   A.   I know what study the patient was -- the

10  subject was in.

11  Q.   Okay.

12  A.   I don't know that --

13  Q.   Okay.

14  A.   -- I remember the name.

15  Q.   Which study was it?  Was it before, or

16  after, or during the study?

17  A.   Not during.  It was after.  I'm just

18  thinking.  I can think of the study.  I knew the

19  study number like five minutes ago.  I don't know

20  that I can -- It's just slipped my mind.

21  Q.   Do you remember what the drug was that was

22  being tested, or the time frame?

23  A.   I know it was last summer.  It was --

24  Q.   The summer of '18?

98

1   A.   Yes.

2   Q.   Okay.

3   A.   It was not -- It was like a compound name

4   that I don't remember the -- It was letters and

5   numbers together, but I don't recall the number.

6   Q.   And what department in the State of

7   Missouri are these reported to?

8   A.   The health department.

9   Q.   Okay.  Okay.  Back to Anderson Hospital.

10  When you got there, did you tell Mr. Wallace that you

11  were already en route to Pharma Medica when you got

12  the call, and you diverted to go to Anderson

13  Hospital?

14  A.   No.  I had arrived to Pharma Medica that

15  day.  And I was informed that he was in the hospital.

16  And that's when I said, 'Well, I need to go check on

17  him to see that he is okay.  And see what's going on

18  that he's in the hospital.'

19  Q.   Okay.

20  A.   And Louis was like, 'I'll drive you.'

21  Q.   Okay.  So you didn't tell Mr. Wallace that

22  you were on your way to Pharma Medica when you got

23  the call, and you diverted to Anderson Hospital prior

24  to going to Pharma Medica?  You didn't tell him that?

99

1   A.   I don't recall that.

2   Q.   Okay.  When you got to Anderson Hospital,

3   did you talk to any of the doctors or nurses?

4   A.   When I was in the room with Mr. Wallace, a

5   couple of staff members came in.

6   Q.   Yes.

7   A.   So, I had my name badge on so that it was

8   obvious who I was, that I wasn't related to

9   Mr. Wallace, and that I didn't work for the hospital.

10  And I handed them my card so that they knew who I

11  was.

12  Q.   Okay.  This was a nurse, or nurses, or the

13  doctor, or who was it?

14  A.   I would say it was a staff member.  I

15  don't believe it was a doctor.  I believe it was a

16  nurse, perhaps a nurse practitioner.  I don't believe

17  I spoke to any doctors there.

18  Q.   Okay.  Did you tell any of the Anderson

19  Hospital staff members, whether it's a nurse, a

20  doctor, or otherwise, about Mr. Wallace being in a

21  study?

22  A.   I did.  I gave them my card because that's

23  crucial medical information.  If he's in the

24  hospital, and he recently took a study drug, that's

100

1  Information that's crucial to his treatments.
2      Q.     Okay.  Did you tell this to the doctor, or
3  to the nurses, or who did you tell that to?
4      A.     Again, I don't believe I talked to any
5  doctors.
6      Q.     Okay.  And did you tell them anything more
7  about the study that he was in?
8      A.     I believe that we took -- Louis had
9  printed off some information.  I believe that it was
10  the lab levels that we had been drawing.  Perhaps it
11  might've been more.  I don't remember what we took
12  with us.  But information for -- that we left on his
13  table so that he could share that with medical staff
14  to let them know.
15      Q.     Whose table?
16      A.     You know the little tables that they have
17  at the hospital?
18      Q.     The food tables that was in Mr. Wallace's
19  room?
20      A.     Yes.  Uh-huh.
21      Q.     All right.  So you left it there for
22  Mr. Wallace to give to the doctors?
23      A.     So that it was there.  So if they had
24  questions, this is is what drug we administered to

101

1  him.
2      Q.     When you went to the hospital, did you go
3  there on your own accord, or did someone tell you to
4  go?
5      A.     I went on my own accord.
6      Q.     Okay.  And just so I'm clear, you never
7  spoke to any of Mr. Wallace's doctors at Anderson
8  Hospital; correct?
9      A.     I -- I don't believe that I did.  I
10  believe that -- I know that I talked to two staff
11  members that were both female.  I believe one was a
12  nurse, and a nurse practitioner.  I don't recall any
13  of them being a physician.
14      Q.     Is there anything that you said to the
15  nurses or nurse practitioner, other than what you've
16  told me about already?
17      A.     No.
18      Q.     Other than the adverse event report, did
19  you create any record or report of your trip to
20  Anderson Hospital?
21      A.     I did write a note.  Let me see if this
22  was from that date.  No.  This was when he came to
23  Pharma Medica.  I don't recall if I wrote a note
24  about that or not.

102

1      Q.     All right.  Did you report Mr. Wallace's
2  Hepatitis condition to anyone, other than the State
3  of Missouri Department of Health?
4      A.     We reported it to the sponsor.
5      Q.     Anyone else?
6      A.     The sponsor would've reported it to the
7  F.D.A.
8      Q.     Did you report it to anyone else?
9      A.     Other than the documentation that's here,
10  I didn't report it to anyone else.
11      Q.     Okay.  And you -- Just so I'm clear, you
12  never provided any treatment to Mr. Wallace for
13  Hepatitis C; correct?
14      A.     Correct.
15      Q.     And the reason you didn't provide
16  treatment was what?
17      A.     So, it depends -- Treatment for Hepatitis
18  C is typically done by hepatologists, which I'm not a
19  specialist of liver disease.
20      Q.     Okay.  Did Pharma Medica ever offer to pay
21  for any of Mr. Wallace's treatment?
22      A.     I don't know that.  I don't know if that
23  was offered or not.
24      Q.     All right.  Turning to Exhibit 3 on Page

103

1  5, is that your signature?
2      A.     It is.
3      Q.     How about on Page 8, is that also your
4  signature there?
5      A.     Yes.
6      Q.     Did you ever report adverse events for
7  other study participants?
8      A.     I don't understand the question.
9      Q.     Well, have you ever filled out an adverse
10  event report for any participant, other than
11  Mr. Wallace?
12      A.     So, this adverse event would be a severe
13  adverse event.  Any severe adverse event would follow
14  this format.  So, yes.
15      Q.     Okay.  And how many times have you
16  submitted adverse event reports?
17      A.     I don't know that I could give you a
18  number.
19      Q.     Just ball park?
20      A.     They weren't terribly common.  Perhaps one
21  to two per year.
22      Q.     Did you ever submit any adverse event
23  reports, other than for Mr. Wallace, for Hepatitis C?
24      A.     I don't recall.  I don't believe so.

104

1   Q.   Do you know, one way or the other, Dr.
2   Jordan, if any of the employees at Pharma Medica
3   during the time of the study that we're here about
4   today, if any of the employees had Hepatitis C?  Do
5   you know, one way or the other?
6   A.   I do not know.
7   Q.   And that same would be true for the other
8   study that we're here about today, too; right?
9   A.   Correct.
10   Q.   After Mr. Wallace was diagnosed with
11   Hepatitis C, did Pharma Medica do anything to screen
12   or test the Pharma Medica employees, or any other
13   participants in the study?
14   A.   No.  I will say not to my knowledge.
15   Q.   Okay.  If you could turn to Exhibit No. 4,
16   the West-Ward adverse event report?
17   A.   Uh-huh.
18   Q.   I think you've already told us this is the
19   study that also relates to Mr. Wallace; correct?  I'm
20   sorry.  It's the adverse event report that relates to
21   Mr. Wallace?
22   A.   Yes.
23   Q.   Right?  On Page Bates numbered 431, down
24   at the bottom where it says other remarks, it says,

105

1   438, this is a three-page memo or e-mail that was
2   written by Mr. Wallace that was attached to the
3   West-Ward adverse event report.  But I want you to
4   read through that, if you need to, and tell me if
5   there is anything in there that you disagree with?
6   And if so, just blurt it out as you're reading.
7   A.   I actually authored a reply to this to
8   Salus IRB.
9   Q.   Okay.  And is that in that stack of
10   documents that you reviewed before the deposition?
11   A.   I don't know.
12   Q.   Okay.  And you shared that reply to Salus
13   IRB?
14   A.   So, Salus IRB, they're in charge of
15   subject safety.  So, if a subject complains to them,
16   it's my job to respond to the complaint.  So I did
17   provide a written response to the IRB regarding that.
18   Q.   And you sent it to the IRB?
19   A.   Uh-huh.
20   Q.   Yes?
21   A.   Yes.
22   Q.   Okay.  Go ahead.  Go ahead and read
23   through what Mr. Wallace wrote, and tell me what you
24   disagree with?

107

1   "Investigator's assessment of causality:  The
2   increased AST and ALT levels, and Hepatitis C are
3   unlikely related to the study drug."  Do you see
4   that?
5   A.   Yes.
6   Q.   Did you write that?
7   MS. DREW:  I'm going to object to
8   the form of the question because she's already
9   testified that Exhibit 4 was authored by the sponsor.
10   Subject to that, you can go ahead
11   and answer, if you know.
12   A.   So, I assessed the AEs.  And on our AE
13   form, I assessed that the causality was unlikely.
14   Q.   (BY MR. WENDLER)  Okay.  And what you
15   meant by that is you don't feel there was anything in
16   the drug itself that Mr. Wallace was testing as a
17   participant that caused Hepatitis C; correct?
18   A.   Correct.
19   Q.   Okay.  And the reason I ask you about this
20   is it says, "Investigator's assessment."  And you
21   were the investigator that is being referenced here;
22   correct?
23   A.   Yes.
24   Q.   Okay.  All right.  If you turn to Page

106

1   A.   Well, probably -- He says we did not
2   bother to tell him his labs were off.  We had made
3   several attempts to contact him about it, his labs.
4   Q.   Okay.  Keep going.
5   A.   I would be surprised if Israa told him, if
6   he said he had symptoms, that Israa would say, 'No,
7   just come back.'
8   Q.   Okay.  You said you'd be surprised.  But
9   I'm asking what you can tell me as a matter of fact
10   you know that you disagree with?
11   A.   Well, I wasn't on that phone call between
12   Israa and Mr. Wallace.  I know Israa.  I know that if
13   someone was complaining of symptoms such as, 'My head
14   hurts really bad, and I'm short of breath,' that if
15   she didn't medically know, she would contact me.
16   Q.   Okay.  And Israa is the woman you spoke
17   about earlier, but Mr. Wallace spelled I-S-S-I-A?
18   A.   Issia.  I would assume that's Israa.  We
19   don't have an Issia that worked for us.
20   Q.   And remind me what Israa's last name is?
21   A.   Diab.
22   Q.   Can you spell that?
23   A.   D-I-A-B.
24   Q.   Okay.  Keep going.  What else do you

108

```
 1   disagree with in Mr. Wallace's narrative here?
 2       A.    It was against Pharma Medica's wishes that
 3   he went to the hospital. If he was having shortness
 4   of breath, and unbearable stomach pain? Absolutely
 5   not. If you're having symptoms that are unbearable,
 6   go to the emergency room. That's completely
 7   acceptable. That would not have been against Pharma
 8   Medica's wishes.
 9             So, he said he was confused how I found
10   him there. He notified us that he was in the
11   hospital.
12       Q.    How do you know that?
13       A.    When I look here -- Here I go. Stacey
14   documented, "Spoke with subject at 8:55. He stated
15   he was admitted to the hospital yesterday afternoon,
16   June 26th." So he told our study coordinator that he
17   had been admitted.
18       Q.    What page were you referring to? What's
19   the Bate's number on there?
20       A.    This one? It's PMRI 00328.
21       Q.    Okay. Go ahead. Back to Mr. Wallace's
22   narrative, what else do you disagree with?
23       A.    So, I would just state that I introduced
24   myself to the people who came into the room so there
                                                        109
```

```
 1   was no confusion that I was a family member, or
 2   something; that they would know why I was there so
 3   that they would know if they didn't want to say
 4   something in front of me, that they could ask me to
 5   leave; that I didn't want to misrepresent who I was.
 6       Q.    So you don't disagree with the statement
 7   that she introduced herself to a couple NPs who came
 8   into the room as the study doctor. You don't
 9   disagree with that; am I right?
10       A.    I did introduce myself.
11       Q.    So you don't disagree?
12       A.    Correct. I don't disagree.
13       Q.    I'm just asking what in this narrative you
14   disagree with?
15       A.    Okay.
16       Q.    So keep going, please?
17       A.    I would say that I was --- I am surprised
18   that they would discharge him from the hospital, if
19   he was so sick that he had to go back to the
20   emergency room.
21       Q.    Okay. You don't disagree with that?
22       A.    No, I wasn't there.
23       Q.    You're just surprised; right?
24       A.    I wasn't there --
                                                        110
```

```
 1       Q.    Okay.
 2       A.    -- to assess his discharge.
 3       Q.    What else do you disagree with?
 4       A.    I know Stacey. I worked with her for
 5   years. I have not witnessed her cussing at subjects,
 6   and telling them that they probably shot heroin.
 7       Q.    What's Stacey's last name?
 8       A.    Miner, M-I-N-E-R.
 9       Q.    Okay. Again, that's something that you
10   don't disagree with, you just find hard to believe?
11       A.    I mean, if I wasn't on the phone call
12   between Stacey and Mr. Wallace, I can't state what
13   happened.
14       Q.    Okay.
15       A.    However, there was a level of
16   professionalism that we don't cuss at subjects. We
17   don't accuse them of things that we don't have proof
18   of.
19       Q.    I get it. I'm just trying to speed things
20   up here to try to tell -- to have you tell me what
21   you disagree with --
22       A.    Okay.
23       Q.    -- not what you want to talk about, or
24   explain, just what you disagree with.
                                                        111
```

```
 1       A.    I disagree that we would tell him we would
 2   have no conversations with him until he's released
 3   hospital records.
 4       Q.    And where do you see that on Page 2?
 5       A.    00439. It's, "I was really upset. She
 6   said, 'Ian, we will have no further interventions
 7   with you, or conversations until you have released
 8   hospital records to us. Good-bye.'"
 9       Q.    He's not referencing something you said
10   there. Do you agree with that?
11       A.    Correct. I agree. I doubt Stacey would
12   call him a liar. So, I disagree that she accused him
13   of lying.
14             I think there's other sources of Hepatitis
15   C. So, when it says the doctors at all hospitals
16   agreed it was acute Hepatitis C, I do agree with
17   that. And due to clean Hepatitis C on paperwork for
18   weeks before at screening Pharma Medica, that the
19   most likely source of infection from a dirty needle.
20   There is other sources of Hepatitis C exposure. We
21   don't use dirty needles. I would disagree that
22   Pharma Medica uses dirty needles.
23             I would disagree that Louis said, 'I'll
24   make you deal.' He didn't make deals with people.
                                                        112
```

1    Pharma Medica does supply lab work, upon
2    request, but there is proper procedures that have to
3    be taken. So, if someone shows up and says, 'I want
4    my records,' you have to fill out a form. It goes to
5    QA. They're not released until the study is over.
6    So, that wouldn't typically -- If someone walked in,
7    and said, 'Give me my records,' that wouldn't be the
8    case.
9        Q.    All right. So Mr. Wallace could get any
10   of his records from Pharma Medica by filling out the
11   form --
12       A.    You could.
13       Q.    -- and going through proper channels?
14       A.    You could request what records, yes. You
15   could request your lab results.
16       Q.    Okay. For any of the studies?
17       A.    Uh-huh.
18       Q.    Yes?
19       A.    You could request your lab results for the
20   studies, yes.
21       Q.    Okay. And Pharma Medica would produce
22   those, provided that proper paperwork is filled out;
23   correct?
24       A.    Correct.

113
May Reporting Service

1    report of the expert that we hired in this case?
2        A.    No, I don't think --
3        Q.    Okay. Let me have you take a look at that
4    real quick. We'll mark this as Exhibit 5.
5                    (Whereupon, Plaintiff's
6                    Exhibit No. 5 was marked
7                    for identification by the
8                    court reporter.)
9        Q.    (BY MR. WENDLER) And I would like you to
10   read through that, and tell me what parts, if
11   anything, of that you agree with, starting with --
12   You don't need to read his background and
13   credentials. But in the narrative section starting
14   on Page 2?
15              MS. DREW: I'm going to instruct her
16   not to answer. She has not reviewed any of the
17   medical records that he has reviewed in this case.
18   She's not being presented as an expert witness. And
19   I'm instructing her not to answer.
20              MR. WENDLER: You can't instruct her
21   not to answer unless you're claiming a privilege.
22              MS. DREW: You're asking for expert
23   testimony.
24              MR. WENDLER: Again, unless you're

115

1        Q.    Okay. Anything else you disagree with in
2    Mr. Wallace's narrative there?
3        A.    When it says the doctors aren't sure if
4    the study drug was part of the reason, and I -- I
5    don't believe that the study drug caused his
6    Hepatitis C.
7        Q.    Okay.
8        A.    So I would disagree that the doctors
9    aren't sure if the study drug is part of the reason.
10       Q.    Anything else that you disagree with?
11       A.    I believe I agree with the rest of it.
12       Q.    Okay. Did Mr. Wallace ever tell you
13   anything that would cause you to think he got
14   Hepatitis C from something else, other than a dirty
15   needle at Pharma Medica?
16       A.    He -- I did talk to him about other
17   sources. He did deny them.
18       Q.    Okay. So, he didn't tell you anything
19   that would cause you to think he got Hepatitis C from
20   a source, other than from Pharma Medica; am I
21   correct?
22       A.    I'm not assuming he got it from Pharma
23   Medica. But other than that, yes, it's correct.
24       Q.    Okay. Have you ever seen, Dr. Jordan, the

114
May Reporting Service

1    claiming privilege, you cannot instruct her not to
2    answer the question. That's the rules.
3        Q.    (BY MR. WENDLER) So, go ahead and read
4    through the narrative section, and tell me if you
5    disagree with anything that that expert wrote?
6        A.    I would say I have not reviewed any of the
7    documents that he's listed.
8        Q.    And that's -- I understand that. I'm not
9    suggesting that you have.
10       A.    I can read the narrative, but I feel like
11   I'm at a disadvantage when I have not reviewed any of
12   the background --
13              MS. DREW: Doctor --
14       A.    -- that he has.
15              MS. DREW: Doctor, if you can't
16   comment, one way or the other, that's a perfectly
17   appropriate answer.
18       A.    Okay.
19              MS. DREW: You don't have to give an
20   answer, and say what you agree or disagree with since
21   you've already established in direct testimony that
22   you're not an expert in Hepatitis C.
23       A.    I am not an expert. And he's had 27 items
24   of review that I've not reviewed.

116
May Reporting Service

**Page 117**

1    Q.  (BY MR. WENDLER) Okay. And I -- I am not
2 suggesting that you have reviewed it. I just want to
3 know if there is anything in the expert's report that
4 he says that you say, 'I know that's wrong.'
5        MS. DREW: Objection.
6    Q.  (BY MR. WENDLER) Without reading the
7 records, without reviewing anything --
8        MS. DREW: Object to the form of the
9 question.
10    Q.  (BY MR. WENDLER) -- If you can tell me
11 something that he wrote that ---
12        MS. DREW: Object to the form of the
13 question; speculation.
14        MR. WENDLER: Would you let me
15 finish, please?
16        MS. DREW: Sure.
17    Q.  (BY MR. WENDLER) I want to know if there
18 is something he wrote that you, as you sit here
19 today, without reading any of the records, without
20 reviewing anything that he's looked at, that you can
21 tell me that you say, 'I know he's wrong.' That's
22 all I'm asking?
23        MS. DREW: Object to the form of the
24 question; calls for speculation; calls for improper

**Page 118**

1 medical testimony, and expert testimony.
2    Q.  (BY MR. WENDLER) Go ahead.
3    A.  **I would say this is seven pages with a lot**
4 **of detail that I can't specifically --**
5    Q.  I'm just asking you about the narrative,
6 the narrative section.
7    A.  **Well, when I look at this, "Mr. Wallace**
8 **screened at Spaulding Medical on May 18 and 22nd." I**
9 **don't know that to be true. Is it incorrect? I**
10 **don't know that it's incorrect, but I don't have**
11 **information to know that that's true.**
12    Q.  And that's what I'm getting at. If there
13 is something in here that you know is incorrect, I'm
14 not asking you that you agree with everything else.
15 I'm just saying, read this, and tell me if there is
16 something in here that you know is incorrect. Not
17 necessarily that you agree with everything else he
18 wrote?
19        MS. DREW: Well --
20    A.  **Well, I don't know that he screened at**
21 **Spaulding so I can't say that -- that I know to be**
22 **true. I don't know that to be true.**
23        MS. DREW: I'm going to object to
24 this.

**Page 119**

1    Q.  (BY MR. WENDLER) Again, therefore, you
2 cannot say it's incorrect or correct? And I don't
3 care about that. What I want to know is if there is
4 something that he wrote that you say, 'I know that is
5 incorrect.' Tell me what it is?
6        MS. DREW: You know what? I'm going
7 to object to the question. I'm going to instruct her
8 not to answer. And you can take it up with the
9 judge. Certify the question. Go for it.
10    Q.  (BY MR. WENDLER) Well, are you going to
11 refuse to answer this question?
12    A.  **I'm going to follow my -- the advice of my**
13 **attorney.**
14    Q.  Okay. And therefore, not answer the
15 question?
16    A.  **Yes, I will not answer the question.**
17        MR. WENDLER: Okay. The questions
18 will be certified. And that would include all the
19 questions relative to the narrative section of Dr.
20 Hull's report.
21    Q.  (BY MR. WENDLER) How about in the
22 Hepatitis C section, can you go there, starting on
23 Page 3? Bottom of Page 3?
24        MS. DREW: Same objections. She's

**Page 120**

1 already testified that she's not an expert in
2 Hepatitis, and asking her to speculate in a field
3 that she's not trained in is inappropriate. It's an
4 improper question. It's asking for expert testimony.
5 And I'm going to instruct her not to answer.
6    Q.  (BY MR. WENDLER) Are you again not going
7 to answer the question based on the advice of --
8    A.  **Correct.**
9    Q.  -- Ms. Drew?
10    A.  **I am not going to answer based on the**
11 **advice of my attorney.**
12    Q.  Okay. And just so we're clear, if I take
13 this up with the judge, and the judge says you have
14 to come back here and answer these questions, and
15 maybe pay my attorney's fees for having to come back
16 here to do that, you're willing to take that risk?
17        MS. DREW: Brian, I am the one
18 that's willing to take that risk.
19        MR. WENDLER: I'm not talking to
20 you. I'm talking to her.
21        MS. DREW: She is my client. You do
22 not talk to her. You talk to her through me. I am
23 representing her. She is a former employee. If you
24 want to violate ethical rules, go ahead and talk to

```
 1    my client directly.
 2         MR. WENDLER:  Teri, all I'm saying
 3    is when I ask her a question, I don't want an answer
 4    from you.  You can object all you want.  I want
 5    answers from her, or you tell me she's not going to
 6    answer.
 7         MS. DREW:  She doesn't have to
 8    answer about who's going to take care of any
 9    attorney's fees.  She's being represented through her
10    capacity as a former employee of Pharma Medica.
11    Trying to infer that she personally is responsible
12    for fees is inappropriate, and you know that.
13         MR. WENDLER:  I don't know where
14    you're even coming from on this because there's a lot
15    of inappropriateness going on here, but it's not from
16    my end.
17         Q.    (BY MR. WENDLER)  But anyway, back to the
18    report, Hepatitis C section, ma'am, you're not going
19    to answer any questions about whether you disagree
20    with that; am I correct?
21         A.    Correct.
22         Q.    And you're not going to tell me if the
23    statement, Hepatitis C is a disease of the liver
24    caused by the Hepatitis C virus?  You won't tell me
                                                    121
```

```
 1    if you agree or disagree with that?
 2         MS. DREW:  I instruct the witness
 3    not to answer.
 4         MR. WENDLER:  Okay.  Certify that
 5    entire section of questions on the Hepatitis C
 6    section.
 7         Q.    (BY MR. WENDLER)  Moving onto the
 8    discussion section.  Again, I would ask that you read
 9    through that, and tell me if there is anything in
10    there that you disagree with that Dr. Hull wrote?
11         MS. DREW:  I am going to instruct
12    Dr. Jordan not to answer the question.  It's an
13    inappropriate question, and asks her to assume
14    evidence that she does not have.  It causes her to
15    speculate.  And it's improper trying to get her to
16    comment as a medical provider who's already testified
17    her area of expertise is not Hepatitis, to comment on
18    an expert who's basing his opinions, discussions on
19    records that Dr. Jordan has not had an opportunity to
20    review, evaluate, and/or consider.
21         Therefore, I'm instructing her not
22    to answer.
23         Q.    (BY MR. WENDLER)  And again, you're not
24    going to answer based on the advice of Ms. Drew?
                                                    122
```

```
 1         A.    Correct.
 2         Q.    All right.
 3         MR. WENDLER:  Again, certify that
 4    section of questions on the discussion section.
 5         Q.    (BY MR. WENDLER)  Then finally on the
 6    conclusions section, Dr. Jordan, Dr. Hull has listed
 7    three opinions there.  Can you read through those
 8    opinions, and tell me if you agree or disagree with
 9    those conclusions that he --- that is there in the
10    conclusion section?
11         MS. DREW:  Same objections as
12    before.  And I'm instructing her not to answer.
13         Q.    (BY MR. WENDLER)  And again, are you not
14    going to answer based on the advice of --
15         A.    Yeah.
16         Q.    -- Ms. Drew?
17         A.    Yes.
18         Q.    Okay.
19                   (Whereupon, Plaintiff's
20                   Exhibit No. 6 was marked
21                   for identification by the
22                   court reporter.)
23         Q.    (BY MR. WENDLER)  Handing you Exhibit No.
24    6, ma'am, this is Defendant's Second Supplemental
                                                    123
```

```
 1    Rule 26 (a)(1) Disclosures.  Do you see that?
 2         A.    Yes.
 3         Q.    Okay.  I'm going to ask you what these
 4    people did at Pharma Medica, to your knowledge.
 5    Okay?
 6         A.    Uh-huh.
 7         Q.    What does a group leader do?
 8         A.    A group leader would typically be a
 9    supervisor of the clinical area.
10         Q.    Supervisor of the what?
11         A.    Of the clinical area.  So ---
12         Q.    And the clinical area would be the area
13    where blood is drawn?
14         A.    Yes.
15         Q.    What other areas would that include, if
16    any?
17         A.    That would be the clinic.  They would
18    supervise the phlebotomy staff.  They would supervise
19    the sample processing.  And they would be in the
20    clinic as a supervisor.
21         Q.    Okay.  Starting on Page 2, there are
22    number of people listed here.  Dr. Khan,
23    Mr. Yahmiahi.  And then it carries over to the next
24    page.  All of the persons that are listed with
                                                    124
```

**Page 125**

1  Canadian addresses, can you tell me what they did at
2  Pharma Medica in St. Charles while you were there,
3  starting with Dr. Khan?
4       A.   So, Dr. Khan was the vice-president of
5  clinical operations. So, he would help in designing
6  the study to make sure that all of the protocol
7  requirements were met.
8       Q.   And how often was he actually at the St.
9  Charles facility when you were in charge there?
10      A.   It would depend on the nature of the
11 study. If it was a more complex study, he would be
12 more likely to come down and stay.
13      Q.   How about for Study No. 1 in this case,
14 was he involved in that?
15      A.   I don't recall that he was.
16      Q.   How about Study No. 2, was Dr. Khan
17 involved in that?
18      A.   I do not recall that he was.
19      Q.   All right. Do you know if he, Dr. Khan,
20 had any involvement in either of the studies, 1 or
21 Study 2, that are involved in this case?
22      A.   He would have to read the protocols.
23      Q.   Uh-huh.
24      A.   He would've communicated with Louis any

**Page 126**

1  specifics as far as clinic set-up, or staffing. But
2  he didn't have -- I don't know what else he would've
3  done on the studies, besides that. He was in Canada
4  for those, I believe.
5       Q.   Mr. Yamlahi, what did he do in Study 1 or
6  Study 2?
7       A.   So, Latifa is the clinical trial director.
8  She is available for consultation, if there's any
9  clinical trial questions. But she was not present
10 for the study.
11      Q.   For either one?
12      A.   Correct.
13      Q.   All right. Mr. Bouhajib?
14      A.   He is in the charge of the bio analytical
15 lab in Canada.
16      Q.   Did he have any involvement in Study 1 or
17 Study 2?
18      A.   I'd have to -- If Pharma Medica did the
19 sample processing, then he would've been in charge of
20 how the samples were analyzed in Canada.
21      Q.   Okay. So he was not part of the study as
22 it took place in St. Charles, Missouri; correct?
23      A.   Correct.
24      Q.   All right. How about -- The next one is

**Page 127**

1  Mr. or Mrs Mehan; is that it?
2       A.   Arun is a protocol writer.
3       Q.   Did he have anything to do with Study One
4  or Study Two in St. Charles?
5       A.   No. He lives in Canada.
6       Q.   Mr. Markus, did he have anything to do
7  with Study 1 or Study 2?
8       A.   I don't believe he worked at Pharma Medica
9  at the time.
10      Q.   Okay. Next is Armando Desousa. Did he
11 have anything to do with the Study 1 or Study 2 in
12 this case?
13      A.   No.
14      Q.   Next we have Louis Co. You talked about
15 him a little earlier. But did he have anything to do
16 with the study?
17      A.   So, he was our senior director of clinical
18 operations. So, he would be working with Shabaz to
19 make certain that the study was planned out such that
20 we knew how many blood draw tables, we had all the
21 supplies that were required, and the staff that was
22 required.
23      Q.   Okay. The staff would include the
24 phlebotomists, and the interns?

**Page 128**

1       A.   As well as the group leads, and the
2  paramedics.
3       Q.   Okay. And is he the one that you said now
4  works for a different pharmaceutical-testing
5  facility?
6       A.   Yes.
7       Q.   Do you know how to reach him? Do you have
8  his phone number, or anything like that?
9       A.   I do have his phone number.
10      Q.   Can you give it to us, please?
11      A.   I don't -- It's in my phone. Do you want
12 me to --
13           Is that okay?
14           MS. DREW:  Uh-huh.
15      A.   Is it not listed in this paper here?
16      Q.   (BY MR. WENDLER) It's listed as Pharma
17 Medica. Well, maybe not.
18      A.   That's not Pharma Medica's number.
19           MS. DREW:  No.
20      Q.   (BY MR. WENDLER) That is his correct
21 number there?
22      A.   I don't know. I would assume that it is.
23      Q.   Can you compare it to your number, and let
24 us know?

```
 1                  (Whereupon, an off the
 2                  record discussion was
 3                  held, which by direction
 4                  was not stenographically
 5                  reported.)
 6      A.    I do have a different number.
 7      Q.    (BY MR. WENDLER)  Okay.  What do you have?
 8      A.    647-621-5580.
 9      Q.    Okay.  I'm looking to see if there are any
10  other Canadians on the list.  And I don't see any.
11  Okay.
12            On the list there is a job title called
13  sub-investigator.  For example, Sharon McGlorn?
14      A.    Uh-huh.
15      Q.    What did the sub-investigator do at Pharma
16  Medica?
17      A.    So, a sub-investigator was like an
18  extension of myself.  So, they would assist with
19  check-ins.  They would assist with monitoring the
20  dosings.  Occasionally they would be on-call.  And
21  they were able to assess screening, post-study labs,
22  and DCGs, as required.
23      Q.    By the way, are you still on the payroll
24  at Pharma Medica at all?
                                              129
```

```
 1      A.    I am.
 2      Q.    And in what capacity?
 3      A.    In terms of a severance.
 4      Q.    Terms of a severance?
 5      A.    Uh-huh.
 6      Q.    Yes?
 7      A.    Yes.
 8      Q.    Okay.  And tell me your understanding of
 9  the severance package that you got?
10      A.    My understanding was in return for my
11  assistance to help with the close-out activities of
12  the site, I would be compensated with six months of
13  salary.
14      Q.    Okay.  And the close-out activities of the
15  site, would that include participate in the defense
16  of this case?
17      A.    They were not specified.  The main things,
18  as far as close-out of the site, were study
19  documents, and study drugs.
20      Q.    Okay.
21      A.    To get them out of the building.
22      Q.    Okay.  Do you have a written severance
23  agreement, or a severance contract with Pharma
24  Medica?
                                              130
```

```
 1      A.    I have a letter of severance.
 2      Q.    Okay.  Was there ever any discussion, or
 3  anything in the severance letter that relates to you
 4  cooperating in the defense of this lawsuit?
 5      A.    No.
 6      Q.    That was never discussed?
 7      A.    No.
 8      Q.    Did you show up here today just
 9  voluntarily?
10      A.    Yes.
11      Q.    Okay.  And you're not being paid for your
12  time here today?
13      A.    Not specific.  I mean, the severance did
14  not list this.  So, I'm not being compensated in any
15  other way.
16      Q.    Okay.  Was it your understanding that you
17  had to show up here as part of your severance
18  agreement?
19      A.    No.
20      Q.    So you're just here voluntarily, free of
21  charge, as far you're concerned?
22      A.    Yes.
23      Q.    Okay.  Do you know, are you eligible for a
24  rehire at Pharma Medica?
                                              131
```

```
 1      A.    They don't have a location in St. Louis.
 2  I would imagine I would be eligible for rehire.  I
 3  can't speak to that.  I don't know what my file is
 4  labeled in Canada.
 5      Q.    Okay.  So, you have a severance payment
 6  that you are receiving from Pharma Medica.  You said
 7  six months worth of pay?
 8      A.    Yes.
 9      Q.    Do you also get a pension of any sort from
10  Pharma Medica?
11      A.    No.
12      Q.    Your only compensation from Pharma Medica
13  that you're getting as of today is the severance
14  payment; correct?
15      A.    Correct.
16      Q.    Do you have anything like a retirement,
17  IRA, or anything that?
18      A.    Nothing from Pharma Medica.
19      Q.    Okay.  Are there any companies affiliated
20  with Pharma Medica that have provided a severance, or
21  retirement, or IRA, or 401(k) package for you?
22      A.    Are you asking about my personal
23  retirement income?
24            MS. DREW:  No.
                                              132
```

| | |
|---|---|
| 1    Q.    (BY MR. WENDLER)  If it's affiliated with | 1    Q.    Okay.  And you don't know if there was a |
| 2  Pharma Medica? | 2  study monitoring paramedic present during Study 1, or |
| 3    A.    No.  No. | 3  during Study 2; am I correct? |
| 4    Q.    That's what I'm asking about? | 4    A.    I've not seen the -- You know, I don't |
| 5    A.    No. | 5  have access to the staffing list of who was there -- |
| 6    Q.    And the only reason I'm asking is some | 6    Q.    It's right there in front of you. |
| 7  companies have shell corporations where they -- | 7    A.    -- that day. |
| 8    A.    Not to my knowledge, no. | 8    Q.    As far as who was there that day?  Okay. |
| 9    Q.    That's not the case here?  Okay. | 9    A.    Yeah.  So if you're asking me who was in |
| 10    Screening receptionist, what does a | 10  the clinic those days, I don't know who was in the |
| 11  screening receptionist do at Pharma Medica? | 11  clinic.  Is it routine that we had a paramedic there? |
| 12    A.    A screening receptionist?  She would, when | 12  Yes.  We commonly had paramedics, or nurses, or |
| 13  someone comes in the building, she would confirm who | 13  someone who is medically trained who could respond in |
| 14  they were, verify their ID, confirm why they were | 14  an emergency. |
| 15  there.  And sometimes they would do an -- I don't | 15    Q.    Yeah.  That's what I'm getting at.  Was |
| 16  know that it's -- When I say sometimes, we did an | 16  there always a paramedic there? |
| 17  influenza screen on everyone.  Could that be the | 17    A.    There should be someone who was medically |
| 18  screening receptionist?  It could. | 18  trained, whether it's a paramedic paragraph or a |
| 19    Q.    That wouldn't be the person that actually | 19  nurse. |
| 20  tested the blood -- | 20    Q.    Who was in charge of making sure the |
| 21    A.    No. | 21  interns and phlebotomists did not reuse needles, if |
| 22    Q.    -- for the participants screening process? | 22  anyone? |
| 23    A.    No. | 23    A.    When they first were -- Before they worked |
| 24    Q.    How about a study monitoring paramedic, | 24  on the studies, they would do the blood-borne |
| 133 | 135 |
| May Reporting Service | May Reporting Service |

| | |
|---|---|
| 1  what do did they do? | 1  pathogen training.  They would be trained, typically, |
| 2    A.    So, that would be a paramedic who would be | 2  by the group leader staff on procedures, how to draw |
| 3  licensed through the State of Missouri who would be | 3  blood, how our procedure goes.  And then when they |
| 4  on-site in case anything medical were to happen. | 4  were drawing blood, they are responsible for their |
| 5    Q.    So, is that a requirement at -- | 5  own work.  But the group leader was typically there |
| 6    A.    Also -- | 6  at the blood draw table watching them draw blood |
| 7    Q.    Sorry. | 7  to -- |
| 8    A.    They would also participate as dosers. | 8    Q.    That's what I was getting at? |
| 9  So, they might does the subjects, as well. | 9    A.    -- confirm that they were doing it |
| 10    Q.    Were they required to be there by | 10  appropriately. |
| 11  regulations, or by law, or do you know? | 11    Q.    During the blood draw times -- |
| 12    A.    I don't know if it's a law.  But when we | 12    A.    Uh-huh. |
| 13  are dosing subjects, we want to make sure that | 13    Q.    -- who did you say was monitoring? |
| 14  they're safe.  And having medically-trained personnel | 14    A.    Typically, the group leader.  Commonly |
| 15  there at all times is important. | 15  there would be a quality control person there, as |
| 16    Q.    Were there any study monitoring paramedics | 16  well.  Sometimes a study coordinator. |
| 17  there during Study 1 or Study 2? | 17    Q.    You said typically.  Was there always |
| 18    A.    I don't have the staff list in front of | 18  someone there monitoring, and watching the |
| 19  me.  I would think that there would have been, yes. | 19  phlebotomists, and the interns during the blood draw |
| 20    Q.    Well, Caleb Conklin, C-O-N-K-L-I-N, a was | 20  process? |
| 21  one. | 21    A.    I would say the majority of the time, yes. |
| 22    A.    Caleb is a paramedic, yes. | 22    Q.    Okay.  And when you say majority, that |
| 23    Q.    Was he there during Study 1 or Study 2? | 23  could be 51 percent.  What percent -- |
| 24    A.    I don't recall. | 24    A.    I wasn't there for every blood draw.  Can |
| 134 | 136 |
| May Reporting Service | May Reporting Service |

1  I say that someone was always there?  Someone --
2  Typically, the practice is, yes, there should be a
3  supervisor there at the table monitoring the blood
4  draws to make sure they're done appropriately.
5      Q.    Okay.
6      A.    So, that was the common practice that was
7  done.
8      Q.    Okay.  But back to the question:  Do you
9  know what percentage of the time there was actually
10 someone there --
11     A.    I couldn't guess.
12     Q.    -- other than there should've been?
13     A.    I couldn't guest a percentage of the time.
14     Q.    Okay.  Okay.  Do you have any -- Let's
15 see.  Any negative marks against your medical license
16 from any medical or nursing association from any
17 state?
18     A.    No.
19     Q.    And you said you've been sued a couple
20 times before?
21     A.    Correct.
22     Q.    Do you remember the name's of the
23 Plaintiffs?
24     A.    The first one was long ago enough I don't
                                                    137

                    May Reporting Service

1  recall.
2      Q.    Where was that?
3      A.    It was in Hazelwood.
4      Q.    Okay.  And the second one?
5      A.    The second one, Melanie Tate Sacarro.
6      Q.    Where was that one?
7      A.    That was in Kansas City.
8      Q.    Z-A-C-A-R-R-O?
9      A.    S-A-C-A-R-R-O, I believe.
10     Q.    In Kansas City?
11     A.    Yes.
12     Q.    All right.  And I'm sometimes embarrassed
13 to ask this question, but I have to.  Do you have any
14 criminal record to your credit where you've pled
15 guilty, or been found guilty of a crime?
16     A.    No.
17     Q.    Including anything from a parking ticket
18 to a multiple homicide?
19           MS. DREW:  Object to the form.
20     Q.    (BY MR. WENDLER)  Anything.
21           MS. DREW:  Object to the form of the
22 question.  It's an improper question.  Felony or
23 misdemeanors that go to the issue of honesty.
24     Q.    (BY MR. WENDLER)  Go ahead.
                                                    138

                    May Reporting Service

1           MS. DREW:  You can answer as to
2  those.
3           MR. WENDLER:  No.  No.  No.  I'm not
4  limiting it to those.
5           MS. DREW:  Yeah, you are.
6           MR. WENDLER:  No, I'm not.  That's
7  not my question.  That's your question.
8      Q.    (BY MR. WENDLER)  My question is:  Do you
9  have any crimes?
10          MS. DREW:  And I'm saying, by law,
11 she doesn't have to reveal --
12          MR. WENDLER:  This is discovery.
13          MS. DREW:  -- parking tickets.
14          MR. WENDLER:  This is discovery.
15          MS. DREW:  Right.
16          MR. WENDLER:  How do I know if she
17 knows what's a felony?
18     Q.    (BY MR. WENDLER)  Just answer the
19 question, please.  If the answer is none, it's
20 simple.
21     A.    I believe I've had a speeding ticket years
22 ago.
23     Q.    Okay.  Anything else?
24     A.    No.
                                                    139

                    May Reporting Service

1      Q.    And the speeding ticket was in Missouri?
2      A.    Yes.
3      Q.    Okay.  Since this case may go to trial
4  here in the St. Louis area, do you have any relatives
5  with the last name other than Jordan?
6      A.    My maiden name is Maddex, M-A-D-D-E-X.
7      Q.    Any others, including in-laws, cousins
8  inch?
9      A.    My in-laws' last name is Jordan.  Of my
10 immediate family, I have -- My mom has a cousin who
11 lives in St. Peters, but I don't have other immediate
12 family, besides my parents, in the St. Louis area.
13     Q.    Okay.  The cousin in St. Peters?
14     A.    That last Ewalt, E-W-A-L-T.
15     Q.    And since your practice is in St. Charles,
16 you probably have a pretty wide range of patients in
17 this area.  Have you ever practiced anywhere, other
18 than in St. Charles?
19     A.    So, I've practiced in Hazelwood, Missouri.
20     Q.    By yourself?
21     A.    With Mercy Medical Group.
22     Q.    Okay.  And you were in Kansas City for a
23 while; right?
24     A.    Yes.
                                                    140

                    May Reporting Service

| | |
|---|---|
| 1     Q.    I don't need to ask about that. All | 1         * * * * * * * * |
| 2   right. I think I am just about done here. But is | 2    [Witness excused.] |
| 3   there anything else about this case, Dr. Jordan, that | 3 |
| 4   you think is important that we have not discussed? | 4 |
| 5     A.    I don't think so. I think we've talked | 5 |
| 6   about a lot. | 6 |
| 7     Q.    Okay. | 7 |
| 8       MR. WENDLER: Just one second. | 8 |
| 9             (Whereupon, an off the | 9 |
| 10              record discussion was | 10 |
| 11              held, which by direction | 11 |
| 12              was not stenographically | 12 |
| 13              reported.) | 13 |
| 14     Q.    (BY MR. WENDLER) At Anderson Hospital, | 14 |
| 15   Dr. Jordan, do you know if Louis spoke to anyone at | 15 |
| 16   the hospital, either through hearing him speak, or | 16 |
| 17   him telling you he spoke to someone? | 17 |
| 18     A.    He didn't -- I don't recall that he told | 18 |
| 19   me that he spoke to anyone. And when we were at | 19 |
| 20   Anderson Hospital, I was in the room with | 20 |
| 21   Mr. Wallace, and so I don't know what Louis was | 21 |
| 22   doing. | 22 |
| 23     Q.    But you rode road back from Maryville, | 23 |
| 24   Illinois to St. Charles with him; correct? | 24 |
|                            141 |                            143 |
| May Reporting Service | May Reporting Service |
| 1     A.    Uh-huh. | 1        COMES NOW THE WITNESS, HEATHER JORDAN, |
| 2     Q.    Yes? | 2   M.D., and having read the foregoing transcript of the |
| 3     A.    Yes. | 3   deposition taken on the 30th day of July, A.D., 2019, |
| 4     Q.    Did he say anything about any | 4   acknowledges by signature hereto that it is a true |
| 5   conversations he had when you were -- | 5   and accurate transcript of the testimony given on the |
| 6     A.    I don't recall. | 6   date hereinabove mentioned. |
| 7     Q.    -- en route back to St. Charles? You | 7 |
| 8   don't recall. | 8 |
| 9     A.    I don't recall if he did. | 9           _____ |
| 10       MR. WENDLER: That's all the | 10          HEATHER JORDAN, M.D. |
| 11   questions I have for today. But I am not closing out | 11 |
| 12   the deposition. I'm reserving the right to reconvene | 12 |
| 13   after the Court rules. | 13   Subscribed to before me this _____ day of |
| 14       MS. DREW: We're going to read and | 14   _____, 2019. |
| 15   sign. | 15 |
| 16       What that means, Doctor, is that | 16 |
| 17   when it's typed in a booklet form, I will send that | 17 |
| 18   to you. You will need to read it. There will be an | 18 |
| 19   errata sheet where you can make changes. And you'll | 19          _____ |
| 20   only have 30 days in which to make th changes, to get | 20          [Notary Public] |
| 21   that back. And that signature, errata sheet will | 21 |
| 22   also have signature page that you'll have to sign. | 22   My Commission Expires:_____ |
| 23   And you'll have to sign with a notary public. | 23 |
| 24     A.    Okay. | 24 |
|                            142 |                            144 |
| May Reporting Service | May Reporting Service |

1    I, Kimberly A. Harris, Certified Shorthand
2    Reporter and Notary Public of the County of Madison,
3    State of Illinois, do hereby certify that HEATHER
4    JORDAN, M.D. came before me on the 30th day of July,
5    A.D., 2019, at the offices of Hinshaw & Culbertson
6    LLp, 701 Market Street, Suite 1375, St. Louis,
7    Missouri, 63101, and swore before me to testify to
8    the truth, the whole truth, and nothing but the truth
9    regarding her knowledge touching upon the matter in
10    controversy.
11    I do further certify that I did take
12    stenographic notes of the questions propounded to
13    said witness and her answers thereto and that said
14    notes were afterwards transcribed by computer-aided
15    transcription under my direction and supervision. I
16    do further certify that the attached and foregoing is
17    a true, correct, and complete copy of my notes and
18    that said testimony is now herewith returned.
19    Dated this 10th of September, A.D., 2019,
20    and given under my hand and seal.
21
22
23    ----------------------------------------
24    KIMBERLY A. HARRIS, CSR
                                              146

May Reporting Service

1    not to answer unless you're claiming a privilege.
2    MS. DREW: You're asking for expert
3    testimony.
4    MR. WENDLER: Again, unless you're
5    claiming privilege, you cannot instruct her not to
6    answer the question. That's the rules.
7    Q.    (BY MR. WENDLER) So, go ahead and read
8    through the narrative section, and tell me if you
9    disagree with anything that that expert wrote?
10    A.    I would say I have not reviewed any of the
11    documents that he's listed.
12    Q.    And that's -- I understand that. I'm not
13    suggesting that you have.
14    A.    I can read the narrative, but I feel like
15    I'm at a disadvantage when I have not reviewed any of
16    the background --
17    MS. DREW: Doctor --
18    A.    -- that he has.
19    MS. DREW: Doctor, if you can't
20    comment, one way or the other, that's a perfectly
21    appropriate answer.
22    A.    Okay.
23    MS. DREW: You don't have to give an
24    answer, and say what you agree or disagree with since
                                              147

May Reporting Service

1
2    COURT REPORTER'S CERTIFICATION OF CERTIFIED QUESTIONS
3
4    I, Kimberly A. Harris, Certified Shorthand
5    Reporter, do hereby certify that the following
6    questions appearing on said pages were asked as shown
7    in my stenographic notes. I further certify that
8    said questions in the following proceedings is true
9    and correct.
10
11    * * * * * * * * *
12    PAGE 115  LINE 10
13    Q.    (BY MR. WENDLER) And I would like you to
14    read through that, and tell me what parts, if
15    anything, of that you agree with, starting with --
16    You don't need to read his background and
17    credentials. But in the narrative section starting
18    on Page 2?
19    MS. DREW: I'm going to instruct her
20    not to answer. She has not reviewed any of the
21    medical records that he has reviewed in this case.
22    She's not being presented as an expert witness. And
23    I'm instructing her not to answer.
24    MR. WENDLER: You can't instruct her
                                              146

May Reporting Service

1    you've already established in direct testimony that
2    you're not an expert in Hepatitis C.
3    A.    I am not an expert. And he's had 27 items
4    of review that I've not reviewed.
5    Q.    (BY MR. WENDLER) Okay. And I -- I am not
6    suggesting that you have reviewed it. I just want to
7    know if there is anything in the expert's report that
8    he says that you say, 'I know that's wrong.'
9    MS. DREW: Objection.
10    Q.    (BY MR. WENDLER) Without reading the
11    records, without reviewing anything --
12    MS. DREW: Object to the form of the
13    question.
14    Q.    (BY MR. WENDLER) -- If you can tell me
15    something that he wrote that --
16    MS. DREW: Object to the form of the
17    question; speculation.
18    MR. WENDLER: Would you let me
19    finish, please?
20    MS. DREW: Sure.
21    Q.    (BY MR. WENDLER) I want to know if there
22    is something he wrote that you, as you sit here
23    today, without reading any of the records, without
24    reviewing anything that he's looked at, that you can
                                              148

May Reporting Service

1  tell me that you say, 'I know he's wrong.' That's
2  all I'm asking?
3          MS. DREW:  Object to the form of the
4  question; calls for speculation; calls for improper
5  medical testimony, and expert testimony.
6      Q.    (BY MR. WENDLER)  Go ahead.
7      A.    I would say this is seven pages with a lot
8  of detail that I can't specifically ---
9      Q.    I'm just asking you about the narrative,
10  the narrative section.
11     A.    Well, when I look at this, "Mr. Wallace
12  screened at Spaulding Medical on May 18 and 22nd." I
13  don't know that to be true. Is it incorrect? I
14  don't know that it's incorrect, but I don't have
15  information to know that that's true.
16     Q.    And that's what I'm getting at. If there
17  is something in here that you know is incorrect, I'm
18  not asking you that you agree with everything else.
19  I'm just saying, read this, and tell me if there is
20  something in here that you know is incorrect. Not
21  necessarily that you agree with everything else he
22  wrote?
23          MS. DREW:  Well --
24     A.    Well, I don't know that he screened at
                                                    149

1  Spaulding so I can't say that --- that I know to be
2  true. I don't know that to be true.
3          MS. DREW:  I'm going to object to
4  this.
5      Q.    (BY MR. WENDLER)  Again, therefore, you
6  cannot say it's incorrect or correct? And I don't
7  care about that. What I want to know is if there is
8  something that he wrote that you say, 'I know that is
9  incorrect.' Tell me what it is?
10          MS. DREW:  You know what? I'm going
11  to object to the question. I'm going to instruct her
12  not to answer. And you can take it up with the
13  judge. Certify the question. Go for it.
14     Q.    (BY MR. WENDLER)  Well, are you going to
15  refuse to answer this question?
16     A.    I'm going to follow my -- the advice of my
17  attorney.
18     Q.    Okay. And therefore, not answer the
19  question?
20     A.    Yes, I will not answer the question.
21          MR. WENDLER:  Okay. The questions
22  will be certified. And that would include all the
23  questions relative to the narrative section of Dr.
24  Hull's report.
                                                    150

1          * * * * * * * *
2          PAGE 119   LINE 22
3      Q.    (BY MR. WENDLER)  How about in the
4  Hepatitis C section, can you go there, starting on
5  Page 3? Bottom of Page 3?
6          MS. DREW:  Same objections. She's
7  already testified that she's not an expert in
8  Hepatitis, and asking her to speculate in a field
9  that she's not trained in is inappropriate. It's an
10  improper question. It's asking for expert testimony.
11  And I'm going to instruct her not to answer.
12     Q.    (BY MR. WENDLER)  Are you again not going
13  to answer the question based on the advice of ---
14     A.    Correct.
15     Q.    -- Ms. Drew?
16     A.    I am not going to answer based on the
17  advice of my attorney.
18     Q.    Okay. And just so we're clear, if I take
19  this up with the judge, and the judge says you have
20  to come back here and answer these questions, and
21  maybe pay my attorney's fees for having to come back
22  here to do that, you're willing to take that risk?
23          MS. DREW:  Brian, I am the one
24  that's willing to take that risk.
                                                    151

1          MR. WENDLER:  I'm not talking to
2  you. I'm talking to her.
3          MS. DREW:  She is my client. You do
4  not talk to her. You talk to her through me. I am
5  representing her. She is a former employee. If you
6  want to violate ethical rules, go ahead and talk to
7  my client directly.
8          MR. WENDLER:  Teri, all I'm saying
9  is when I ask her a question, I don't want an answer
10  from you. You can object all you want. I want
11  answers from her, or you tell me she's not going to
12  answer.
13          MS. DREW:  She doesn't have to
14  answer about who's going to take care of any
15  attorney's fees. She's being represented through her
16  capacity as a former employee of Pharma Medica.
17  Trying to infer that she personally is responsible
18  for fees is inappropriate, and you know that.
19          MR. WENDLER:  I don't know where
20  you're even coming from on this because there's a lot
21  of inappropriateness going on here, but it's not from
22  my end.
23     Q.    (BY MR. WENDLER)  But anyway, back to the
24  report, Hepatitis C section, ma'am, you're not going
                                                    152

| | |
|---|---|
| 1 to answer any questions about whether you disagree | 1   A.   **Yeah.** |
| 2 with that; am I correct? | 2   Q.   -- Ms. Drew? |
| 3   A.   **Correct.** | 3   A.   **Yes.** |
| 4   Q.   And you're not going to tell me if the | 4   Q.   Okay. |
| 5 statement, Hepatitis C is a disease of the liver | 5   * * * * * * * * |
| 6 caused by the Hepatitis C virus?  You won't tell me | 6 |
| 7 if you agree or disagree with that? | 7 |
| 8        MS. DREW:  I instruct the witness | 8 |
| 9 not to answer. | 9 |
| 10        MR. WENDLER:  Okay.  Certify that | 10 |
| 11 entire section of questions on the Hepatitis C | 11 |
| 12 section. | 12 |
| 13        * * * * * * * * | 13 |
| 14        PAGE 122   LINE 8 | 14 |
| 15   Q.   (BY MR. WENDLER)  Moving onto the | 15 |
| 16 discussion section.  Again, I would ask that you read | 16 |
| 17 through that, and tell me if there is anything in | 17 |
| 18 there that you disagree with that Dr. Hull wrote? | 18 |
| 19        MS. DREW:  I am going to instruct | 19 |
| 20 Dr. Jordan not to answer the question.  It's an | 20 |
| 21 inappropriate question, and asks her to assume | 21 |
| 22 evidence that she does not have.  It causes her to | 22 |
| 23 speculate.  And it's improper trying to get her to | 23 |
| 24 comment as a medical provider who's already testified | 24 |
| 153 | 155 |
| May Reporting Service | May Reporting Service |

| | |
|---|---|
| 1 her area of expertise is not Hepatitis, to comment on | |
| 2 an expert who's basing his opinions, discussions on | |
| 3 records that Dr. Jordan has not had an opportunity to | |
| 4 review, evaluate, and/or consider. | |
| 5        Therefore, I'm instructing her not | |
| 6 to answer. | |
| 7   Q.   (BY MR. WENDLER)  And again, you're not | |
| 8 going to answer based on the advice of Ms. Drew? | |
| 9   A.   **Correct.** | |
| 10   Q.   All right. | |
| 11        MR. WENDLER:  Again, certify that | |
| 12 section of questions on the discussion section. | |
| 13        * * * * * * * * | |
| 14        PAGE 123   LINE 6 | |
| 15   Q.   (BY MR. WENDLER)  Then finally on the | |
| 16 conclusions section, Dr. Jordan, Dr. Hull has listed | |
| 17 three opinions there.  Can you read through those | |
| 18 opinions, and tell me if you agree or disagree with | |
| 19 those conclusions that he -- that is there in the | |
| 20 conclusion section? | |
| 21        MS. DREW:  Same objections as | |
| 22 before.  And I'm instructing her not to answer. | |
| 23   Q.   (BY MR. WENDLER)  And again, are you not | |
| 24 going to answer based on the advice of -- | |
| 154 | |
| May Reporting Service | |